**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-01964-JLK-NYW

KELSEY OLDERSHAW, ELINA NAVARRO, JANE STANT, AND JAYMIE STEVENS

individually and on behalf of others
similarly situated,

Plaintiffs,

v.

DAVITA HEALTHCARE PARTNERS, INC. AND
TOTAL RENAL CARE INC.,

Defendants.

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS' AMENDED MOTION FOR APPROVAL OF NOTICE**

---

Defendants DaVita Healthcare Partners, Inc. and Total Renal Care, Inc. (collectively referred to as "DaVita" or the "Company"), by and through their counsel, Ogletree, Deakins, Nash, Smoak, & Stewart, P.C., hereby submit their Response to Plaintiffs' Amended Motion for Approval of Notice ("Motion") (Dkt. #63).

## I. INTRODUCTION

DaVita's policies comply with the Fair Labor Standards Act ("FLSA"), and there is no evidence, other than Plaintiffs' self-serving allegations, to support any claim that the Company does not properly compensate its nonexempt (hourly) teammates for all the time they work. Indeed, DaVita relies upon its teammates to accurately record all of their working time, and it pays them based on the time they submit. Notwithstanding the overwhelming evidence that

refutes each of Plaintiffs' claims, one Plaintiff alleges she was not paid for missed meal periods, another claims DaVita violated the FLSA by misclassifying some teammates as exempt, and they all contend the Company failed to pay overtime for alleged off-the-clock work under a wide variety of circumstances among individuals who are not "similarly situated" under any analysis the Court may employ.

Plaintiffs are not even similarly situated to each other:

- One plaintiff was an exempt manager who claims she was misclassified and should be paid overtime for hours she worked but did not track or record, admits she knew nonexempt teammates in her clinic worked off-the-clock in violation of Company policy, and admits she did nothing to prevent her teammates from performing off-the-clock work;

- Another plaintiff worked as an executive assistant, tracked her own hours, worked and was paid for an extensive amount of overtime every week she worked, but claims she was somehow not compensated for time spent answering her cell phone or sending text messages while she was en route to work or home (even though it was her responsibility to record her hours and no one ever told her not to record such time); and

- Two plaintiffs worked as trainers, were not assigned to work in a specific clinic, tracked their own hours, have no supportable explanation for why they now claim they worked additional hours they did not record, and admit they did not complain about their allegations before they filed this lawsuit.

Based on their varying job duties and widely divergent allegations as to how each believes DaVita violated the FLSA, Plaintiffs now seek judicial approval to send notice of this lawsuit to over 75,000 current and former teammates spread across the country without even attempting to show how they are "similarly situated" to putative class members.

The Court should deny Plaintiff's Motion. While the burden of establishing conditional certification in the Tenth Circuit is not heavy, it is not nonexistent. At a minimum, Plaintiffs must identify "substantial allegations that the putative class members were together the victims

of a single decision, policy or plan."[1] Plaintiffs have not carried their burden because they cannot do so – their own jobs and allegations as to how each of them believes the Company violated the FLSA shows they could not possibly have been the victims of a "single decision, policy or plan." To the contrary, Plaintiffs ignore their burden altogether and rely upon this Court's decision in *Turner v. Chipotle Mexican Grill*, 123 F. Supp. 3d 1300, 1302 (D. Colo. 2015) ("*Chipotle*") to argue "[n]o court action is required" and that all individuals must do to join this case is simply file a consent form. (Motion, p. 8.) But, Plaintiffs do seek "court action" – they seek an order directing DaVita to produce personal contact information for over 75,000 current and former teammates so they may send a judicially approved notice informing all such individuals of their right to join without any showing that the individuals who may opt in are similarly situated to the named Plaintiffs. The problem with Plaintiffs' reliance upon *Chipotle* is that no other court has adopted a similar approach, *Chipotle* collides liberal joinder standards with the burdensome notice mechanism reserved for traditional class and collective actions, and *Chipotle* eviscerates the current FLSA collective action scheme and turns cases like this into unmanageably large multi-plaintiff actions without the more efficient discovery and pleading tools available in traditional class and collective action cases.

For the reasons explained in detail below, DaVita respectfully requests that this Court deny Plaintiffs' Motion and require them to meet the "similarly situated" standard enunciated under the Tenth Circuit's approach to certification of FLSA collective actions before ordering a judicially approved notice be mailed to over 75,000 current and former DaVita teammates.

---

[1] *Thiessen v. General Elec. Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001).

## II. FACTUAL & PROCEDURAL BACKGROUND

### A. DaVita's Business.

DaVita Inc. is the parent company of DaVita Kidney Care and HealthCare Partners. (Affidavit of Marilyn Vu-Tran ("Vu-Tran Aff."), attached as Ex. 1, at ¶ 2.) DaVita Kidney Care is a leading provider of kidney care, delivering dialysis services to patients with chronic kidney failure and end stage renal disease. (*Id.*) Headquartered in Denver, Colorado, DaVita Kidney Care operates over 2,200 outpatient dialysis centers located throughout the United States serving approximately 185,000 patients. (*Id.*) HealthCare Partners, a DaVita Medical Group, manages and operates medical groups and affiliated physician networks in several states, including Colorado. (*Id.*) HealthCare Partners provides integrated care management for over 750,000 patients. (*Id.*) Between DaVita Kidney Care and HealthCare Partners, DaVita currently employs approximately 69,000 employees (called "teammates"). On the DaVita Kidney Care side alone, there are well over 500 different job descriptions. (*Id.*)

### B. Plaintiffs and Their Allegations.

There are four named Plaintiffs in this action, each working in a different job at DaVita. Kelsey Oldershaw ("Oldershaw") was an Executive Assistant and Divisional Operations Coordinator from September 2014 through August 2015. (First Am. Complaint (Dkt. #33) at ¶ 38; Deposition of Kelsey Oldershaw ("Oldershaw Dep."), attached as Ex. 2, at 34:9-35:2; and 8/29/2014 Offer Letter to Kelsey Oldershaw, attached as Ex. 3.) Oldershaw alleges DaVita terminated her employment in retaliation for her complaints that she was not properly paid for hours worked, including overtime. (First Am. Complaint at ¶¶ 101-102, 108-109.) She also alleges DaVita subtracted time from her records to avoid paying her for all hours she worked.

(Oldershaw Dep. at 14:5-18.) Oldershaw further contends she was required to respond to text messages and telephone calls after her scheduled work hours without compensation. (*Id*. at 15:24-16:17.)

Elina Navarro was an Administrative Assistant and exempt Facility Administrator from March 2013 through January 2016. (First Am. Complaint at ¶ 39; Amended Consent to Join (Dkt. #26-1); and Deposition of Elina Navarro ("Navarro Dep."), attached as Ex. 4, at 10:23-11:1, 11:25-12:3.) Navarro alleges she was misclassified as exempt, and thus, denied overtime pay to which she was entitled for hours worked over forty per week. (First Am. Complaint at ¶ 21; Amended Consent to Join (Dkt. #26-1); and Navarro Dep. at 9:1-6, 64:9-15, 111:12-112:9.)

Jane Stant was a trainer and registered nurse from January 2012 through February 2016. (First Am. Complaint at ¶ 40; Deposition of Jane Stant ("Stant Dep."), attached as Ex. 5, at 22:19-23:6.) She claims DaVita required her to work off-the-clock by requiring her to purchase snacks and drinks and set out books and nameplates for the classes she taught. (Stant Dep. at 53:15-54:2.)

Jaymie Stevens was hired in August 1989 and currently works as a chronic trainer educator. (First Am. Complaint at ¶ 41; Consent to Join (Dkt. #20-2); Deposition of Jaymie Stevens ("Stevens Dep."), attached as Ex. 6, at 15:19-16:14.) She alleges she was permitted to record hours allocated for her training meetings but was not paid for time spent working before or after her shifts. (Stevens Dep. at 43:11-15.)

**C. Procedural History**

Oldershaw filed her Collective and Class Action Complaint on September 9, 2015, and Defendants filed their Answer on December 7, 2015. (Dkt. #s 1 and 7, respectively.) Plaintiffs

filed their First Amended Complaint adding Plaintiffs Navarro, Stant, and Stevens on March 21, 2016, and Defendants answered on April 8, 2016. (Dkt. #s 33 and 38, respectively.) Opt-In Plaintiff Georgia B. Hamren filed her Consent to Join on August 8, 2016. (Dkt. #56.)

Plaintiffs allege various violations of the FLSA and Colorado state wage and hour laws based on their claim that DaVita failed to accurately record and pay them for all the hours they worked. (First Am. Complaint at ¶ 50.) Plaintiffs specifically assert DaVita required them to clock out for meal breaks but required them to perform work-related duties during their breaks. (*Id*. at ¶ 67.) Plaintiffs further allege DaVita required them to work, uncompensated, outside their scheduled shifts. (*Id*. at ¶ 68.) They also contend DaVita's "written and oral policies and procedures" constituted a contract that DaVita breached. (*Id*. at ¶¶ 115-119, 123-127.)

To date, Plaintiffs have taken four 30(b)(6) depositions, and Defendants deposed the four named Plaintiffs. The parties have all served and responded to extensive written discovery.

**D. Plaintiffs Were Not Subject to an Unlawful Company-wide Policy or Practice.**

No Company policy requires, suggests, or even condones teammates working off-the-clock. DaVita's Teammate Policies expressly prohibit non-exempt teammates from working off-the-clock. (Oldershaw Dep. at 44:22-46:8, 61:2-12; Stant Dep. at 73:1-16; Stevens Dep. at 49:25-50:12; and DaVita's Teammate Policies, attached as Ex. 7, pp. 19, 54, 58.)[2] Teammates understand they are paid based on the hours they record, and they are responsible for complying "with all record-keeping requirements and must accurately record and promptly report all

[2] Declarations of various DaVita teammates referred to herein are attached as Exhibits 8-97 (*see* Defendants' Exhibit List to Their Opposition to Plaintiffs' Amended Motion for Approval of Notice). *See* Ex. 10 at ¶ 16; Ex. 33 at ¶ 6; Ex. 37 at ¶ 6; Ex. 54 at ¶ 6; Ex. 55 at ¶¶ 6 and 9; Ex. 59 at ¶ 6; Ex. 62 at ¶ 6; Ex. 65 at ¶ 13; Ex. 67 at ¶ 6; Ex. 68 at ¶ 22; Ex. 72 at ¶ 6; Ex. 73 at ¶ 6; and Ex. 75 at ¶ 6.

working hours." (Oldershaw Dep. at 59:23-60:2; Stant Dep. at 50:3-16, 51:14-18, 81:5-83:11, 84:1-21; Stevens Dep. at 52:23-56:12; and Ex. 7, p. 70.)[3] Teammates who work in DaVita's clinics are aware of the location of the time clocks and are required to clock in once they arrive and before performing any work.[4] Other nonexempt teammates, like Oldershaw, Stant, and Stevens, who do not work in clinics, record their time by logging into DaVita's PeopleNet system from a remote location (i.e., home), wait for the screen with a timecard to appear, and input the hours they work. (Oldershaw Dep. at 48:7-50:15, 50:23-51:10; Stant Dep. at 43:24-46:12; Stevens Dep. at 40:13-42:2.) Teammates clock out for meal breaks and are prohibited from performing work during their breaks.[5]

When teammates work more than forty hours per week, they are paid one and one-half times their regular hourly rate for all hours worked over forty. (Oldershaw Dep. at 60:14-61:1;

---

[3] *See* Ex. 8 at ¶ 8; Ex. 10 at ¶ 12; Ex. 11 at ¶ 9; Ex. 12 at ¶ 8; Ex. 14 at ¶ 8; Ex. 15 at ¶ 9; Ex. 18 at ¶ 8; Ex. 19 at ¶ 8; Ex. 21 at ¶ 8; Ex. 23 at ¶ 15; Ex. 24 at ¶ 9; Ex. 25 at ¶ 11; Ex. 26 at ¶ 10; Ex. 27 at ¶ 9; Ex. 30 at ¶ 10; Ex. 31 at ¶ 10; Ex. 38 at ¶ 14; Ex. 40 at ¶ 9; Ex. 41 at ¶ 8; Ex. 44 at ¶ 7; Ex. 45 at ¶ 9; Ex. 46 at ¶ 9; Ex. 47 at ¶ 18; Ex. 48 at ¶ 9; Ex. 49 at ¶ 9; Ex. 51 at ¶ 9; Ex. 52 at ¶ 8; Ex. 54 at ¶ 6; Ex. 56 at ¶ 8; Ex. 58 at ¶ 8; Ex. 60 at ¶ 10; Ex. 61 at ¶ 8; Ex. 63 at ¶ 8; Ex. 64 at ¶ 8; Ex. 65 at ¶ 12; Ex. 66 at ¶ 10; Ex. 68 at ¶ 14; Ex. 70 at ¶ 9; Ex. 71 at ¶ 8; Ex. 73 at ¶ 8; Ex. 74 at ¶ 8; Ex. 76 at ¶ 8; Ex. 77 at ¶ 8; Ex. 78 at ¶ 8; Ex. 79 at ¶ 8; Ex. 80 at ¶ 10; Ex. 82 at ¶ 8; Ex. 83 at ¶ 8; Ex. 84 at ¶ 10; Ex. 86 at ¶ 10; Ex. 87 at ¶ 10; Ex. 88 at ¶ 8; Ex. 89 at ¶ 12; Ex. 90 at ¶ 5; Ex. 91 at ¶ 8; Ex. 93 at ¶ 6; Ex. 94 at ¶ 8; Ex. 96 at ¶ 8; and Ex. 97 at ¶ 8.

[4] *See* Ex. 12 at ¶ 6; Ex. 23 at ¶ 11; Ex. 25 at ¶ 9; Ex. 26 at ¶ 6; Ex. 27 at ¶ 8; Ex. 28 at ¶ 9; Ex. 30 at ¶ 10; Ex. 32 at ¶ 13; Ex. 33 at ¶ 6; Ex. 37 at ¶ 6; Ex. 46 at ¶ 8; Ex. 54 at ¶ 6; Ex. 55 at ¶ 6; Ex. 56 at ¶ 8; Ex. 59 at ¶ 6; Ex. 61 at ¶ 8; Ex. 65 at ¶ 11; Ex. 67 at ¶ 6; Ex. 72 at ¶ 6; Ex. 73 at ¶ 6; Ex. 75 at ¶ 6; Ex. 80 at ¶ 10; Ex. 82 at ¶ 6; Ex. 83 at ¶ 6; Ex. 84 at ¶ 6; Ex. 89 at ¶ 12; and Ex. 97 at ¶ 6.

[5] *See* Ex. 8 at ¶ 6; Ex. 11 at ¶ 6; Ex. 12 at ¶ 6; Ex. 14 at ¶ 7; Ex. 15 at ¶ 6; Ex. 21 at ¶ 6; Ex. 25 at ¶ 9; Ex. 26 at ¶ 6; Ex. 30 at ¶ 8; Ex. 33 at ¶ 8; Ex. 40 at ¶ 7; Ex. 41 at ¶ 8; Ex. 44 at ¶ 6; Ex. 48 at ¶ 6; Ex. 51 at ¶ 13; Ex. 52 at ¶ 7; Ex. 59 at ¶ 8; Ex. 63 at ¶ 6; Ex. 64 at ¶ 6; Ex. 77 at ¶ 6; Ex. 80 at ¶ 9; Ex. 83 at ¶ 6; Ex. 84 at ¶ 6; Ex. 90 at ¶ 5; and Ex. 91 at ¶ 6.

Ex. 7, p. 55.)[6] They understand that if they have questions about the hours they work or about their pay generally, they can direct their inquiries to supervisors, Facility Administrators, or People Services. (Ex. 7, p. 9.)[7] None of the named Plaintiffs, however, complained about the wage and hour issues they allege in this lawsuit to anyone at DaVita while they worked there (Oldershaw Dep. at 106:1-7; Navarro Dep. at 112:10-19; Stant Dep. at 59:1-3; Stevens Dep. at 73:13-18), even though DaVita's investigation reveals that teammates' questions about their hours or pay are resolved to their satisfaction.[8]

---

[6] *See* Ex. 10 at ¶ 11; Ex. 11 at ¶ 11; Ex. 12 at ¶ 10; Ex. 15 at ¶ 11; Ex. 18 at ¶ 10; Ex. 19 at ¶ 9; Ex. 21 at ¶ 10; Ex. 23 at ¶ 9; Ex. 24 at ¶ 11; Ex. 27 at ¶ 5; Ex. 30 at ¶ 13; Ex. 33 at ¶ 5; Ex. 36 at ¶ 10; Ex. 37 at ¶ 5; Ex. 38 at ¶ 10; Ex. 39 at ¶ 12; Ex. 40 at ¶ 11; Ex. 41 at ¶ 10; Ex. 45 at ¶ 11; Ex. 48 at ¶ 11; Ex. 49 at ¶ 12; Ex. 51 at ¶ 10; Ex. 54 at ¶ 5; Ex. 56 at ¶ 7; Ex. 58 at ¶ 10; Ex. 59 at ¶ 5; Ex. 60 at ¶ 7; Ex. 61 at ¶ 10; Ex. 63 at ¶ 10; Ex. 64 at ¶ 10; Ex. 65 at ¶ 9; Ex. 66 at ¶ 9; Ex. 67 at ¶ 5; Ex. 68 at ¶ 19; Ex. 70 at ¶ 11; Ex. 71 at ¶ 9; Ex. 72 at ¶ 5; Ex. 74 at ¶ 10; Ex. 76 at ¶ 10; Ex. 77 at ¶ 10; Ex. 78 at ¶ 10; Ex. 80 at ¶ 8; Ex. 83 at ¶ 10; Ex. 87 at ¶ 12; Ex. 88 at ¶ 10; Ex. 89, at ¶¶ 10-11; Ex. 90 at ¶ 7; Ex. 91 at ¶ 10; Ex. 93 at ¶ 9; and Ex. 97 at ¶ 10.

[7] *See* Ex. 8 at ¶ 12; Ex. 10 at ¶ 18; Ex. 11 at ¶ 13; Ex. 12 at ¶ 12; Ex. 13 at ¶¶ 14-15; Ex. 14 at ¶ 11; Ex. 15 at ¶13; Ex. 16 at ¶ 10; Ex. 17 at ¶ 11; Ex. 18 at ¶ 13; Ex. 19 at ¶¶ 11-12; Ex. 20 at ¶ 9; Ex. 21 at ¶ 12; Ex. 22 at ¶ 8; Ex. 23 at ¶¶ 21-23; Ex. 24 at ¶ 13; Ex. 25 at ¶ 14; Ex. 26 at ¶ 14; Ex. 27 at ¶ 12; Ex. 28 at ¶ 11; Ex. 30 at ¶ 15; Ex. 32 at ¶ 7; Ex. 33 at ¶ 7; Ex. 35 at ¶ 12; Ex. 36 at ¶ 11; Ex. 37 at ¶ 7; Ex. 38 at ¶¶ 21-22; Ex. 39 at ¶ 13; Ex. 40 at ¶ 13; Ex. 41 at ¶ 12; Ex. 42 at ¶¶ 16 and 18; Ex. 43 at ¶¶ 9 and 12; Ex. 45 at ¶ 13; Ex. 46 at ¶ 12; Ex. 47 at ¶¶ 22-23; Ex. 48 at ¶ 13; Ex. 49 at ¶ 16; Ex. 50 at ¶ 11; Ex. 51 at ¶ 14; Ex. 52 at ¶ 11; Ex. 55 at ¶ 10; Ex. 56 at ¶¶ 11-12; Ex. 57 at ¶ 12; Ex. 58 at ¶ 12; Ex. 59 at ¶ 7; Ex. 60 at ¶ 11; Ex. 61 at ¶¶ 11-12; Ex. 62 at ¶ 9; Ex. 63 at ¶ 12; Ex. 64 at ¶ 13; Ex. 65 at ¶¶ 15 and 19; Ex. 66 at ¶¶ 10 and 12; Ex. 67 at ¶ 7; Ex. 70 at ¶ 14; Ex. 72 at ¶ 7; Ex. 73 at ¶ 11; Ex. 74 at ¶ 12; Ex. 75 at ¶ 7; Ex. 76 at ¶ 13; Ex. 77 at ¶ 12, Ex. 78 at ¶ 12; Ex. 79 at ¶¶ 11-12; Ex. 80 at ¶ 13; Ex. 82 at ¶ 12; Ex. 83 at ¶ 12; Ex. 84 at ¶ 14; Ex. 87 at ¶ 14; Ex. 88 at ¶ 12; Ex. 89 at ¶ 18; Ex. 90 at ¶ 11; Ex. 91 at ¶ 12; Ex. 92 at ¶ 13; Ex. 93 at ¶ 11; Ex. 94 at ¶ 12; and Ex. 97 at ¶ 12.

[8] *See* Ex. 10 at ¶¶ 15-16 and 19; Ex. 11 at ¶ 12; Ex. 23 at ¶ 20; Ex. 30 at ¶¶ 14-15; Ex. 42 at ¶¶ 16-17; Ex. 43 at ¶¶ 9-11; Ex. 44 at ¶¶ 7-10; Ex. 46 at ¶¶ 9-11; Ex. 47 at ¶ 19; Ex. 49 at ¶¶ 9-11; Ex. 52 at ¶¶ 8 and 10; Ex. 53 at ¶ 6; Ex. 58 at ¶¶ 8 and 10-11; Ex. 60 at ¶¶ 8-9 and 12; Ex. 61 at ¶ 8; Ex. 63 at ¶¶ 8 and 10; Ex. 64 at ¶ 8; Ex. 65 at ¶¶ 14-17; Ex. 68 at ¶¶ 15-17; Ex. 70 at ¶¶ 12-13; Ex. 73 at ¶ 8; Ex. 74 at ¶ 8; Ex. 75 at ¶ 7; Ex. 76 at ¶ 8; Ex. 77 at ¶ 8; Ex. 78 at ¶ 8; Ex. 79 at ¶ 8; Ex. 80 at ¶ 10; Ex. 82 at ¶ 8; Ex. 83 at ¶ 8; Ex. 84 at ¶¶ 7-10; Ex. 86 at ¶ 11; Ex. 88 at ¶ 8; Ex. 89

**E. DaVita's Non-Exempt Workforce Includes Numerous Jobs with Vastly Different Job Duties.**

DaVita's non-exempt workforce includes numerous jobs, and each position performs different duties, making conditional certification of a nationwide class of all nonexempt teammates impossible under the Tenth Circuit's standard. The following is a non-exhaustive list describing the basic job duties of some of DaVita's non-exempt positions in clinics around the country:

- Administrative Assistants answer telephones,[9] admit new patients,[10] assist patients with transportation needs,[11] and order supplies for clinics.[12]
- Biomedical Technicians maintain dialysis machines, order parts, maintain water purification systems, and follow-up with facility staff to see if they have issues with their equipment.[13]
- Clinical Coordinators address issues that arise with patients,[14] provide dialysis therapy and ensure compliance with DaVita's policies and procedures,[15] and analyze patient assessments and lab results.[16]
- Charge Nurses ensure patients receive adequate care, that all materials and

---

at ¶¶ 15-16; Ex. 90 at ¶¶ 5, 7-8 and 10; Ex. 92 at ¶ 12; and Ex. 97 at ¶ 8.

[9] *See* Ex. 26 at ¶ 5; Ex. 49 at ¶ 5; Ex. 61 at ¶ 5; Ex. 84 at ¶ 5; Ex. 90 at ¶ 4; and Ex. 93 at ¶ 4.

[10] *See* Ex. 26 at ¶ 5; and Ex. 84 at ¶ 5.

[11] *See* Ex. 41 at ¶ 5; Ex. 88 at ¶ 5; Ex. 90 at ¶ 4; and Ex. 93 at ¶ 4.

[12] *See* Ex. 41 at ¶ 5; Ex. 49 at ¶ 5; Ex. 61 at ¶ 5; and Ex. 90 at ¶ 4.

[13] *See* Ex. 68 at ¶ 10.

[14] *See* Ex. 51 at ¶¶ 5 and 7.

[15] *See* Ex. 95 at ¶ 5.

[16] *See* Ex. 51 at ¶ 5; and Ex. 95 at ¶ 5.

medicines are stocked[17], that all patients receive treatments and medications as prescribed, including directing staff to ensure such treatments and medications are provided; perform medication counts; check refrigerator temperatures; ensure all staff are on time and in the correct Patient Oriented Dialysis location; and check to see whether patients have been hospitalized.[18]

- Registered Nurses focus on direct patient care throughout hemodialysis treatment,[19] educate patients regarding kidney health,[20] and dismantle and disinfect dialysis machines.[21]

- Clinical Hemodialysis Technicians provide patient care,[22] take and monitor patient vital signs,[23] and assist with mixing acid for dialysis treatment.[24]

- Dieticians review lab results[25] and, based on those results, educate their patients on recommended changes to their diets and recommend additional tests to be performed by the doctors; they also provide patient status updates for Charge Nurses, Facility Administrators, and Social Workers.[26]

- Home Hemo Nurses train patients to conduct their treatments at home, and conduct two to three home visits with the patient and care partner to ensure they conduct treatments correctly.[27]

- Licensed Practical Nurses connect patients to dialysis machines, assess patient

---

[17] *See* Ex. 25 at ¶ 5; and Ex. 58 at ¶ 5.

[18] *See* Ex. 80 at ¶ 5.

[19] *See* Ex. 11 at ¶ 5; Ex. 37 at ¶ 4; Ex. 40 at ¶ 6; and Ex. 55 at ¶ 6.

[20] *See* Ex. 55 at ¶ 4; and Ex. 65 at ¶ 6.

[21] *See* Ex. 37 at ¶ 4.

[22] *See* Ex. 23 at ¶ 7; and Ex. 38 at ¶ 7.

[23] *See* Ex. 23 at ¶ 7.

[24] *See* Ex. 23 at ¶ 7; and Ex. 37 at ¶ 4.

[25] *See* Ex. 69 at ¶ 4.

[26] *See* Ex. 17 at ¶ 5.

[27] *See* Ex. 30 at ¶ 5.

vital signs, and assess patients after their treatments conclude.[28]

- Social Workers help patients find resources relating to counseling and housing,[29] counsel patients regarding transplant referrals, transportation, medication assistance, missed appointments, improving their quality of life, and patient grievances.[30]

The named Plaintiffs held vastly different positions with varying job duties. For instance, as an Executive Assistant and Divisional Operations Coordinator, Plaintiff Oldershaw regularly visited clinics in the Denver metropolitan area to deliver items to their staff, managed her supervisor's calendar, proofread documents, and planned meetings. (Oldershaw Dep. 64:9-65:9, 75:9-76:9.) As a Facility Administrator (exempt), Navarro was the highest ranking teammate in her facility and was responsible for managing her clinic, which included ensuring the facility was properly staffed, preparing and being held responsible for the clinic's budget, and recommending that teammates be hired or terminated based on her judgment and observations. (Navarro Dep. at 81:20-88:9, 94:25-95:20, 109:16-110:13.) As a trainer and registered nurse, Stant developed and delivered training courses for new and incumbent teammates, which required her to develop curriculum, train other trainers, setup classrooms, and teach the classes herself. (Stant Dep. 55:9-56:17.) As a chronic trainer educator, Stevens also trained new DaVita teammates, assisted with onboarding, and was the leader for DaVita's trainers (who are otherwise known as "preceptors"). (Stevens Dep. 24:1-24, 30:1-24.) The above-cited list does not include several other non-exempt job positions that also have vastly different job duties and responsibilities from Plaintiffs. The nature of DaVita's business, providing dialysis services to patients with chronic

---

[28] *See* Ex. 89 at ¶ 7.

[29] *See* Ex. 81 at ¶ 5.

[30] *See* Ex. 50 at ¶ 5.

kidney failure and end stage renal disease, requires a wide array of education and training to perform the different tasks.

## II. ARGUMENT

### A. The Standard for Conditionally Certifying FLSA Collective Actions and Approving Judicial Notice to Putative Class Members.

Plaintiffs urge this Court to apply the same standard it adopted in *Chipotle* to their FLSA claims, despite the fact that no other court has adopted a similar approach, and there are substantial factual differences between the *Chipotle* plaintiffs (who all have similar job duties, are all classified as nonexempt employees, and assert similar claims relating to Chipotle's electronic timekeeping system) and Plaintiffs in this case. For the reasons described below, the Court should apply the Tenth Circuit's two-step approach to certification of FLSA collective actions and not the hybrid standard it applied in *Chipotle*.

#### 1. The Tenth Circuit's Two-Step Approach to Certification of FLSA Collective Actions under 29 U.S.C. § 216(b) Applies to Plaintiffs' Motion.

In appropriate cases, the FLSA grants federal courts the discretion to conditionally certify a case as a collective action to permit plaintiffs to aggregate their claims with others who are "similarly situated" and choose to "opt-in" to the litigation. *See* 29 U.S.C. § 216(b); *Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165, 167 (1989). The Tenth Circuit follows the familiar and widely accepted[31] two-step process to determine whether plaintiffs are "similarly situated" for

---

[31] Chipotle made this same point in its Motion to Certify Memorandum and Opinion Order for Interlocutory Appeal, which this Court denied. *See Turner v. Chipotle Mexican Grill, Inc.*, Civil Action No. 14-cv-2612-JLK, Dkt. #88, pp. 3-5 ("*Chipotle* Motion to Certify"); *Id.* at Dkt. #94, pp. 5-6 ("*Chipotle* Order Denying Interlocutory Appeal"). Chipotle cited the following cases as support for its assertion that the two-step approach is used in every Circuit, and DaVita adopts the same cases to support its argument: *Prescott v. Prudential Ins. Co.*, 729 F. Supp. 2d 357, 364 (D. Maine 2010) (addressing First Circuit); *Glatt v. Fox Searchlight Pictures, Inc.*, 791 F.3d 376,

certification of an FLSA collective action. *See Thiessen*, 267 F.3d at 1102; *see also Brown v. Money Tree Mortg., Inc.*, 222 F.R.D. 676, 679 (D. Kan. 2004).

In the first step, often called the "notice" or "conditional certification" stage, the court decides whether to certify the collective action conditionally and give notice to potential collective action members of the pendency of the lawsuit. The FLSA itself does not grant plaintiffs the right to send judicially approved notice to other potential class members – courts imported the notice requirement into the two-step approach from Rule 23 class actions and courts' ability to manage their cases. *See, e.g., Hoffman-LaRoche*, 493 U.S. at 484. In fact, nothing in the FLSA permits a court to order judicial notice be sent to all of an employer's current and former employees simply because a handful of plaintiffs believe there may be other individuals who wish to join their lawsuit – such notice is only permitted in Rule 23 and § 216(b) cases after plaintiffs make at least some showing that notice is warranted, and the case will proceed only on behalf of those individuals who are "similarly situated" to the plaintiffs.[32]

---

387 (2nd Cir. 2015) (addressing Second Circuit); *Zavala v. Wal-Mart Stores Inc.*, 691 F.3d 527, 536 (3rd Cir. 2012) (addressing Third Circuit); *Regan v. City of Charleston, S.C.*, 2014 WL 3530135, at *2 n. 2 (D. S. Car. July 16, 2014) (addressing Fourth Circuit); *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 915 n. 2 (5th Cir. 2008) (addressing Fifth Circuit); *Frye v. Baptist Mem'l Hosp., Inc.*, 495 Fed. Appx. 669, 671 (6th Cir. 2012) (addressing Sixth Circuit); *Russell v. Ill. Bell Tel. Co.*, 575 F. Supp. 2d 930, 933 (N.D. Ill. 2008) (addressing Seventh Circuit); *Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1056 (D. Minn. 2011) (addressing Eighth Circuit); *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1003 (N.D. Cal. 2010) (addressing Ninth Circuit); *Thiessen v. GE Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001) (addressing Tenth Circuit); *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1260 (11th Cir. 2008) (addressing Eleventh Circuit); *see also Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1530 (2013) (discussing significance of "conditional certification" and the "notice stage" for collective actions under the FLSA); *Hunter v. Sprint Corp.*, 346 F. Supp. 2d 113, 117 (D.C. Cir. 2004) (addressing D.C. Circuit).

[32] *See Hoffman-LaRoche*, 493 U.S. at 170 ("Section 216(b)'s affirmative permission for employees *to proceed on behalf of those similarly situated* must grant the court the requisite

Before a court may facilitate notice, plaintiffs must make "substantial allegations" that they are "similarly situated" to members of the putative class they seek to represent. *See Thiessen*, 267 F.3d at 1105. Courts should not conditionally certify a case and facilitate notice when the plaintiffs fail to meet their burden of proving collective treatment is appropriate. *See, e.g.*, *Saarela v. Union Colony Protective Servs., Inc.*, 2014 WL 3408771, at *3 (D. Colo. July 14, 2014) (holding complaint that was "almost entirely conclusory in nature" could not be treated as setting forth any "substantial allegations" sufficient to satisfy the plaintiff's burden)[33]; *see also Hinojos v. Home Depot, Inc.*, 2006 WL 3712944, at *2-3 (D. Nev. Dec. 1, 2006) (denying conditional certification because plaintiffs "failed to make the required showing"). Further, courts should allow collective actions only when adjudication of "common issues of law and fact arising from the same alleged . . . activity" promotes efficiency and judicial economy. *Hoffman-La Roche*, 493 U.S. at 170-71.

Plaintiffs' burden "is not a mere formality," and, contrary to Plaintiffs' mistaken belief, it certainly is not a free pass to conditional certification. *See Streeter-Dougan v. Kirkston Mortgage Lending, LLC*, 2013 WL 6174936, at *2 (S.D. Ind. Nov. 21, 2013); *Badgett v. Texas Taco Cabana, L.P.*, 2006 WL 2934265, at *2 (S.D. Tex. Oct. 12, 2006); *Xavier v. Belfor USA Grp., Inc.*, 585 F. Supp. 2d 873, 878 (E.D. La. 2008). Even though the Court's inquiry at this initial stage may be less stringent than after extensive discovery has been conducted, courts consistently hold that the burden of establishing certification is justified "is not invisible and

---

procedural authority to manage the process of joining multiple parties in a manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure.") (emphasis added).

[33] All unreported cases cited herein are attached as Ex. 98.

cannot be based on the conclusory allegations of a few employees." *Lee v. Sky Plumbing, Inc.*, 2010 WL 745770, at *2 (M.D. Fla. Mar. 1, 2010) (internal citations omitted). When, as here, it is evident class treatment ultimately will not be appropriate, it is a waste of the Court's and parties' time and resources to proceed with a collective action out of a desire to give plaintiffs the benefit of the doubt. *See, e.g., Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941 (W.D. Ark. 2003); *see also Adair v. Wisconsin Bell, Inc.*, 2008 WL 4224360, at *10 (E.D. Wis. Sept. 11, 2008) ("[T]he financial burden to an employer may be significantly increased by conditional certification of a collective action, because rather than limited to the experience of individual plaintiffs, discovery is expanded to class-wide policies and practices."); *D'Ana v. M/A-COM, Inc.*, 903 F. Supp. 889, 894 (D. Md. 1995) ("[A]n employer should not be unduly burdened by a frivolous fishing expedition conducted by plaintiff at the employer's expense."); *Woods v. New York Life Ins. Co.*, 686 F.2d 578, 581 (7th Cir. 1982) (recognizing a plaintiff's discovery demands upon conditional certification may impose "a tremendous financial burden to the employer").

**2. The Court Should Not Apply Its Novel Approach to Permitting Judicially Approved Notice without Requiring Plaintiffs to Make Any Showing that They Are Similarly Situated to Each Other or Potential Opt-Ins.**

Plaintiffs cite to this Court's *Chipotle* decision to support their argument that when a current or former DaVita employee comes forward and self identifies himself or herself as similarly situated he or she should be allowed to join this case – "[n]o court action is required." (Motion, p. 8.) But, court action is exactly what Plaintiffs seek in the form of an order approving advertisement of their lawsuit to over 75,000 current and former teammates to help them identify additional plaintiffs to opt in to this lawsuit. The central problem with Plaintiffs' argument, and

the *Chipotle* ruling, is that it seeks to distinguish FLSA collective actions from Rule 23 class actions when it comes to the plaintiffs' burden at the certification stage, but it still wants to import a judicial notice mechanism to make it easier for the plaintiffs to identify additional opt-ins to join their case without requiring plaintiffs to make any showing that is otherwise required for notice to be sent in any other type of case. Plaintiffs and the Court cannot have it both ways.

In *Chipotle*, the Court identified differences between Rule 23 class actions and § 216(b) collective actions, determining such differences "remove[] any rationale for subjecting individual party plaintiffs in collective actions to the rigorous procedural requirements of class actions." *Chipotle*, 123 F. Supp. 3d at 1307. The Court determined "the 'certification' rubric borrowed from Rule 23 has no place in wage claim litigation under the FLSA" and recognized that for the statute's first fifty years, courts interpreted §216(b) as "allowing liberalized permissive joinder of any party plaintiff 'similarly situated.'" *Id.* at 1306. The Court also cited Scott A. Moss & Nantiya Ruan, *The Second-Class Class Action: How Courts Thwart Wage Rights by Misapplying Class Action Rules*, 61 Am. U. L. Rev. 523 (2012), and *Fink v. Oliver Iron Min. Co.*, 65 F. Supp. 316 (D. Minn. 1941), for the proposition that "[t]he only requirement, per the statute, was that each plaintiff 'gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.'" *Id*. But, *Fink* and the cases Professors Moss and Ruan cite do not even mention sending notice to putative members of a purported class, and, in fact, all involved plaintiffs who either joined or intervened in the cases without first receiving a judicially sanctioned notice, indicating this Court is the first to both apply a liberal joinder standard to FLSA collective action cases while at the same time import a modern notice mechanism to

advertise the lawsuit to putative class members.[34]

The Court further observed that "attorneys and courts conflate collective actions with modern Rule 23 class actions . . . ." *Id*. at 1307. But, that is exactly what the Court did when it borrowed judicial notice from Rule 23 and the two-step § 216(b) cases and ordered Chipotle to provide information to plaintiffs to permit them to send notice to over 200,000 individuals who worked in over 1,800 restaurants. *Id*. at 1307, 1309-10. If the Court intends to adhere strictly to § 216(b)'s language then there is no reason for the Court to order notice be sent to a class of persons who may or may not be "similarly situated" to Plaintiffs. In other words, it appears the Court does not believe principles of Rule 23 class actions should apply to plaintiffs, but the Court still wants to subject defendants to a notice requirement that requires them to challenge each and every opt-in's "similarly situated-ness" without any showing by plaintiffs that notice is warranted or that they are, in fact, similarly situated to their proposed class.

**a. Plaintiffs' Allegations and the Facts of this Case Are Easily Distinguishable from *Chipotle*.**

Even if the Court's *Chipotle* standard applied to FLSA collective actions in the Tenth Circuit, the Court still should not apply it here because the plaintiffs' allegations and the operative facts at issue in the two cases are vastly different:

[34] *See Fink*, 65 F. Supp. at 318; *Pentland v. Dravo Corp.*, 152 F.2d 851 (3d Cir. 1945); *Locascio v. Teletype Corp.*, 74 F.R.D. 108, 111 (N.D. Ill. 1977); *Berry v. Crocker Nat'l Bank*, 1976 WL 673, at *6 (N.D. Cal. Apr. 22, 1976); *Mistretta v. Sandia Corp.*, 1975 WL 195, at *4 (D.N.M. Apr. 23, 1975); *Wright v. U.S. Rubber Co.*, 69 F. Supp. 621, 622-23 (S.D. Iowa 1946); *Calabrese v. Chiumento*, 3 F.R.D. 435, 437 (D.N.J. 1944).

| ***Turner v. Chipotle*** | ***Oldershaw, et al. v. DaVita Healthcare Partners, Inc. and Total Renal Care Inc.*** |
|---|---|
| Alleges off-the-clock work by nonexempt employees working in restaurants. (*Chipotle* Motion to Certify, p. 2; *Chipotle*, 123 F. Supp. 3d at 1304.) | Alleges both misclassification of exempt, management-level teammates, as well as off-the-clock work by nonexempt teammates. (*See* pp. 20-21 *infra*.) |
| Putative class members all perform the same basic job duties. (*Chipotle* Motion to Certify, p. 2.) | The four named Plaintiffs all hold different jobs and perform different job duties. (*See* pp. 11-12 *supra*.) |
| Plaintiffs alleged Chipotle used "timekeeping devices that automatically punch employees off the clock, even if they are still working." (*Chipotle*, 123 F. Supp. 3d at 1303.) | There is no evidence of a policy or program relating to DaVita's timekeeping devices at issue in this case like there is in *Chipotle*. Even the named Plaintiffs in this case used different methods for tracking their time. (*See* Oldershaw Dep. at 93:3-100:24; Stevens Dep. at 40:13-44:15; Stant Dep. at 43:24-47:14.) |
| "The principal allegation is that Chipotle's hourly employees were deprived of overtime pay by the operation of a computer program . . . that plaintiffs assert arbitrarily cuts off the time clock at half past midnight . . . so that employees were not paid for hours worked . . . ." (*Chipotle* Order Denying Interlocutory Appeal, p. 5.) This Court stated the above allegation was the basis for "forming the collective to give employees and former employees an opportunity to opt-in." (*Id.*, p. 6.) | There are no such allegations here and no such basis for "forming" such a collective. |
| Plaintiffs alleged the policies in question "originate at Chipotle's corporate headquarters in Colorado to be carried out by general managers nationwide." (*Id.* at 1303-04.) | There is no such evidence in this case. |

The Court should not treat Plaintiffs' allegations the same as the *Chipotle* plaintiffs' claims, and it should not simply assume all opt-ins would be similarly situated such that all of their claims can be adjudicated in this lawsuit under § 216(b).

**b. The *Chipotle* Standard Will Lead to the Inefficient and Ineffective Prosecution of this Lawsuit.**

DaVita cannot locate any authority for a court to facilitate the advertisement of a lawsuit to identify additional potential plaintiffs through a judicial notice process when traditional notions of joinder applied to a plaintiff's claims. The Court's approach in *Chipotle* will effectively turn every single or multi-plaintiff FLSA claim into a nationwide lawsuit simply by asserting the plaintiff's claims are representative of other employees who worked for a defendant during the relevant statute of limitations. In this case, that means Plaintiffs are able to seek judicial assistance to advertise their lawsuit from coast to coast to gather potentially tens of thousands of additional plaintiffs by asserting there are others who may want to sue DaVita without any actual proof such people exist or that they are similarly situated to the named Plaintiffs. Permitting notice to be mailed under the theory set forth in *Chipotle* will lead to an impractically large group of plaintiffs, making the management of the case after the notice stage unnecessarily cumbersome, inefficient, and inconsistent with the true purposes of the FLSA. Furthermore, Plaintiffs who join an action under Rule 20 bear the burden of proving their claims on an individual basis. *See* Moss & Ruan, 61 Am. U. L. Rev. at 557-58 (*citing Krueger v. New York Tel. Co.*, 163 F.R.D. 446, 449 (S.D.N.Y. 1995)). Requiring each plaintiff who joins this lawsuit to prove his or her individual claims and permitting DaVita to conduct the discovery necessary to defend against each of their claims is a far less efficient process than employing the traditional two-step certification standard (and proportional discovery that goes along with it) used by this and every other Circuit in the country. *See e.g., Myers v. Hertz Corp.*, 624 F.3d 537, 554–55 (2d Cir. 2010) ( "[T]he district courts of this Circuit appear to have coalesced around a two-step method, a method which . . . we think is sensible."); *see also Morgan v. Family Dollar*

*Stores, Inc.,* 551 F.3d 1233, 1260–62 (11th Cir. 2008); *Sandoz v. Cingular Wireless LLC,* 553 F.3d 913, 915 n .2 (5th Cir. 2008); *Comer v. Wal–Mart Stores, Inc.*, 454 F.3d 544, 546-47 (6th Cir. 2006). In fact, applying the *Chipotle* standard to this case will likely result in DaVita requesting written discovery and depositions of thousands of opt-in plaintiffs across the country to determine whether they are truly similarly situated and whether their claims have merit, undoubtedly also resulting in hundreds of motions to dismiss, discovery disputes, and motions for summary judgment, which is what the Tenth Circuit's two-step approach tries to avoid.

**B. Plaintiffs Failed to Meet Their Burden of Showing They Are "Similarly Situated" to Members of Their Putative Class.**

To meet their burden of making "substantial allegations" that they are similarly situated to more than 75,000 potential class members spread across the country, Plaintiffs must present more than six declarations from one current and five former DaVita teammates, four of whom (including all of the named Plaintiffs) worked in and around the Denver metropolitan area.[35] "Such a limited sampling of employees does not support the Plaintiffs' assertion of widespread violations resulting from a common policy or plan." *West v. Border Foods, Inc.*, 2006 WL 1892527, at *6 (D. Minn. July 10, 2006). Plaintiffs must produce declarations that "successfully engage" DaVita's declarations and affidavits which show teammates working in different jobs, under different classifications (exempt v. nonexempt), performing different job duties, and reporting to different supervisors are not similarly situated to one another and cannot all be lumped together in one class. *See, e.g., Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1097 (11th Cir.

[35] Out of over 75,000 potential class members, Plaintiffs were able to gather only six declarations (four of which are from Plaintiffs and one is from their only additional opt-in). That equates to a sampling of approximately 0.00008% of the putative class. This is significant given the amount of time this case has been pending and Plaintiffs' extensive efforts to recruit other individuals to join in their case during that time.

1996); *Bass v. PJComm Acquisition Corp.*, 2010 WL 3720217, at *2 (D. Colo. Sept. 15, 2010) (Blackburn, J.) (*quoting Grayson* with approval).

### 1. Plaintiffs Are Not Similarly Situated to Each Other, Much Less Members of Their Putative Class.

"A fundamental requirement of maintaining a class action is that the representatives must be members of the classes or subclasses they seek to represent." *Clayborne v. Omaha Pub. Power Dist.*, 211 F.R.D. 573, 580 (D. Neb. 2002); *see also Stubbs v. McDonald's Corp.*, 227 F.R.D. 661 (D. Kan. 2004) (noting the plaintiff did not have standing to represent individuals in positions plaintiff did not hold). Plaintiffs have not met that requirement in this case. They each allege the following as the basis for their claims that DaVita violated the FLSA:

**Kelsey Oldershaw**

- Time missing from her pay records (even though she cannot identify how much is missing, why it is missing, or even which days should reflect more hours than are noted in DaVita's timekeeping system). (First Am. Complaint at ¶¶ 101-102, 108-109; Oldershaw Dep. at 14:5-18; 16-17.)
- Time for meal periods she claims she did not take (even though she was only clocked out for a handful of meal periods at the beginning of her employment and never clocked out for meal periods again – she was paid for that time). (Oldershaw Dep. at 136:12-137:1.)
- Off-the-clock time spent responding to text messages and telephone calls on her way to work and home (even though she was paid for overtime in every week in which she worked for DaVita, and no one ever told her she should not record the time she now claims she spent responding to text messages and telephone calls). (Oldershaw Dep. at 16-17.)

**Elina Navarro**

- Misclassified as exempt when she was a Facility Administrator (even though she was the highest

ranking teammate in the clinic and performed extensive managerial tasks in that role). (First Am. Complaint at ¶ 21; Amended Consent to Join (Dkt. #26-1); Navarro Dep. at 9:1-6, 64:9-15, 111:12-112:9.)

- Off-the-clock time she claims was not recorded because she was misclassified as exempt. (Navarro Dep. at 9:1-6, 64:9-15, 111:12-112:9.)

**Jane Stant**

- Off-the-clock time for purchasing snacks and drinks for her classes and setting out books and nameplates before her classes began (even though no one told her not to record that time, and she has no reason to believe she would not have been paid for the time had she recorded it). (Stant Dep. 53:15-54:2.)

**Jaymie Stevens**

- Off-the-clock time spent working before and after her training sessions when she was required to input hours allocated for her training meetings (even though she never complained and admits there is no reason to believe she would not have been paid for this time if she had recorded it). (Stevens Dep. 43:11-15.)

Stant and Stevens are the only Plaintiffs in this case who performed similar job duties and share similar allegations such that they could arguably meet the Tenth Circuit's "similarly situated" standard. The remaining Plaintiffs are not even similarly situated to one another. For instance, Oldershaw is the only Executive Assistant, and she alleges she was not paid for tasks none of the other Plaintiffs performed. Navarro, on the other hand, claims she was misclassified as exempt, which means the discovery and legal arguments relating to her claims are different than any of the other Plaintiffs.

**a. Exempt and Nonexempt Teammates Are Not Similarly Situated and Cannot Be Included in the Same Putative Class.**

Courts recognize that exempt and nonexempt employees are not similarly situated for

purposes of conditional class certification because both the legal arguments and evidence relating to their claims are different. *See, e.g.*, *Stockton v. Alltite, Inc.*, 2016 WL 3973778, at *3 (D. Kan. July 25, 2016) (denying certification where plaintiffs sought a class including both exempt and nonexempt employees); *Kinnett v. State of Kan.*, 1991 WL 241832, at *1 (D. Kan. Oct. 30, 1991) (dismissing certain plaintiffs from FLSA action, observing that "the factual basis for the claim between exempt and non-exempt plaintiffs is different"); *Romero v. H.B. Auto. Grp., Inc.*, 2012 WL 1514810, at *12 (S.D.N.Y. May 1, 2012) ("Where a collective action contains a mix of employees, some of whom are classified exempt from the FLSA's requirements, and some of whom are classified as non-exempt, there is no factual nexus between the collective action members' situations, and conditional certification is not appropriate."). An FLSA claim by an exempt employee is necessarily "distinct from that of the non-exempt employee." *Romero*, 2012 WL 1514810 at *12 (*citing Diaz v. Electronics Boutique of Am., Inc.*, 2005 WL 2654270, at *3-4 (W.D.N.Y. Oct. 17, 2005)). In this case, Plaintiffs should not be allowed to lump all teammates together and shift the burden to DaVita to engage in a teammate-by-teammate analysis to determine which opt-ins are similarly situated under the FLSA.

**b. Exempt Facility Administrators Are Not Similarly Situated to Each Other and Should Not Be Part of Any Conditionally Certified Class.**

Conditional certification is particularly inappropriate for claims alleging misclassification of DaVita's Facility Administrators because they are not the victims of a single decision, policy, or plan that violated the FLSA. Instead, their claims require an individualized, highly fact-specific analysis of daily job duties and responsibilities, and such claims must be evaluated on a case-by-case basis.

Plaintiffs' Motion is supported by declarations of only two Facility Administrators – submitted by Navarro and Stephanie Schreffler. (*See* Dkt. #s 60-12 (p. 8 of 11) at ¶ 5; 60-13 at ¶ 5.) Schreffler's declaration does not reference her duties as a Facility Administrator, let alone the duties of others in the same position. (*See* Dkt. #60-13.) Navarro and Schreffler's declarations rely on their own alleged unique experiences, but neither of them offers any admissible evidence regarding the duties and responsibilities of other Facility Administrators (or employees in other positions for that matter). Plaintiffs also fail to offer any evidence regarding alleged hours worked by any Facility Administrators other than Navarro.

In stark contrast to Plaintiffs' unsupported claims, Defendants have collected evidence that demonstrates not only how varied Facility Administrators' work may be at different clinics, but also that numerous Facility Administrators across the country do not support Plaintiffs' sweeping claims and generalizations regarding DaVita's practices. Specifically, DaVita's counsel met with 18 Facility Administrators at clinics across the country, including Austin, Texas; Escondido, California; Mission Viejo, California; Aurora, Colorado; Brighton, Colorado; Lakewood, Colorado; Littleton, Colorado; Westminster, Colorado; Hollywood, Florida; Lakeland, Florida; Miami, Florida; Forest Park, Georgia; Roswell, Georgia; St. Paul, Minnesota; Garden City, New Jersey; Houston, Texas; and, Alexandria, Virginia.[36] First, and most significantly, Facility Administrator declarants consistently stated that they ensure compliance with DaVita's timekeeping policies and procedures, as well as federal laws and regulations.[37]

---

[36] *See* Ex's. 9, 13, 16, 22, 29, 31-32, 34-35, 42-43, 47, 54, 62, 85-86, 92, and 96.

[37] *See* Ex. 9 at ¶ 5 ("I also perform the onboarding and orientation of new teammates by, among other things, training them on DaVita's policies and procedures . . . and to ensure compliance with all DaVita policies and state, local and federal laws and regulations . . . ."); Ex. 16 at ¶ 8

Several declarants also volunteered that nonexempt teammates are responsible for entering their time by clocking in and out, nonexempt teammates are sometimes asked to work overtime, and they are properly paid for any overtime hours they work.[38] Many Facility Administrators explained they regularly receive and respond to questions from their nonexempt teammates regarding pay, clocking in and out, and overtime.[39] Facility Administrators also detailed their

---

("Teammates are expected to clock in before doing any work . . . Teammates are expected to clock out at the end of the day as the last thing they do before leaving."); Ex. 32 at ¶ 12 ("During their initial training and continuing during their employment in meetings and conversations, I emphasize the requirement that all teammates be clocked in at all times they are working."); Ex. 34 at ¶ 8 ("Based on my management training, I know that Davita [sic] forbids its employees from working off-the-clock.)"; Ex. 35 at ¶ 13 (discussing training on proper time clock usage and expectations); Ex. 47 at ¶ 18 ("When Davita [sic] hires a new employee, he/she goes through a training and orientation period in which he/she is taught how to clock-in and clock-out using the PeopleNet system. Employees are told that they are responsible for recording all of the time they work and are paid based on the time submitted to PeopleNet. This information is also included in [DaVita's] policies."); Ex. 55 at ¶ 6 ("In following DaVita's policies, I have not instructed, required, or allowed a teammate to work off-the-clock . . . I did not work off-the-clock while I was working as a registered nurse . . . ."), ¶ 9 ("Based on my management training and experience working with Davita [sic], I know that Davita [sic] forbids its employees from working off-the-clock. As a Facility Administrator, I cannot allow or require teammates to work off-the-clock. I delegate to my Administrative Assistant the job of monitoring on a daily basis whether hourly teammates have properly clocked in and clocked out."); Ex. 62 at ¶ 6 ("In following DaVita's policies, I have not instructed, required, or allowed a teammate to work off-the-clock."); Ex. 85 at ¶ 5 ("I also perform the onboarding and orientation of new teammates by, among other things, training them on DaVita's policies and procedures . . . and to ensure compliance with all DaVita policies and state, local and federal laws and regulations . . . ."); Ex. 86 at ¶ 6 ("I spend the remainder of my time . . . investigating missed punches and proper coding of hours worked by teammates . . . reviewing training required by each teammate, following up with the teammates to ensure they have everything they need for the training and confirming that it is completed on a timely basis."); and Ex. 92 at ¶ 5 ("I am the head supervisor for this facility. Generally, examples of functions that I perform include (i) monitoring the time clock (e.g., to determine if any [sic] missed time punches and, if so, make corrections to ensure the teammate is paid for the time they say they worked) . . . .").

[38] *See e.g.*; Ex. 13 at ¶ 13; Ex. 16 at ¶¶ 5, 8; Ex. 31 at ¶ 10; Ex. 32 at ¶¶ 12-13; Ex. 34 at ¶¶ 7-9; Ex. 55 at ¶¶ 6, 8-9; Ex. 62 at ¶¶ 6, 8; Ex. 86 at ¶¶ 10-11; and Ex. 96 at ¶ 8.

[39] Ex. 16 at ¶ 10 (also adding teammates may also contact others with concerns); Ex. 31 at ¶ 12;

methods for capturing time if a teammate was unable or forgot to properly record time worked.[40] Many Facility Administrators also expressed that – despite years of service with DaVita – they never worked off-the-clock when in a different non-exempt role (if applicable),[41] they never heard of teammates complaining about not being paid for work they performed,[42] and they were not aware of teammates being pressured to work off-the-clock.[43]

Finally, with respect to job duties, Facility Administrators consistently described responsibilities that would justify their exempt status under the FLSA.[44] For example, Carol Sullivan, a Facility Administrator at the Mission Viejo, California clinic who manages 21 teammates, stated "[o]n a day to day basis, my teammate management responsibilities cover many things. No two days are alike because new challenges for teammates pop up all the time.

---

Ex. 35 at ¶¶ 5, *see also* 11 (adding teammates can contact others with concerns); Ex. 42 at ¶¶ 16-18; Ex. 43 at ¶¶ 9, 12; Ex. 47 at ¶¶ 13, 22-23; Ex. 55 at ¶ 10; Ex. 62 at ¶ 9; Ex. 92 at ¶ 12; *see also* Ex. 22 at ¶ 8 (stating with respect to her own pay, she approached her direct supervisor and received a pay raise upon taking on increased responsibilities and a larger facility); and Ex. 43 at ¶ 12 (FA highlighting Teammate Hotline and People Services assistance available to her).

[40] Ex. 13 at ¶ 14; Ex. 16 at ¶ 9; Ex. 35 at ¶ 7; Ex. 47 at ¶¶ 19-20; Ex. 62 at ¶ 2 (22+ years of service); Ex. 86 at ¶¶ 11-12; Ex. 92 at ¶ 12; *see also* Ex. 29 at ¶ 5 (FA noting she is responsible for overall operations, including payroll and processes, and that she approves any changes that are made by her staff with regard to payroll changes).

[41] Ex. 43 at ¶¶ 5, 7, 11.

[42] Ex. 13 at ¶ 13; Ex. 31 at ¶ 13; Ex. 34 at ¶ 9; Ex. 43 at ¶ 11; and Ex. 86 at ¶ 13.

[43] Ex. 31 at ¶¶ 2 (8+ years of service), 13; Ex. 34 at ¶¶ 2 (18+ years of service), 9; Ex. 42 at ¶ 15; Ex. 43 at ¶¶ 2 (11+ years of service), 4, 11; Ex. 47 at ¶ 21; Ex. 55 at ¶¶ 2 (17+ years of service), 6; Ex. 62 at ¶¶ 7-8; Ex. 86 at ¶¶ 2-3 (1+ years of service), 13; and Ex. 92 at ¶¶ 2 (11+ years), 11.

[44] Ex. 9 at ¶¶ 4-10; Ex. 13 at ¶¶ 8-11; Ex. 16 at ¶ 5; Ex. 22 at ¶¶ 4-5; Ex. 28 at ¶ 5; Ex. 31 at ¶¶ 5-6; Ex. 32 at ¶¶ 5-6, 9-11; Ex. 34 at ¶ 6; Ex. 35 at ¶¶ 5-7, 9-11; Ex. 42 at ¶¶ 6-12; Ex. 43 at ¶¶ 5-6, 8, 10-11; Ex. 47 at ¶¶ 5-17; Ex. 55 at ¶¶ 5, 7; Ex. 62 at ¶ 5; Ex. 85 at ¶¶ 4-13; Ex. 86 at ¶¶ 5-11; Ex. 92 at ¶ 5; and Ex. 96 at ¶ 5.

There is no checklist or script for performing my job in managing teammates . . . ." (Ex. 85 at ¶¶ 2, 5.)[45] She also noted that aside from typical hiring, firing, training, disciplinary action, and assessments expected of a manager, she receives and resolves teammate concerns and complaints and ensures all teammates complete annual testing and maintain licenses, and added that overall, her management duties amount to 45% of her work. (*Id.* at ¶ 5.) Sullivan stated another 35% of her job duties include working on financial management, risk management, quality assurance, and patient management responsibilities (*id.* at ¶ 7) and that 10% of the time she works on government-related quality assurance compliance responsibilities (*id.* at ¶ 8). Sullivan also manages a "home dialysis program" from her clinic, for which she uses her own discretion and judgment to strategize and develop plans of improvement as needed for the program, which requires about 10% of her time. (*Id.* at ¶ 9.)

Some Facility Administrators also perform clinical or social work duties when needed.[46] For instance, Cecilia Navarro (unrelated to Plaintiff Navarro, hereinafter referred to as "C. Navarro") started her career with DaVita as a staff nurse and was later promoted to Clinical Coordinator before her current role as a Facility Administrator. (Ex. 62 at ¶ 2.) Given her clinical background, C. Navarro not only oversees her clinic's operations, including hiring, firing, budgeting, and scheduling teammates, but she also assists her floor staff when they need assistance providing patient care. (*Id.* at ¶ 5.) Other Facility Administrators are also involved in various programs unrelated to the management of their clinics, such as the Star Training

[45] Other Facility Administrators agree that their duties varied daily. *See, e.g.,* Ex. 9 at ¶ 5.

[46] Ex. 55 at ¶ 5; Ex. 62 at ¶ 5.

Program, which convenes to interview potential new teammates for clinics in specific regions.[47]

For all these reasons, Facility Administrators are not similarly situated, and their claims cannot be adjudicated on a class-wide basis.

**2. There Is No Evidence Plaintiffs Were Subjected to an Unlawful Company-Wide Policy or Practice.**

The only company-wide policy that applied to Plaintiffs and their proposed class is that DaVita properly compensates its teammates for the time they work. (*See* Ex. 7 at pp. 19, 54, 58, and 70.)[48] Otherwise, Plaintiffs' own job classifications and duties show just how different they are and why their claims cannot be adjudicated as part of a single collective action. To the contrary, and as explained above, the evidence relevant to whether Facility Administrators, like Navarro, are properly classified as exempt is irrelevant to a nonexempt Executive Assistant's claim that she was not paid for time she spent on telephone calls and sending emails and text messages from home and in the car or whether nonexempt trainers are paid for time spent setting up classrooms and purchasing snacks and drinks for their participants.[49]

[47] Ex. 34 at ¶ 6; Ex. 39 at ¶ 6; Ex. 55 at ¶ 5; and Ex. 62 at ¶ 5.

[48] Ex. 8 at ¶ 11; Ex. 10 at ¶ 16; Ex. 11 at ¶ 12; Ex. 12 at ¶ 11; Ex. 13 at ¶ 13; Ex. 14 at ¶¶ 9-10; Ex. 15 at ¶ 12; Ex. 17 at ¶ 10; Ex. 18 at ¶ 11; Ex. 19 at ¶ 10; Ex. 20 at ¶ 8; Ex. 21 at ¶ 11; Ex. 23 at ¶ 18; Ex. 24 at ¶ 12; Ex. 25 at ¶ 13; Ex. 26 at ¶ 13; Ex. 27 at ¶ 10; Ex. 30 at ¶ 11; Ex. 31 at ¶ 13; Ex. 35 at ¶ 12; Ex. 36 at ¶ 10; Ex. 38 at ¶ 20; Ex. 39 at ¶ 12; Ex. 40 at ¶ 12; Ex. 41 at ¶ 11; Ex. 45 at ¶ 11; Ex. 48 at ¶ 12; Ex. 49 at ¶ 13; Ex. 52 at ¶ 10; Ex. 58 at ¶ 11; Ex. 60 at ¶ 12; Ex. 61 at ¶ 11; Ex. 63 at ¶ 11; Ex. 64 at ¶ 11; Ex. 65 at ¶ 17; Ex. 66 at ¶ 11; Ex. 68 at ¶ 21; Ex. 70 at ¶ 12; Ex. 71 at ¶ 10; Ex. 73 at ¶ 10; Ex. 74 at ¶ 11; Ex. 76 at ¶ 11; Ex. 77 at ¶ 11; Ex. 78 at ¶ 10; Ex. 79 at ¶ 11; Ex. 80 at ¶ 11; Ex. 82 at ¶ 11; Ex. 83 at ¶ 11; Ex. 84 at ¶ 13; Ex. 87 at ¶ 13; Ex. 88 at ¶ 11; Ex. 89 at ¶ 16; Ex. 90 at ¶ 8; Ex. 91 at ¶ 11; Ex. 92 at ¶ 11; Ex. 93 at ¶ 8; Ex. 94 at ¶ 10; and Ex. 97 at ¶ 11.

[49] *See* Section II.B.1.a *supra*.

### 3. Plaintiffs All Worked in the Denver Metropolitan Area, But They Seek to Represent an Organizationally and Geographically Diverse Class of Current and Former Teammates.

Courts deny certification when plaintiffs fail to present specific evidence that they are similarly situated to employees who are both organizationally and geographically dispersed. *See, e.g., Tracy v. Dean Witter Reynolds, Inc.*, 185 F.R.D. 303, 309 (D. Colo. 1998) (finding ten employee affidavits and depositions did not support an inference "that their experiences [were] reflective of a national practice to deny overtime compensation."); *Hens v. ClientLogic Operating Corp.*, 2006 WL 2795620 (W.D.N.Y. Sept. 26, 2006) (refusing to certify the class as to locations for which Plaintiff submitted no declarations); *Tucker v. Labor Leasing, Inc.*, 872 F. Supp. 941, 949 (M.D. Fla. 1994) (denying company-wide notice because plaintiffs failed to show they were similarly situated to employees at other sites). This is especially true when plaintiffs do not present any declarations from employees located at different facilities. For example, in *Braun v. Superior Indus. Int.'l, Inc.*, 2010 WL 3879498, at *6 (D. Kan. Sept. 28, 2010), the plaintiffs did not present declarations from employees working at all of the defendant's sites, and the Court found "there are no allegations or evidence from which the court could infer that employees in those facilities are required to perform pre- and post-shift work." *Id*.

Plaintiffs Oldershaw, Navarro, Stant, and Stevens all worked in the same Palmer group (a DaVita term for a geographic region, each with its own reporting chain) in the Denver metropolitan area and all admitted during their depositions that they do not know how other teammates record or spend their time. (Oldershaw Dep. at 126:3-18; Navarro Dep. at 64:7-8; Stant Dep. at 114:11-22; and Stevens Dep. at 74:5-25.) Their only "evidence" of a nationwide policy or practice is their own self-serving statements in their declarations and the declaration of

a single former employee, Stephanie Schreffler. (Declaration of Georgia Hamren, Dkt. #60-12, at ¶ 13; Declaration of Kelsey Oldershaw, Dkt. #60-12, at ¶ 9; Declaration of Jaymie Stevens, Dkt. #60-12, at ¶ 10; Declaration of Elina Navarro, Dkt. #60-12, at ¶ 10; Declaration of Jane Stant, Dkt. #60-12, at ¶ 9; and Declaration of Stephanie Schreffler, Dkt. #60-13, at ¶ 16.) But, one declaration from a single employee that is contradicted by at least 90 declarations submitted by DaVita is insufficient to show all of the putative class members Plaintiffs seek to represent were subjected to a uniform, nationwide policy or practice that violates the FLSA.

**4. Individualized Inquiries Predominate This Case.**

This lawsuit is simply not a good candidate for collective treatment because the adjudication of Plaintiffs' claims, much less the claims of the class they seek to represent, necessarily requires highly individualized inquiries into each opt-in plaintiff's work history with DaVita. *See, e.g., Castle v. Wells Fargo Fin., Inc.*, 2008 WL 495705, at *5 (N.D. Cal. Feb. 20, 2008) (denying certification because "individual issues predominate such that the employees are not similarly situated" in off-the-clock cases); *Williams v. Accredited Home Lenders, Inc.*, 2006 WL 2085312, at *4 (N.D. Ga. July 25, 2006) (denying certification because "there must be a fact-specific, individualized inquiry into each Plaintiff's day-to-day activities" to determine whether "off-the-clock" violations existed). These individualized inquiries include, but are not limited to, the following:

(a) the job position the opt-in holds or held;

(b) whether the opt-in is or was classified as exempt or non-exempt (or both at different times during his or her employment);

(c) the job duties the opt-in performs(ed);

(d) the Palmer group in which the opt-in works(ed);

(e) the supervisors to whom the opt-in reports(ed);

(f) the training provided to each opt-in;

(g) the manner in which each opt-in records(ed) his or her time;

(h) whether the opt-in performed off-the-clock work;

(i) whether any off-the-clock work the opt-in performed resulted in the opt-in working enough hours to qualify for overtime;

(j) whether any alleged off-the-clock activities performed by the opt-in actually constitutes "work" under the FLSA; and

(k) whether the *de minimis* doctrine applies to the opt-in's alleged off-the-clock work.

Conditional certification is not appropriate in a case like this because Plaintiffs' allegations relate to specific "circumstances personal to the [individual plaintiffs] rather than [any] generally applicable policy" or practice like the one at issue in Chipotle. *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1272 (M.D. Ala. 2004). Given the drastic differences among putative class members with respect to their diverse job classifications,[50] daily job duties, supervisors, and claims for off-the-clock work, the facts of this case require too particularized and individualized an analysis into each worker's claims to warrant conditional certification.

The cases Plaintiffs cite to support their argument that the Court should order nationwide notice be distributed to all putative class members can be easily distinguished from the facts at issue here. For instance, in *Smith v. Pizza Hut*, Inc., 2012 WL 1414325, at *5 (D. Colo. Apr. 21, 2012) (Arguello, J.), the Court applied the two-step approach to a proposed class in which all of the members held the same job, shared the same job duties, and were subject to the same reimbursement policy. In *Barnwell v. Corrections Corp. of America*, 2008 WL 5157476, at *2 (D. Kan. Dec. 9, 2008), the Court applied the two-step approach to a class of corrections officers

[50] *See* Section II.B.1.a. *supra*.

– each subject to the same policy requiring him or her to commence work, unpaid, seven minutes prior to his or her shift. Similarly, in *Underwood v. NMC Mortg. Corp.*, 245 F.R.D. 720, 723 (D. Kan. 2007), the Court applied the two-step approach to a class who held the same position and job duties and were subject to the same policy that allegedly violated the FLSA.[51]

**C. If Notice Is Approved, Plaintiffs' Proposed Schedule and Posting Requirements Are Overly Burdensome on DaVita and Not Supported by Precedent or the Facts of This Case.**

Because Plaintiffs have failed to prove conditional certification is proper, notice should

---

[51] The remainder of the cases Plaintiffs cite are similarly distinguishable. They all apply the two-step approach this Court rejected in *Chipotle*, and all of the putative class members held the same job, performed essentially the same job duties (like the putative class in *Chipotle*), or were all subject to the same alleged violations of the FLSA. *See Fortna v. QC Holdings*, 2006 WL 2385303, at *5 (N.D. Okla. Aug. 17, 2006) (noting plaintiffs limited the proposed class to employees "holding the job classification or performing the job function of 'Branch Manager' a/k/a 'Store Manager'"); *Dyson v. Stuart Petroleum Testers, Inc.*, 308 F.R.D. 510, 513 (W.D. Tex. 2015) (addressing one specific job position in which all such employees were subject to the same conditions of employment); *Kelly v. Bluegreen Corp.*, 256 F.R.D. 626, 631 (W.D. Wis. 2009) (certifying class of sales representatives "because there appears to be no difference among" their job descriptions or policies that apply to them); *Adams v. Inter-Con Sec. Sys., Inc.*, 242 F.R.D. 530, 537 (N.D. Cal. 2007) (recognizing putative plaintiff security guards all had the same job position with the same job duties); *Levy v. Verizon Info. Servs. Inc.*, 2007 WL 1747104, at *4-5 (E.D.N.Y. June 11, 2007) (certifying a limited class sought by plaintiffs in three states because plaintiffs only had declarations from individuals in those states); *Burch v. Quest Commc'ns Int'l, Inc.*, 500 F. Supp. 2d 1181, 1185 (D. Minn. 2007) (certifying a class of call center employees, all of whom had similar job duties and shared the same allegations of off-the-clock work); *Vondriska v. Premier Mortg. Funding, Inc.*, 564 F. Supp. 2d 1330, 1335 (M.D. Fla. 2007) (noting all of the putative plaintiffs, loan officers, had the same job position with the same job duties; *Allen v. McWane, Inc.*, 2006 WL 3246531, at *3 (E.D. Tex. Nov. 7, 2006) (recognizing all of the putative plaintiffs had the same job and same job duties); *Pontius v. Delta Financial Corp.*, 2005 WL 6103189, at *3 (W.D. Pa. July 22, 2005) (certifying a misclassification case where all putative class members had the same job duties so that the exempt classification analysis could be performance for all members of the collective); *Pendlebury v. Starbucks*, *Pendlebury v. Starbucks Coffee Co.*, 2005 WL 84500, at *1-2 (S.D. Fla. Jan. 3, 2005) (certifying a putative class of store managers alleging they were improperly classified as exempt, all of whom had the same job duties.

not be issued to anyone.[52] However, if the Court were to find otherwise, Plaintiffs' proposed notice and the schedule they propose are not appropriate and must be modified.

**1. The Scope of the Notice Is Overbroad – The Notice Should Be Limited to Teammates in Plaintiffs' Geographic Region, Who Report to Similar Supervisors, and Perform Similar Duties.**

The geographic scope of the proposed notice is overbroad, as the named Plaintiffs all worked in Colorado within the same DaVita Palmer group. Courts routinely deny geographically broad certification and restrict the geographic scope to only those areas where the named plaintiffs worked. *See, e.g., Hobbs v. Tandem Envtl. Solutions,* 2011 WL 484194, at *2 (D. Kan. Feb. 7, 2011) (limiting class to employees who provided services at the Wichita branch only because plaintiffs failed to make substantial allegations of similarity to employees in other branches); *Harper v. Lovett's Buffet, Inc.*, 185 F.R.D. 358, 363 (M.D. Ala. 1999) (limiting scope of collective action to a single location where employees worked "at different restaurants, in different states, for different managers, and, most likely, in quite different working conditions"); *Travers v. Jetblue Airways, Corp.*, 2010 WL 3835029, at *3 (D. Mass. Sept. 30, 2010) (denying conditional certification to skycaps where plaintiffs failed to show the existence of similarly situated skycaps at JetBlue terminals outside of Boston); *Tucker v. Labor Leasing, Inc.*, 872 F. Supp. 941, 947-49 (M.D. Fla. 1994) (granting motion as to other clerical employees at same terminal, but holding that employees failed to establish that clerical employees at other locations were similarly situated); *McGlone v. Contract Callers, Inc.*, 867 F. Supp. 2d 438, 445 (S.D.N.Y.

[52] It is worth noting that "DaVita", as Plaintiffs appear to be using that term, consists of many different business units, each of which is separately managed, they utilize their own reporting chains, and they engage in different lines of business. DaVita assumes Plaintiffs seek approval to send notice of this lawsuit to teammates in the kidney care line of business since that is the line of business in which all Plaintiffs and current opt-ins worked.

2012) (rejecting nationwide class and limiting notice to division in which plaintiff worked).

Plaintiffs have failed to present admissible evidence to justify certification as to all nonexempt (hourly) teammates across the country. Because the evidence shows Plaintiffs only worked in the Denver metropolitan area, any notice should be limited to nonexempt teammates in the same geographic area who reported to the same supervisors as Plaintiffs and performed the same or similar job duties.

**2. Plaintiffs Seek Sensitive Personal Information about Potential Opt-Ins That Is Not Necessary for Notice and Is Nothing More than an Intrusion Into Teammates' Reasonable Expectations of Privacy.**

If the Court approves notice, which it should not do under either a joinder standard (which does not contemplate notice) or the Tenth Circuit's two-step process, Plaintiffs request the Court to order DaVita to produce the following information about putative class members: names, addresses, email addresses, telephone numbers, dates of employment, and dates of birth. (Motion, p. 13.) DaVita respectfully requests that it only be required to provide information relevant and necessary for the notice: the names and last known home addresses of current and former teammates. Plaintiffs' request for the production of highly personal information entrusted to their employer, including current and former teammates' telephone numbers, personal email addresses (which DaVita does not maintain for all nonexempt teammates), and dates of birth would unnecessarily invade the privacy of those individuals without their consent. *See, e.g., Greenstein v. Meredith Corp.*, 948 F. Supp. 2d 1266, 1271 (D. Kan. 2013) (denying plaintiffs' request for e-mail addresses and social security numbers); *Taylor v. Autozone, Inc.*, 2011 WL 2038514, at *6 (D. Ariz. 2011) ("[I]n the interest of protecting class members' privacy, we will not order defendant to provide telephone numbers . . . Such information is sensitive, and

putative class members may have provided personal data to defendant with the expectation of confidentiality."); *Torres v. CSK Auto, Inc.*, 2003 WL 24330020, at *3 (W.D. Tex. Dec. 17, 2003) (denying FLSA plaintiffs' request for names, addresses, social security numbers, and telephone numbers of putative class members based on privacy concerns). This highly personal information about persons who may in fact have no interest in this litigation should not be disclosed on the thin basis that Plaintiffs' counsel desires it. Current and former DaVita teammates' privacy interests outweigh any need for the compelled disclosure of such data.

Plaintiffs misrepresent court rulings on this issue by stating their "request is consistent with how other courts have treated similar circumstances." (Motion, pp. 13-14.) In fact, the cases Plaintiffs cite in their Motion are easily distinguishable from the facts at issue in this case and do not support the Court ordering DaVita to disclose highly sensitive personal information about its teammates without their permission. *See Jones v. JGC Dallas LLC*, 2012 WL 6928101, at *3 (N.D. Tex. Nov. 29, 2012), *report and recommendation adopted*, 2013 WL 271665 (N.D. Tex. Jan. 23, 2013) (ordering the defendant to provide contact information for potential plaintiffs but limiting the putative class to exotic dancers who were classified as independent contractors); *Guy v. Casal Inst. of Nevada, LLC*, 2014 WL 1899006, at *7 (D. Nev. May 12, 2014) (ordering the defendant to provide email addresses, physical addresses, and telephone numbers but not dates of birth or dates of employment); *Calder v. GGC-Baltimore, LLC*, 2013 WL 3441178, at *3 (D. Md. July 8, 2013) (certifying class of exotic dancers, all of whom had the same job duties, but did not require defendant to provide dates of birth or dates of employment); *Morden v. T-Mobile USA, Inc.*, 2006 WL 1727987, at *2-3 (W.D. Wash. June 22, 2006) (noting the defendant was required to provide only names of putative class members); *Shockey v. Huhtamaki, Inc.*, 730

F. Supp. 2d 1298, 1308 (D. Kan. 2010) (ordering the defendant to provide only names, addresses, telephone numbers, and dates of employment); *Belcher v. Shoney's, Inc.*, 927 F. Supp. 249, 252 (M.D. Tenn. 1996) (requiring the defendant to provide only the names and addresses of putative class members; *Schwed v. Gen. Elec. Co.*, 159 F.R.D. 373, 377 (N.D.N.Y. 1995) (limiting distribution of notice in an age discrimination case to a single location and employees in a particular division).

**3. A 45-Day Joinder Period is More Than Adequate.**

A ninety-day joinder period for potential opt-in plaintiffs to become parties is simply too long. Plaintiffs contend putative plaintiffs require ninety days to "learn of the collective action and file their consent-to-join." But, Plaintiffs cite no authority indicating a ninety-day opt-in period is appropriate in this case. To the contrary, a ninety-day opt-in period would diverge from the overwhelming number of decisions holding thirty to forty-five days is sufficient. *See e.g., Greenwald v. Phillips Home Furnishings, Inc.,* 2009 WL 1025545, at *1 (E.D. Mo. April 15, 2009) (allowing 45 days to opt-in); *Martinez v. Cargill Meat Sols.*, 265 F.R.D. 490, 501 (D. Neb. 2009) ("holding forty-five days is sufficient time for putative plaintiffs to consider their options and, if desired, seek the assistance of outside counsel in deciding whether to join this lawsuit"); *DeKeyser v. Thyssenkrup Waupaca, Inc.,* 2008 WL 5263750, at *6 (E.D. Wis. Dec. 18, 2008) (allowing 45 days); *Williams v. Long*, 585 F. Supp. 2d 679 (D. Md. 2008) (allowing 30 days); *Bados Madrid v. Peak Const., Inc.,* 2009 WL 2983193, at *3 (D. Ariz. Sept. 17, 2009) (allowing 45 days); *Boyle v. Barber & Sons, Co.,* 2004 WL 5897946, at *5 (W.D. Mo. May 21, 2004) (allowing 30 days); *Baden-Winterwood v. Life Time Fitness*, 2006 WL 2225825, at *3 (S.D. Ohio Aug. 2, 2006) ("[S]ixty (60) days is too long and would needlessly delay the litigation.").

The court in *Martinez* explained another reason for refusing to allow an excessively long opt-in period, "[A]s to those plaintiffs who have already joined, 120 days will substantially delay the progress of this litigation." *Martinez*, 265 F.R.D. at 501 (allowing 45 days). In this case, ninety days is simply too long and unnecessary as it will delay the progress of this litigation for the Plaintiffs already in this action and for Defendants. As in the above cases, forty-five days is more than sufficient for putative plaintiffs to receive the notice, consider their options, and potentially seek an opinion from outside counsel in deciding whether to join this lawsuit.

**4. A Sixty-Day "Pre-Notice" Period Is Unprecedented and Improper.**

Not only do Plaintiffs request an excessively long opt-in period, but they also seek to tack on an extra sixty days at the front-end of the opt-in period as an initial "contact period." Plaintiffs cite only one case to support their request, but, *Hoffman-LaRoche* did not contain a "pre-notice" period like the one Plaintiffs request. In fact, the *Hoffman-LaRoche* notice was not distributed via telephone, email, or text message – rather, the notice was distributed by mail without a "pre-notice" confirmation period. *See Hoffmann-La Roche*, 493 U.S. at 171. E-mail was not widely used, and text messages did not exist when the case was decided. Plaintiffs' overreaching request for an additional sixty days before the notice period begins is unwarranted and not supported by any authority.

In *Boyington v. Percheron Field Servs., LLC*, the plaintiffs requested the last known mailing address and e-mail address of each member of the proposed notice group. 2015 WL 3756330, at *3 (W.D. Pa. June 16, 2015). The plaintiffs argued that "because the proposed FLSA Notice Group include[d] many persons who are no longer employed by [defendant], and for whom [defendant] may not have an accurate mailing address, production of the e-mail

addresses [wa]s necessary to ensure that each member of the Proposed FLSA Notice Group receive[d] notice of [the] action." *Id.* The court rejected the plaintiffs' argument holding that providing the email address of the members of the conditionally certified class was overly intrusive. *Id*. Moreover, the court assuaged plaintiffs' concerns indicating it was "willing to revisit the issue should notification via first-class mail prove to be insufficient." *Id*.

Similarly, in this case, Plaintiffs' cite a "risk that Notice sent by first-class mail to a last known address will not reach potential former employees of Defendants." But, as in *Boyington*, this Court should follow the tried and true procedure for notice, First Class U.S. mail, and be willing to revisit the issue should notification via first-class mail prove to be insufficient. Allowing Plaintiffs to contact potential opt-in plaintiffs via telephone, email, and/or text message is overly intrusive and completely unnecessary. Further, an additional sixty-day period to confirm mailing addresses before the notice period begins is unprecedented and not appropriate in this case.

**5. The Court Should Not Toll the Statute of Limitations.**

Tolling the statute of limitations is not proper in this case. Generally, a cause of action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action, even though the plaintiff may not be aware of all of the evidence relevant to his or her claim. *See, e.g., Baker v. Bd. of Regents of State of Kan.,* 991 F.2d 628, 632 (10th Cir. 1993). Tolling the statute of limitations may be proper in cases where a plaintiff or plaintiffs were "deceived, misled, lulled into inaction, or otherwise faced extraordinary circumstances that made it impossible for them to file a timely FLSA claim." *Geiger v. Z-Ultimate Self Def. Studios LLC*, 2015 WL 1139843, at *3 (D. Colo. Mar. 11, 2015). Generally, the delay between the filing of a

complaint and notice to potential opt-in plaintiffs, so long as it is limited to litigation in its normal course, is not a basis upon which equitable tolling properly may be used to toll the statute of limitations. *See Geiger*, 2015 WL 1139843, at *3; *Young v. Dollar Tree Stores, Inc.*, 2013 WL 1223613, at *2-3 (D. Colo. March 25, 2013). Indeed, "plaintiffs and potential opt-in plaintiffs are presumed to be aware of the facts and circumstances of their employment, and it is those facts and circumstances that allegedly form the basis of the FLSA claims of the plaintiffs." *Geiger*, 2015 WL 1139843, at *3.

While it is true that this Court tolled the statute of limitations in *Chipotle*, it is also true that there were extenuating circumstances in that case that are not at issue here. As this Court explained in *Chipotle*, the "procedural history of [that] case [wa]s tortuous, and uniquely so." *Turner v. Chipotle Mexican Grill, Inc.*, 123 F. Supp. 3d 1300, 1304 (D. Colo. 2015), *motion to certify appeal denied,* 2015 WL 5579579 (D. Colo. Sept. 23, 2015). In this case, as in *Geiger*, there is simply "no basis to assume . . . that all plaintiffs and all potential opt-in plaintiffs . . . somehow have been prevented from filing a timely FLSA claim" whether collectively or individually. Further, Plaintiffs' contention that tolling is necessary because of Defendants' alleged "misrepresentation that it would engage in negotiations regarding Plaintiffs' Notice and Consent at the Early Neutral Evaluation" is simply false.

This Court should deny Plaintiffs' request to toll the statute of limitations "retroactive to the date on which Plaintiffs filed this Motion for Approval of Notice" because, as courts in this District have held, "the delay between the filing of a complaint and notice to potential opt-in plaintiffs" does not render tolling proper. *Collins v. Dkl Ventures, LLC*, 2016 WL 852880, at *3 (D. Colo. Mar. 4, 2016).

**6. The Court Should Not Require DaVita to Post Plaintiffs' Notice on Its Intranet.**

Posting a notice on Defendants' intranet is not only unnecessary but is overly intrusive and will deliver notice to employees who are not included in the putative class. Delivering notice via First Class U.S. mail is the standard means of delivery for notice in FLSA collective action cases. *See e.g., Cannon v. Time Warner NY Cable LLC*, 2014 WL 4401313, at *2 (D. Colo. Sept. 5, 2014), *report and recommendation adopted as modified*, 2014 WL 4980383 at *1 (D. Colo. Oct. 6, 2014). In their overreaching request for intranet notice, Plaintiffs rely on several cases, <u>none of which permitted intranet posting</u>. The cases Plaintiffs cite are of no value for several reasons.

First, it is noteworthy that none of Plaintiffs' cases are from the District of Colorado, the Tenth Circuit, or even another district court in the Tenth Circuit. Second, and more importantly, none of the cases permitted intranet notice (and one case actually explicitly denied a request for intranet posting). Finally, the cases are inapposite and, to the extent a court did allow physical posting at the defendant's facility (which is not necessarily tantamount to intranet posting), there was a specific reason for allowing physical posting.

In *Baricuatro v. Indus. Pers. & Mgmt. Servs., Inc.*, the plaintiffs were itinerant Filipino workers, scattered across the globe, many of whom did not speak English and lacked "full access to their mail and email." 2012 WL 5986467, at *1 (E.D. La. Nov. 29, 2012). The putative plaintiffs in *Arriaga-Zacarias v. Lewis Taylor Farms, Inc.* were Mexican citizens who were employed as farm workers. 2008 WL 5115005, at *1 (M.D. Ga. Dec. 4, 2008). The putative plaintiffs in *Garcia v. Salamanca Grp., Ltd.* were restaurant workers. 2008 WL 818532, at *1 (N.D. Ill. Mar. 24, 2008). In *Romero v. Producers Dairy Foods, Inc.*, the court required the

defendant to physically post notice on its premises because of an extraordinary circumstance where some names and addresses of employees were not on the employee list the defendant provided. 235 F.R.D. 474, 493 (E.D. Cal. 2006). Finally, in *Castillo v. P & R Enters., Inc.*, the defendant was required to post notice in its offices, but most employees worked as janitors at third-party facilities, and the defendant was not required to post notice in third-party areas "not designated" for defendant's use. 517 F. Supp. 2d 440, 449 (D.D.C. 2007).

Contrary to Plaintiffs' contention, the circumstances of this case are not a "similar situation" to the cases on which they rely. The putative class in this case includes employees and former employees who presumably speak English and are able to receive First Class U.S. mail. Defendants are also fully capable of providing a complete list of putative class members to Plaintiffs without leaving out any names.

Surprisingly, Plaintiffs also rely on *Alequin v. Darden Rests., Inc.* for the proposition that requiring intranet posting is "consistent with how other courts have handled other, similar situations." (Motion, p. 16.) In *Alequin*, however, the court denied the plaintiffs' request that notice be posted on the defendant's centralized computer network, holding notice by "regular mail and, where available, email is sufficient." 2013 WL 3945919, at *1 (S.D. Fla. July 31, 2013). The *Alequin* court agreed with the defendant's arguments that if notice was posted on the intranet, it would necessarily be delivered to employees who were not members of the putative class. *Id*. Further, the court held, "posting notice of a lawsuit against [d]efendants on [d]efendants' centralized computer network is overly and unnecessarily intrusive into" defendants' operations. *Id*.

If required to post on its intranet, DaVita's teammates who are not included in the putative class will receive the notice. This is not only intrusive but will necessarily lead to confusion as teammates not in the putative class may not know whether they are included in this lawsuit. Further, intranet posting is not only over inclusive because it will send the notice to employees not included in the putative class, but it is also under inclusive because it will fail to reach other putative class members who are no longer employed by Defendants. Such an over inclusive and under inclusive means of distributing notice is not only ineffective, but unnecessary.

## III. CONCLUSION

For all the foregoing reasons, the Court should apply the Tenth Circuit's two-step approach to certifying FLSA collective actions and deny Plaintiffs' Motion for failing to meet their burden to come forward with "substantial allegations," supported by admissible evidence, showing they are similarly situated to the class they seek to represent. At a minimum, if the Court is inclined to apply the *Chipotle* approach to this case, notice should not be approved (since there is no authority for notice under the Court's liberal joinder standard outside the Tenth Circuit's two-step approach), the scope of any notice that is approved should be limited as described above, and exempt teammates should not be included in the same lawsuit as nonexempt teammates.

Dated this 26th day of September, 2016.

OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.

By: s/ Austin E. Smith

David D. Powell, Jr.
Austin E. Smith
1700 Lincoln Street, Suite 4650
Denver, Colorado 80203
Telephone: 303.764.6800
david.powell@ogletreedeakins.com
austin.smith@ogletreedeakins.com

Dorothy D. Parson
111 Monument Circle, Suite 4600
Indianapolis, IN 46024
Telephone: 317.916.2160
dorothy.parson@ogletreedeakins.com

Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of September, 2016, I electronically filed the foregoing **DEFENDANTS' RESPONSE TO PLAINTIFFS' AMENDED MOTION FOR APPROVAL OF NOTICE** with the Clerk of Court using the CM/ECF system which will also send notification to the following:

Colleen T. Calandra
colleen@ramoslaw.com

*s/ Linda R. Kerman*
Linda R. Kerman, Paralegal