**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:  1:15-cv-01964-MSK-NYW

KELSEY OLDERSHAW,
ELINA NAVARRO,
JANE STANT, and
JAYMIE STEVENS
individually and on behalf of others
similarly situated,

      Plaintiffs,

v.

DAVITA HEALTHCARE PARTNERS, INC. and
TOTAL RENAL CARE INC.,

      Defendants.

---

### DEFENDANTS' MOTION FOR DECERTIFICATION

---

      Defendants, DAVITA HEALTHCARE PARTNERS, INC. and TOTAL RENAL CARE INC. ("Defendants" or "DaVita") hereby move this Court to decertify the conditionally-certified collective and in support thereof state as follows:

      **CERTIFICATION**: Pursuant to D.C.COLO.LCivR Rule 7.1, Defendants have conferred with Plaintiffs' counsel regarding the relief sought by this motion. Plaintiffs oppose the motion.

### PRELIMINARY STATEMENT AND BACKGROUND

      The conditionally certified collective is a mismatched group of employees who held dozens of different job titles, performed materially distinct job duties, and reported to a litany of different supervisors.  Largely because of these material differences, the claims asserted by the members of the collective vary drastically.  Discovery in this case shows that the only thing the Plaintiffs and Opt-ins have in common is that they work(ed) for DaVita.  Otherwise, they advance different

1

alleged violations of the FLSA based on completely different causes, theories and factual circumstances. As such, Plaintiffs and the Opt-ins' claims are not suitable for resolution as a collective action. Put another way, Plaintiffs and the Opt-ins' claims cannot be tried as a collective action whereby the factfinder makes collective liability and damages determinations. Because of the totally individualized nature of each Plaintiff and Opt-in's claims, the collective should be decertified and each individual's claims should be determined on their own merits.

This Court recognized the potential for variation amongst claims at the first stage of the certification analysis, but granted conditional certification under the applicable (lenient) standard.[1] Thereafter, Plaintiffs issued notice to these current and former DaVita employees, some of whom filed consents to participate. A total of 80 current and former DaVita employees filed consents to join during the opt-in period. Several have since been dismissed from the action by various means, and only 69 remain as of this filing.[2] The Parties have taken extensive discovery, including 60 depositions of the Plaintiffs and Opt-ins.

---

[1] The conditionally-certified collective includes "all non-exempt employees who worked at DaVita's Arvada, Aurora, Belcaro, Brighton, Boulder, Commerce City, East Aurora, Lakewood, Lakewood Crossings, Lone Tree, Sable, South Denver, and Thornton clinics in Colorado. The conditionally-certified collective also includes all non-exempt employees who worked for DaVita out of state in Great Falls, Montana and under the supervision of Dan Viaches in clinics in Indiana, Illinois, Georgia, and Tennessee." *See* Doc. No. 138, at 30.

[2] Thirteen (13) opt-ins filed stipulations of voluntary dismissal with the Court. *See* Docs. 188, 189, 191, 193 (Ethan Hatchett, Isaac Aguilar, John Bergquist, Kenny (Chue) Yang, Melissa Bettger, Heathcliff Warren, Karolyn Bird, Kimberly Palmer, Ricky Bush, Peggy Miller, Trevor Lynn, Ivy Gonzales, and Kimberly Palmer). Defendants filed a motion to dismiss fourteen (14) other opt-ins for failure to prosecute, which is currently pending with the Court. *See* Doc. 192. (Note: Kimberly Palmer was initially included in Doc. 187, but subsequently voluntarily dismissed her claims. *See* Doc. 189.)

Many of the individuals described above gave testimony that was harmful to Plaintiff's case during discovery. Plaintiffs' attempts to remove those individuals from the collective by terminating their claims does little to change the fact that notice was sent to (and therefore the conditionally certified collective includes) people that have no claim. Plaintiffs' voluntary removal of these people from the case concedes this fact.

This discovery reveals that the claims made by the various members of the collective have little in common.  Indeed, the individuals who were deposed held more than 25 different positions and performed dramatically different job duties.  Some even admitted to holding exempt positions during some or all of the relevant period.  Thus, unsurprisingly, the claims of these individuals vary drastically.  Some allege that they worked off-the-clock, while others admit having been paid for all hours worked.  Some allege that they were unable to take a meal break, while others admit that meal breaks were always provided.

Even among the group of Plaintiffs purporting to assert off-the-clock claims, Plaintiffs advance at least fourteen distinct types of claims.  Several opt-ins testified that some supervisors required them to work off-the-clock, but that others did not.  Others testified that whether an uninterrupted meal break was provided depended on what facility you worked at or what shift you worked.  Still others make no off-the-clock or meal break claim—instead asserting a claim for spread of hours, breach of contract, or unpaid travel time.

Given these material variances in employment settings and claims made, any determination of liability here would necessarily require individualized inquiries.  The merits of any individual's claims have no bearing on any other Plaintiff's claims.  Allowing such disparate claims to proceed as a collective action would inflict a high degree of prejudice on DaVita because it would allow the testimony of individuals with different claims potentially to serve as the basis of a collective-wide award that would include others who are not similarly situated.  Such a trial would also require DaVita to present individualized defenses that apply only to some Plaintiffs, imposing an impossible task of determining liability on the factfinder.  The collective must therefore be decertified.

## **ARGUMENT**

This case cannot proceed as a collective action unless the members of the collective are "similarly situated." 29 U.S.C. § 216(b). "[T]he Tenth Circuit has approved a two-stage *ad hoc* analysis for determining whether employees are 'similarly situated' under § 216(b)." *Swartz v. DJ Eng'g, Inc.*, 2015 WL 4139376, at *7 (D. Kan. July 9, 2015). At the first stage of this analysis, the court applies a lenient standard—requiring "nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Theissen v. GE Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001). Here, the Court discharged the first stage of this analysis when it authorized notice to members of the conditionally certified collective.[3] *See* Doc. 138.

Now that discovery is complete, however, the Court must make "a second determination, utilizing a stricter standard of 'similarly situated.'" *Theissen*, 267 F.3d at 1103. At this stage, "§

---

[3] Three different approaches are available to district courts conducting the 'similarly situated' analysis: the *ad hoc* approach, the Rule 23 and the spurious approach. *See Theissen*, 267 F. 3d at 1102-1103. Tenth Circuit case law mandates no particular approach, but does recognize that the *ad hoc* method is "arguably...the best of the three approaches." *Id.* at 1105. Indeed, courts have lauded the *ad hoc* approach for its practicality and ease of use, noting that it has "two clear stages, with two clear standards to apply." *Sanchez v. Simply Right, Inc.*, 2017 WL 2230079, at *3 (D. Colo. May 22, 2017).

Use of the Rule 23 approach, on the other hand, has been recognized as contrary to Congressional intent. *See generally In re Chipotle Mexican Grill, Inc.*, 2017 U.S. App. 2017 WL 4054144, at *4 (10th Cir. 2017). The spurious method, similarly, has been questioned as "debatable," although not so much as to rise to an abuse of discretion. *Id.* at *11.

Largely for these reasons, courts within this Circuit consistently apply the second step of the *ad hoc* approach during the second stage of the process—when deciding a motion to sever (or decertify). *See e.g., Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088 (D. Kan. Aug. 7, 2012); *Scott v. Raudin McCormick, Inc.*, 2010 WL 5093650 (D. Kan. Dec. 8, 2010).

For these reasons, this motion should proceed under that standard. It is respectfully submitted, however, that the standards are similar—and that the outcome would be the same under any of the approaches. *See generally Theissen*, 267 F.3d at 1105 (noting that "there is little difference in the various approaches. All approaches allow for consideration of the same or similar factors, and generally provide a district court with discretion to deny certification for trial management reasons.")

216(b) demands a higher level of scrutiny." *Bryant v. At Fast Delivery of Colo., Inc.*, 2015 WL 3929663, *2 (D. Col. Jun 28, 2015) (Krieger, C.J.) In conducting this analysis, courts review several factors including: (1) disparate factual and employment settings of the individual plaintiffs, (2) the various defenses available to defendant which appear to be individual to each plaintiff, and (3) fairness and procedural considerations. *See id.* These are commonly referred to in the Tenth Circuit as the "*Theissen* Factors."[4]

For the reasons discussed below, all three of the *Theissen* Factors weigh heavily in favor of decertification. Indeed, discovery confirms that Plaintiffs had very different jobs and make very different claims that will be subject to highly individualized defenses. Largely for these two reasons, it would be neither fair nor practical to allow this case to go to trial as a collective action.[5]

---

[4] This second determination is focused on how this case will be tried. *Thiessen*, 267 F.3 at 1102-03 (district court should apply a stricter standard at decertification focused on whether individual issues will predominate *at trial*). If the case remains certified for purposes of trial, it means that the jury can make a classwide liability determination based on the testimony or evidence from representative plaintiffs. *See General Bldg. Contractors Ass'n v. Pa.*, 458 U.S. 375, 380 n.5 (1982) (where liability determinations require individualized proof is grounds for a motion for decertification). This is a significantly higher standard for Plaintiffs to satisfy than the Rule 20 permissive joinder standard which only requires that there be *any* common questions of law or fact. For this reason, courts have decertified conditionally-certified classes such as this one, only to later consider whether *individual* cases can be joined under Rule 20 on which *Plaintiffs* have the burden. *See, e.g. Adams v. Big Lots Stores, Inc.*, 2009 WL 2160430 (E.D. La. 2009) (recognizing that individual plaintiffs stemming from a decertified FLSA collective action can meet the permissive Rule 20 joinder standard even though the court had decertified the FLSA collective action for failure to meet the "similarly situated" standards). In short, whether the individual Plaintiffs in this matter have claims that satisfy the Rule 20 joinder standard is not before the Court in this Motion. Rather, this Motion requests that this Court not permit this case be tried as a collective action using representative testimony whereby the factfinder can draw liability decisions for everyone in collective based on the testimony of some.

[5] *See Scott v. Raudin McCormick, Inc.*, 2010 WL 5093650, at *4 (D. Kan. Dec. 8, 2010) (holding that the fact that claims required a "fact-intensive analysis weighs against maintaining certification of this collective action."); *see also Purdham v. Fairfax Cnty. Pub. Schs.*, 629 F. Supp. 2d 544, 547 (E.D. Va. 2009) (A collective action can only survive a motion to decertify when the plaintiffs' claims can be adjudicated collectively "because they share common underlying facts and do not require substantial individualized determinations for each class member."); *Holaway v. Stratasys, Inc.*, 2013 WL 5787476, *2 (D. Minn. Oct. 28, 2013) (If liability is "a mainly individual inquiry, then class treatment of this action is not efficient in any way." Fact-intensive, individualized liability determinations "weigh heavily in favor of decertification."); *Zivali v. AT&T Mobility*, 784 F. Supp. 2d 456 (S.D.N.Y. 2011) (decertifying FLSA class involving alleged off-the-clock work because "plaintiffs' off-duty claims involve highly individualized

As one court citing *Thiessen* put it:

> [T]his collective action would be unmanageable because "this case is fraught with questions requiring distinct proof as to individual plaintiffs." *Bayles*, 950 F. Supp. At 1067. "Indeed, a collective action is designed to permit the presentation of evidence regarding certain representative plaintiffs that will serve as evidence for the class as a whole. It is oxymoronic to use [the collective action] device in a case where proof regarding each individual plaintiff is required to show liability." *Id.* (other citations omitted). As the *Thiessen* court observed, "[t]here is simply a realistic limit on what a jury may reasonably be expected to observe, retain and process." *Thiessen*, 996 F. Supp. At 1084.

*Gatewood v. Koch Foods of Miss., LLC*, 2009 WL 8642001, *20-21 (S.D. Miss. Oct. 20, 2009).

The same is true here. As a result, the collective should be decertified.

## POINT I

## PLAINTIFFS' DISPARATE EMPLOYMENT SETTINGS MANDATE DECERTIFICATION

Discovery revealed that the members of the collective worked in drastically different employment settings. Some worked in DaVita clinical facilities, providing health care services to patients. Others worked at DaVita corporate headquarters performing duties such as filing, scheduling, and even preparing materials and planning for meetings. One opt-in's primary duties consisted of providing computer services and IT support. In other words, the members of the collective worked in highly disparate employment settings. The first *Theissen* factor therefore weighs heavily in favor of decertification.

---

situations" and "resolution of the many fact-specific issues . . . would essentially require 4,100 mini-trials in which each individual plaintiff could present evidence that he or she in fact failed to receive proper overtime compensation."); *Mathis v. Darden Rests.*, 2014 WL 4428171, *5 (S.D. Fla. Sept. 1, 2014) (decertifying FLSA collective action in off-the-clock case because "Defendants would face all-or-nothing liability for large groups of employees, despite those employees' dissimilar working conditions. Individual Opt-in Plaintiffs would not receive recoveries based on their individual experiences. Rather, they would be grouped with other Opt-in Plaintiffs and receive either windfalls or insufficient recoveries.").

A. *There Was No Company-Wide Policy or Practice Requiring Plaintiffs to Work Off-the-Clock*

Plaintiffs allege that they were all subject to a uniform, nationwide practice that deprived them of overtime.  But there is simply no evidence establishing the existence of any unifying policies or practices relating to off the clock work.  In fact, the opposite is true.  DaVita has a written policy expressly requiring employees to clock-in for all time worked.  Specifically, Section 4.2 of DaVita's "Teammate Policies" (which serves as the employee handbook), titled "Time Reporting for Non-Exempt Teammates" provides:

> We require non-exempt teammates to report their time worked by clocking in and out on the time and attendance system.
>
> If you are a non-exempt teammate, you must clock in when you start work and clock out at the end of your workday, and for all unpaid time (such as unpaid meal breaks)…
>
> You should be clocked in whenever you are performing work, even if it is not during your scheduled shift.
>
> It is your responsibility to clock in and out, at to ensure the accuracy and completeness of your time record…

A copy of this policy is attached as Composite **Exhibit 58**.

DaVita also has a policy titled "No Off-the-Clock Work" which states, expressly, that "[n]on-exempt teammates are prohibited from conducting any DaVita business outside of their normal work hours, including making or receiving cell phone calls or emails, unless authorized by their supervisor." *Id.*

DaVita also has a policy specifically providing that

> non-exempt teammates . . . should not perform work during . . . meal periods.  Supervisors will make every effort to ensure that you are given regular meal period during which you are relieved of all work, except otherwise provided by law.  If you work six or more hours during your shift, you will be provided with one 30-minute unpaid meal period before the fifth hour of work.  However, if it is necessary for you to work during a meal period, or if

7

you are not relieved of all work during a meal period, then the meal period is considered time worked, and you will be paid accordingly.

*Id.*

At least one Named Plaintiff admits that she knew working off the clock violated DaVita policy, and that no member of management instructed her not to record all of her work time. Deposition of Jaymie Stevens ("Stevens"), at 56:1-9, 49:16-20.[6]  Additionally, several opt-ins acknowledged the existence of these policies and admitted that they were aware of them.[7] Courtney Johnson, for example, concedes that DaVita does not ask employees to work off the clock, but that some employees chose to do so in violation of company policy.  Johnson at 90:18-92:3.  Accordingly, any liability in this case would necessarily be the result of **violations** of DaVita's policies, not the result of DaVita's policies.

This Court recognized at the first stage of the certification process that:

> [T]here is nothing in the Amended Complaint or the declarations or deposition testimony submitted to the Court that indicates that the defendants had a nationwide policy of requiring their employees to work off the clock.

---

[6] Defendants will short cite to depositions being filed in the following form: Deponent's Last Name at Page:Line.  The deposition transcripts are being filed in alphabetical order as the follows: Exhibits: (1) Anders, Kandace; (2) Andreen, Alyssa; (3) Baumer, Kristina; (4) Bentley, Yvonne; (5) Bergquist, John; (6) Bird, Karolyn; (7) Bissell, Ernida; (8) Bolan, Heather; (9) Brakefield, Katherine; (11) Bush, Ricky; (12) Cowell, Debra; (13) David, Sharon; (14) Dolif, Anthony; (15) Duval, Stacy; (16) Everett-Earles, Bobbi; (17) Garner, Diana; (18) Godinez, Nancy; (19) Grays, Collette; (20) Hamren, Georgia; (21) Hannan, Sandra; (22) Harris, Roberta; (23) Horgan, Matthew; (24) Jackson, David; (25) Johnson, Courtney; (26) Jones, Angelina; (27) Kerr, Catherine; (28) Kochkonyan, Ziniada; (29) Landin, Denise; (30) Lucero, Michael; (31) Martinez, Joshua; (32) Massey, Cynthia; (33) Mastroantonio, Stephanie; (34) Mautz, Jamie; (35) Mendiola, Nora; (36) Miller, Peggy; (37) Murphy, Paula; (38) Navarro, Elina; (39) Oldershaw, Kelsey; (40) Page, Melissa; (41) Petrelli, Amber; (42) Ratliff, Arcandrice (43) Reigenborn, Sabrina; (44) Rodriquez, Denisa; (45) Selby, Nancy; (46) Sembower, James; (47) Seutin, Reinhilde; (48) Souza, Wendy; (49) Stant, Jane; (50) Stark, Deborah; (51) Stevens, Jaymie; (52) Tafoya, Kimberly; (53) Thaboua, Sabrina Lucas; (54) Voltolini, Christina; (55) Vue, William; (56) Warren, Heathcliff;  (57) Yang, Chue (Kenny).

[7] *See* Andreen at 42:22-43:14, Baumer at 38:10-42:11, Dolif at 55:10-58:3; Ratliff at 78:7-14; Tafoya at 35:2-8; Stant at 13:22-25, 81:22-82:9.

> Indeed, the deposition testimony of two plaintiffs, Ms. Stant and Ms. Navarro, undermine such claim.  Both testified that defendants allow local facility administrators who supervise local clinics to make decisions about employee overtime.  Ms. Stant admitted that when she worked as a facility administrator, none of her superiors instructed her to deprive employees of overtime pay.  Ms. Navarro testified that she spoke with the defendants' human resources as an assistant facility administrator about paying overtime and was told that local facility administrators had authority to make those decisions.

Doc. 138, at 28-29.

Because of this evidence, this Court found that "there are some facilities where employees may work off the clock, and there are some facilities where employees may not work off the clock."  *Id.* at 29.  Discovery has reinforced the Court's conclusion that there is no universal unlawful policy that Plaintiffs are challenging that applies to all members of the collective.  In fact, the only written policy in existence expressly requires non-exempt employees to clock in for all time worked.  Thus, even if Plaintiffs were directed to work off-the-clock, that direction would have been contrary to Defendants' official policy.

In the absence of any company-wide policy sanctioning the practice complained of, liability inevitably depends on individual circumstances and no collective can be certified.[8]

---

[8] *See, e.g. Camilotes v. Resurrection Health Care Corp.*, 286 FRD 339, 346-52 (N.D. Ill. 2012) (decertifying collective action where plaintiffs had not established that practices complained of were system-wide); *Gatewood*, 2009 WL 8642001, *20-22 (decertifying action where plaintiffs acknowledged they were not subject to single pay practice of employer and evidence showed they were subject to different timekeeping and compensation practices "determined by their specific positions, departments and supervisors"); *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 282-83 (N.D. Tex. 2008) (decertifying action upon finding no evidence of a "single decision, policy, or plan . . . causing the Plaintiffs to work off the clock"); *Lugo v. Farmer's Pride Inc.*, 737 F. Supp. 2d 291, 302-04 (E.D. Pa. 2010) (decertifying FLSA claims because "the liability of defendant depends on whether defendant failed to pay a particular plaintiff for compensable time spent performing [off-the-clock work] activities" and "any under compensation was not suffered on a collective basis . . . but rather [] defendant's policies and practices impacted individual plaintiffs in individual ways."); *Hinojos v. The Home Depot, Inc*., 2006 WL 3712944 (D. Nev. Dec. 1, 2006) (denying certification of nationwide FLSA class alleging unpaid overtime hours and alteration of time cards because plaintiffs did "not point to a common policy or practice on a nationwide, or even statewide, basis" and "the need for individualized determinations to resolve the claims of each plaintiff.").

B. *Plaintiffs Held Various Job Titles and Performed Varying Duties*

Plaintiffs also held various job titles, performed different job duties, and worked under numerous supervisors at many different facilities. For these additional reasons, the factfinder would have to undertake a highly individualized analysis to evaluate the claims made by each individual plaintiff.

The putative collective includes all non-exempt DaVita employees that allegedly worked off-the-clock, worked through a meal break, or were not paid overtime at certain DaVita facilities. Through discovery, it became clear that the group of opt-ins (and therefore the conditionally certified collective) also contains several employees who were exempt during the relevant period.[9] These exempt employees claim that DaVita's classifications of their positions as exempt were incorrect. *See e.g.,* Navarro at 64:13-15.

Because exempt employees are not entitled to overtime pay under the FLSA, the Court would have to undertake an entirely separate, individualized inquiry into whether each position held by these individuals was properly classified as exempt by DaVita before ever getting to the issue of whether there is any liability in the case for allegedly unpaid overtime. This is an entirely different substantive claim from the claims of the non-exempt employees claiming they worked off the clock. It is also a claim that is not alleged in Plaintiffs' Complaint. The existence of exempt and non-exempt employees within the conditionally-certified collective is alone proof that Plaintiffs are not similarly situated, and, therefore, that the collective should be decertified.[10] *See*

---

[9] For example, opt-ins Paula Murphy and Arcandrice Ratliff testified that they held exempt positions during some, if not all, of the relevant period. *See* Murphy at 25:2-26:4; Ratliff at 13:24, 32:20-22.

Likewise, one of the Named Plaintiffs, Elina Navarro, testified that she has been classified as exempt since 2012 when she became an Assistant Facility Administrator ("AFA"). Navarro at 111:14-22. Navarro was also promoted to a FA position in 2015, another exempt position. *Id.*; Ratliff at 70:3-6, 91:9-21.

[10] *See, e.g., Rife v. Fronton Holdings, LLC*, 219 F. Supp. 3d 1256, 1261 (S.D. Fla. 2016) (holding that proposed class including exempt and non-exempt employees was "overbroad" and for this reason, denying

*Blake v. Hewlett-Packard Co.*, 2013 WL 3753965, *11 (S.D. Tex. July 11, 2014) (holding that "if that [class] definition includes both exempt and nonexempt employees, then the members of the putative class cannot be similarly situated.").

Even if the Court were to ignore this fatal flaw, the collective should still be decertified because the non-exempt employees it includes held dozens of different jobs that required them to perform drastically different duties. Indeed, several opt-ins testified that they personally held several different non-exempt positions with DaVita during the relevant period.[11] Some Plaintiffs, such as Sabrina Thaboua, even testified that they worked different jobs during a single shift. Thaboua at 62:12-16 (worked as PCT and Administrative Assistant during same 12-hour shifts). This is especially significant because some Plaintiffs expressly admit that their claim(s) relate only to one of several different positons they held during the statutory period. *See e.g.*, Mastroantonio at 104:18-105:10, 118:4-21, 49:13-16 (only making claim for time worked as a part-time social worker).

The following list contains some but, incredibly, not all the different positions held by members of the conditionally-certified collective:

---

conditional certification); *Stockton v. Alltite, Inc.*, 2016 WL 3973778, *3-4 (D. Kan. July 25, 2016) (denying certification motion because proposed class included exempt and non-exempt employees); *Garcia v. Champion Glass, LLC*, 2013 WL 12106226, *3-4 (W.D. Tex. Mar. 27, 2013) (denying motion for conditional certification where class included both non-exempt and exempt employees); *Reyes v. Bona 1372, Inc.*, 2017 WL 5148367, *6 (E.D. Tex. Oct. 17, 2017) (holding that proposed class including exempt and non-exempt employees was "overbroad" and limited certified class to non-exempt employees only).

[11] Stacy Duval, for example, worked as a Floor Nurse and as a Clinical Coordinator. Duval at 15:8-22. Zinaida Kochkonyan was a PCT and Assistant Administrator. Kochkonyan at 8:12-14. Jamie Mautz has been a PCT, Administrative Assistant and Education Coordinator. Mautz at 30:1. Kelsey Oldershaw was an Executive Assistant and Divisional Coordinator. Oldershaw at 23:24-33:2. Collette Grays has worked as a Floor Nurse, Clinical Coordinator and Case Manager, all at different facilities. Grays at 20:15-20, 24:7-8, 21:17. Jane Stant worked in both exempt and non-exempt positions as an FA, Clinical Administrator, Travel Nurse, Clinical Nurse and Clinical Educator. Stant at 14:1-3, 28:14-14, 28:15-16, 23:2-6. Reinhilde Seutin worked as a PCT, Dialysis Nurse, Clinical Coordinator and Inventory Technician. Seutin at 31:1-24, 47:15-24, 51:17-19. Sabrina Lucas Thaboua worked as a PCT, Administrative Assistant and Vascular Access Manager. Thaboua at 20:13-19, 21:8-12, 21:17-22.

- Patient Care Technician ("PCT")
- PCT II
- PCT III
- Clinical Research Coordinator
- Registered Nurse
- Administrative Assistant
- Biomedical Technician
- Vascular Access Coordinator
- Clinical Coordinator
- Assistant Facility Administrator
- Facility Administrator
- Executive Assistant
- Facility Infection Manager
- Charge Nurse
- Float Nurse
- Clinical Nurse Manager
- Education Coordinator
- Case Manager
- Insurance Support Specialist
- Divisional Coordinator
- Certified Clinical Hemodialysis Technician
- Desktop Support Service Technician
- Network Technician
- Centralized Trainer
- Clinical Educator
- Social Worker

Not surprisingly, the job duties of these 25+ positions vary dramatically. PCTs set up dialysis machines, administer medicine, and assess patients. Baumer at 21:17-24:13; Bergquist at 31:19-24; Kochkonyan at 18:24-22:9. Administrative Assistants file paperwork, answer phones, schedule, and help run payroll. Bentley at 34:7. Executive Assistants organized team meetings, travelled to those meetings, set up interviews, on-boarded new hires, kept executives' calendars, proofread, prepared and submitted expense reports, and ran errands. Hamren at 23:12-27:6; Oldershaw at 75:15-76:6. Biomedical Technicians maintained and repaired medical equipment. Bergquist at 29:9-30:5. Some members of the collective were "Trainers," "Preceptors," or

"Education Coordinators."  *See* Dolif at 19:2-14; Mautz at 34:15-19.  Those individuals registered teammates for training and classes, set up classrooms, and ordered food and supplies.  Mautz at 34:15-19.  At least one member of the collective had primary duties that consisted, generally, of performing IT work at DaVita's World Headquarters.  *See* Souza at 27:10-24.

Largely because the duties of these opt-ins differ dramatically, so too do the circumstances under which they allegedly worked off-the-clock.  A PCT, for example, may have needed to care for a patient during a meal break—and may not have had time to punch back in before doing so.  An office-based worker, on the other hand, may have voluntarily performed work from home without punching in or out at all.

This is akin to a factory worker, secretary, and cashier all employed by the same retailer seeking to assert claims collectively despite having materially different theories of liability.  Any such collective would very likely be decertified, as this one should be, because given the wide disparity of jobs and legal theories, it makes it impossible to determine liability or damages on a collective basis using representative testimony or any other common proof.  Courts have held as much in similar cases involving collectives of healthcare workers that included opt-ins with different positions.[12]  The same result must issue here.

---

[12] *See, e.g. Frye v. Baptist Mem. Hosp.*, 495 F. App'x 669, 673 (6th Cir. 2012) (district court did not abuse its discretion in decertifying collective action brought by employees of a hospital where there was no common theory and the plaintiffs held different jobs, worked in different departments, and were subject to different compensation reporting procedures); *Creely v. HCR Manorcare*, 920 F. Supp.2d 846, 850, 853-54 (N.D. Ohio 2013) (denying "motion for final certification" in action brought by short and long-term care employees because the opt-in plaintiffs occupied various positions including registered nurses, licensed practical nurses, certified nursing assistants, and admissions coordinators at different facilities across the country and because the allegedly unlawful policy was implemented in a decentralized manner); *Jarosz v. St. Mary Med. Ctr.*, 2014 WL 4722614, *7-12 (E.D. Pa. Sept. 22, 2014) (decertifying FLSA collective action where plaintiffs "held a variety of different positions in many different departments, and worked under numerous supervisors"); *King v. W. Corp.*, 2006 WL 118577, *15 (D. Neb. Jan. 13, 2006) ("Because the jobs and responsibilities prevent application of class-wide claims or defenses, litigating this case as a collective action would not be efficient.").

C. *Plaintiffs Worked Under Several Supervisors at Many Different Facilities*

As discussed above, DaVita has a company-wide policy expressly forbidding off-the-clock work and requiring non-exempt teammates to accurately report all hours worked. *See* Exhibit 58. Any directive to work off the clock or accurately record all hours could have only been made on a local (as opposed to company-wide) basis by a rogue supervisor, and would have been in violation of DaVita policy. In such circumstances, courts routinely deny certification of FLSA collectives.[13]

The Court should decertify this collective for the same reasons. By their own testimony, Plaintiffs reported to an estimated 90 different supervisors. Many opt-ins testified that they individually reported to up to eight different supervisors during their time at DaVita.[14]     Even

---

[13] *See, e.g., Hadley v. Journal Broad. Group, Inc.*, 2012 WL 523752, at * 4 (E.D. Wis. Feb. 16, 2012) (holding, in the context of an off-the-clock claim, that "each employee's own subjective interpretation of his supervisor's directive would require an individualized, rather than common, approach."); *Bell v. Reading Hosp. & Med. Ctr.*, 2016 WL 3902938, *10-13 (E.D. Pa. Jul. 19, 2016) (decertifying a collective of healthcare workers because their employment setting differed where the opt-ins "worked in 14 different departments under 32 different supervisors" and "[e]ach department offered different services, maintained different hours of operation, and varied in size and capacity."); *Simmons v. T-Mobile USA, Inc.*, 2007 WL 210008, at *6 (S.D. Tex. Jan. 24, 2007) (denying certification because "this is a case involving claims of 'off the clock' unpaid overtime, where allegedly dozens (if not hundreds) of different low-level supervisors with wide management discretion in practice violate Defendant's clear, lawful written policies at some or many of Defendant's more than one hundred different retail locations."); *Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709, *7 (E.D. La. July 2, 2004) (denying certification where anecdotal deposition testimony showing particular managers requiring off-the-clock work on occasional instances).

[14] *See* Baumer at 34:19-38:1 (eight different supervisors); David at 17:25-21:7 (same); Mautz at 22:16-23:15 (same); Lucero at 41:11 (had "a lot" of supervisors); Godinez at 25:17-27:4 (seven different supervisors); Seutin at 58:5-64:24, 93:1-5 (same); Santos at 36:18-44:9 (same); Everett-Earles at 19:23-21:2 (six different supervisors); Kochkonyan at 16:21-18:9 (same); Bissell at 28:4-25 (five different supervisors); Cowell at 42:23-44:25, 50:5-23, 55:9-20 (same); Thaboua at 19:8-16 (same); Petrelli at 42:6-19 (same); Grays at 33:1 (same); Kerr at 9:12-15, 64:17-25, 67:25-68:2 (same); Rodriquez at 21:18-29:2-7 (same); Mendiola at 98:14-23 (same); Brakefield at 29:21-31:10 (four different supervisors); Jackson at 30:1-4, 71:15-18, 128:4-11 (same); Ratliff at 30:10-31:14, 48:21-25 (same); Martinez at 26:11-27:12, 45:16-17 (same); Harris at 24:24-25:11 (same); Horgan at 18:24-19:4, 36:23-37:8 (same); Andreen at 28:3-20 (three different supervisors); Warren at 27:5-12, 28:19-22, 69:18-21 (same); Sembower at 42-43 (same); Reigenborn at 16:14-17, 25:20-26:1, 25:12-14 (same); Bentley at 34:21-36:21 (same); Duval at 24:24-25:5 (same); Miller at 52:9, 71:12, 79:7-8 (same); Page at 45:1-2 (two different supervisors); Bolan at 24:18-20, 25:1-4 (same); Selby at 23:25-24:5 (same).

more compellingly, Plaintiffs admit that their relevant experiences working off the clock varied

greatly from supervisor to supervisor, even within the same facility.  For example:

1) Sabrina Reigenborn testified that she would not clock in until the start of her shift when she worked under one supervisor, but that this changed under a different supervisor who allowed her to punch in as soon as she arrived at work.  Reigenborn at 35:11-13. The first supervisor mentioned the need to avoid overtime because of labor budgets and the other never mentioned that issue.  *Id.* at 34:4-7, 35:18-22.

2) Jamie Mautz, a PCT, Administrative Assistant and Education Coordinator, admits that only one of her eight supervisors asked her to work off the clock.  Mautz at 22:16-23:15.  One of her supervisors disciplined her for clocking in early and spoke to her about clocking out late, but the remainder of her supervisors gave no such counseling. *Id.* at 49:15-25, 50:18-24.

3) John Bergquist testified that one of his supervisors instructed him not to clock in until the machines were up and running while all the rest of his supervisors permitted him to clock in when he arrived at work to start getting paid.  Bergquist at 71:10-72:21.

4) Stacy Duval testified that she received different verbal instructions from her supervisors about when to clock in and out for pre- and post-shift work and about when to work overtime.  Duval at 40:7-41:19, 78:2-8.

5) Stephanie Mastroantonio admits that because she was uncomfortable with one FA, she felt like she could not work overtime, but with another supervisor, she was allowed to and did work overtime outside her schedule.  Mastroantonio at 49:9-12, 48:15-18, 106:8-15.

6) Colette Grays testified that three of the FAs she worked for told her to be mindful of the labor budget when recording her hours, and other FAs did not.  Grays at 71:12-13, 105:2-11.

7) Jane Stant testified that only one of her many supervisors instructed her that she was limited to 40 hours per week and that her supervisors never told her to work off the clock.  Stant at 51:10-52:1, 74:17-19.

8) Sabrina Thaboua testified that one FA told her to perform work after clocking out, but that other FAs did not.  Thaboua at 37:18-38:10.  Thaboua also testified that the same FA told her she needed to clock out when completing compliance training while no other FA gave her the same instruction. *Id.* at 36:15-37:13.

9) Debra Cowell testified that she received calls outside working hours when working for one FA, but not others.  Cowell at 86:1-10; 87:16-88:6.

10) Sharon David testified that all but one of her supervisors told her she could only clock in one hour before she saw her first patient.  David at 18:10-24.  Likewise, only one of her supervisors asked her to attend a meeting without clocking in.  *Id.* at 64:25-65:4.

In addition to reporting to different supervisors, Plaintiffs worked at different facilities in different palmers (regions), each with different practices.  For example, Diana Garner, a nurse, worked in 21 different facilities in five states, and testified that the most time she ever spent at one facility was five days.  Garner at 40:7-41:7, 34:9-12.[15]

The number of different facilities is significant because the relevant timekeeping practices varied materially based on one's supervisor, facility, and position.  With respect to the differences between supervisors, for example, John Bergquist's supervisors had him log hours at the end of each week, contrary to company policy.  Bergquist at 42:3-20.  Other supervisors had him enter his time daily.  *Id.* at 47:25-48:5.  William Vue did not clock in at all, but independently maintained an excel spreadsheet to log his hours of work.  Vue at 44:15-22.  Jane Stant and Jaymie Stevens' timekeeping methods varied depending on the position they held at the time.  In some positions,

---

[15] *See also* Yang at 18:14-19:7 (worked shifts at eleven facilities outside of home facility); Warren at 26:22-31:25 (worked shifts at nine different facilities); Bentley at 34:21-36:21 (two different facilities in different regions); Thaboua at 17:14-18:2 (two different home clinics and floated to other facilities); Kerr at 9:22-25, 68:9-13 (has been based out of multiple facilities); Anders at 14:21-24, 15:18-21 (worked at six facilities in metro Denver area); Sembower at 19:14-17 (worked at no fewer than nine different facilities); Stevens at 15:9-18 (worked at every DaVita location in Denver as well as outside the state); Seutin at 41:25, 59:20-22 (worked shifts at six different facilities); Grays at 73:6-7 (has worked in five different facilities); Page at 30:8-31:15 (worked at many hospitals and clinics); Bissell at 27:19-28:21 (worked at two facilities in different regions); Massey at 21:22-22:10, 69:7-14 (worked at three different facilities); Jackson at 30:25-32:22, 38:22-24 (same); Johnson at 33:5-13 (worked at several facilities); Mendiola at 21:2-24:3 (worked some shifts in ten different palmers); Rodriquez at 21:13-22:7 (worked in eight different facilities); Harris at 23:24-24:23 (worked in seven different facilities); Brakefield at 21:10-26:21 (worked in five different facilities); Stant at 14:1-3, 145:12-19, 146:1-25 (worked at five facilities in different states); Godinez at 19:16, 66:23-24 (worked in four different facilities); Tafoya at 17:24-18:17 (same); Bush at 20:4-25, 64:15-17 (worked in three different facilities); Cowell. at 11:18-21, 48:16-21, 51:6-12 (same); Kochkonyan at 15:7-16:14 (same); Dolif at 17:3-5, 33:6-14, 61:22-24 (same); David at 17:15-21 (worked in two different facilities); Duval at 25:9-27:20 (same); Petrelli at 14:18-18:22 (worked at three facilities in two different states).  Opt-in Michael Lucero was a "floater" who worked out of up to three facilities in a single day, travelling to wherever there was a need.  Lucero at 59:8-9, 61:18-19.

Stant maintained a spreadsheet through which she self-reported her hours, while in others she clocked in and out using a time clock. Stant at 43:24-46:25. Similarly, Stevens testified that as a Centralized Trainer and Clinical Educator she tracked her time virtually, but that she punched in and out when she was a PCT. Stevens at 40:13-41:3, 43:7-10.

Others testified that the basic timekeeping practices varied by facility. Courtney Johnson, for example, testified that she clocked in before doing any work at two DaVita facilities. Johnson at 60:11-13, 62:11-21. At another, however, she picked up necessary materials on the way to work, before clocking in. *Id.* at 60:14-62:10. Heathcliff Warren testified that at one facility in Colorado Springs, the policy was that employees could not clock in until the clinic opened, but that this policy did not apply anywhere else. Warren at 37:8-17, 75:24-73:1.

Time-keeping practices also varied depending on the position held by the opt-in plaintiff and the plaintiff's preferences. PCTs and others holding similar positions used a punch clock, while employees that held more administrative roles entered their own time and did not punch in or out. Mautz at 36:6-25. Some employees tracked their time both ways depending on what positions they held and when. *See* Miller at 93:3, 39:8-24. Others entered their time through a web browser on their computers from the office or from home, which allowed them to track their work time away from the facility.[16] Souza at 34:8-19; Oldershaw at 81:18-23, 164:8-11.

The variances in the method of timekeeping is not a peripheral issue because the essential allegation here is DaVita's failure to accurately track Plaintiffs' hours of work. Vetting this allegation inevitably requires an inquiry into how exactly time was tracked. Because the time entry practices varied by position, supervisor and personal preference, the Court's substantive

---

[16] Some class members could work remotely as a matter of course. Souza at 52:16-18.

determination of whether each Plaintiff and Opt-in worked off the clock (the core allegation here) will vary, as will the type of evidence the Court should consider.

Moreover, different supervisors allegedly had different stances about off-the-clock work. For example, Catherine Kerr testified that she worked at various facilities, and that the FAs at each facility took a materially different position on whether staying punched in for overtime was permissible.  Kerr at 43:24-46:22, 138:19-140:1.  Kerr admitted that her claim is limited to time worked at only one of the facilities she worked at—and that she was paid for all hours worked at the others.  *Id.* at 34:15-19, 43:12-20, 47:7-20.  Other Opt-Ins made similar concessions.  For example, Colette Grays testified that she could record all of her hours worked at some facilities, but not at others.  Grays at 100:11-25.  Angelina Jones also testified that she was only restricted to clocking in and out at her scheduled times at one of the locations at which she worked, but not the other.  Jones at 36:6-9, 37:20-38:39:4.

Where, as here, the essential timekeeping practices vary by supervisor, facility or positions "Plaintiff[s] ha[ve] failed to show that opt-in plaintiffs are similarly situated to her, or that they are similarly situated to each other." *See Gordon v. Maxim Healthcare Servs., Inc.*, 2017 WL 253408 (E.D. Pa. Jul. 21, 2017) (holding that where employees worked in at least four different offices and had different supervisors who maintained different requirements on *how external employees should report their time*, class certification should be denied).  Given these variations, any liability determination will require individualized proof and determinations regarding the practices at the individual facility at issue during various times and each individual supervisors for whom each plaintiff worked.  Stated differently, "there is simply no way to resolve the claims of each [collective] member without independently establishing the facts that apply to that plaintiff…there is no way to resolve the [collective's] claims on a representative basis." *Aguilera v. Waukesha*

*Mem. Hosp., Inc.*, 2015 WL 3791469, *8 (E.D. Wisc. Jun. 18, 2015); *see also Miller v. ThedaCare, Inc.*, 2018 WL 472818, at *11 (E.D. Wis. Jan. 18, 2018) (holding that "[t]here are too many differences in situations for Plaintiffs to be similarly situated" where a putative collective consisted of "165 different employees from 33 departments across two different hospitals who reported to at least 38 managers and 55 supervisors.").

As set forth above, discovery has exposed that the members of the collective held dozens of different positions and worked under approximately 90 different supervisors. These distinctions are material because Plaintiffs performed dramatically different job duties subject to various (sometimes conflicting) directives. They even tracked and entered their time differently, depending on their positions. Under these circumstances, the first *Theissen* factor—the disparate employment settings of the individual plaintiffs—weighs heavily in favor of decertification.

<u>POINT II</u>

<u>THE INDIVIDUALIZED DEFENSES APPLICABLE TO EACH PLAINTIFF'S CLAIMS
MANDATE DECERTIFICATION</u>

The second factor for the Court to consider is whether the potential defenses pertain to Plaintiffs as a whole, or whether many different defenses will be raised regarding each individual plaintiff. "Courts have granted motions for decertification based on this factor because individualized defenses inhibit the efficiency of proceedings on a collective basis." *Green*, 888 F. Supp. 2d at 1103; *Eagle v. Freeport-McMoran, Inc.*, 2016 WL 7494277, *6-7 (D.N.M. Aug. 3, 2016) (quoting *Thiessen*, 267 F.3d at 1102-03) ("[i]f the district court determines that the plaintiffs have disparate employment settings or that a defendant has 'come forward with highly individualized defenses with regard to each of the various [claims] alleged by [the] plaintiffs,' [sic] the district court can conclude that decertification is appropriate"). Some courts have held that inappropriately trying a case as a collective-action, and thereby depriving a defendant from

presenting all available defenses, violates due process. *See, e.g. Lindsey v. Normet*, 405 U.S. 56, 66 (1972) ("Due process requires that there be an opportunity to present every available defense."); *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) ("A defendant in a class action has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates that right or masks individual issues.")

Similarly, trying this case as a collective action would deprive DaVita of the opportunity to assert the individualized defenses it has to Plaintiffs' unique, highly individualized claims. Thus, this case should not proceed to trial as a collective action. Instead, the collective should be decertified.

A. *The Individualized Nature of Plaintiffs' Claims Requires Individualized Defenses*

The claims asserted by the members of the collective vary drastically. Quite literally, the relief these individual opt-ins are asking to recover here is opt-in specific. As discussed above, some opt-ins are challenging their exempt classifications, a claim requiring significantly different defenses than those in an off-the-clock case. Even the non-exempt opt-ins have vastly different substantive claims about when they allegedly worked off the clock, at whose direction, why they worked off the clock or whether the company was aware of such work.

Because of the drastic differences between the claims asserted, Defendants cannot mount a defense based on common (or even representative) evidence. Defendants' only feasible choice is to assert individualized defenses. Thus, if allowed to proceed as a collective action, this case will dissolve into individualized mini-trials. This, of course, would defeat the entire purpose of a collective action. *King v. W. Corp.*, 2006 WL 118577, *15 (D. Neb. Jan 13, 2006) ("Disparate individual defenses heighten the individuality of claims, and requiring the defendant to raise these arguments in a [collective] action suit undermines its ability to mount a clear and coherent defense to the case."). This second factor therefore also weighs heavily in favor of decertification.

1. *The Off-the-Clock Claims are Individualized*

Some non-exempt opt-ins allege that they were not paid for work that they performed off-the-clock before or after their shifts.  The nature and extent of this alleged off-the-clock work varies entirely by individual—depending largely on each person's position, supervisor, and the facility at which they worked.  Discovery reveals that Plaintiffs advance at least fourteen distinct types of off-the-clock theories:

1) Some allege they were not paid for on-call time, including in some cases being placed on the on-call list while on paid time off.  *See, e.g.* Bergquist at 97:7-99:25; Miller at 10:2.

2) Some allege they worked remotely preparing or completing training modules, attending webinars and scheduling or reviewing reports.[17]

3) Some allege they worked at home or at work responding to texts, emails or phone calls if received outside normal working hours.[18]

4) Some allege that to varying degrees, their supervisors told them not to clock in until the machines were up and running, their scheduled start time, or a certain amount of time prior to the first patient yet they performed work before clocking in.[19]

5) Some allege they intermittently worked before clocking in or after they clocked out to prepare for their shift, set up, clean-up or to wrap up what they were doing.[20]

---

[17] Andreen at 46:25-47:25, 40:3-24; Page at 44:21-22; Duval at 45:12-15; Kochkonyan at 27:8-29:1; Martinez at 98:12-18; Mendiola at 106-109; Ratliff at 60:1-19, 119:12-20; Souza at 34:22-25, 35:4-7; Mastroantonio at 29:21-30:23; Stant at 103:17-104:14 (claims not paid for work performed before and after training sessions); Thaboua at 33:5-34:7 (spent 6-8 hours per week doing scheduling and other work at home); Massey at 53:1-7 (attended a couple of webinars she was not clocked in for).

[18] Baumer at 52:18-53:8; Hamren at 35:18-36:5, 64:14-20; Martinez at 98:12-18, Mautz at 59:20-61:20; Oldershaw at 84:11-20; Mastroantonio at 109:19-110:14; Lucero at 79:21-80:3; Stant at 66:6-67:8; Cowell at 60:12-62:12, 63:1-64:19, 81:15-83:14; Andreen at 35:14-24, 39:5-40:24.

[19] Bergquist at 58:10-59:12; Bolan at 42:7-11; David at 26:2-8; Dolif at 21:24-22:19, 29:21-30:2; Martinez at 97:23-98:1, 55:15-25, 58:16-59:11, 60:10-13; Rodriquez at 49:1-10, 60:21-25; Jones at 29:13-20; Andreen at 37:3-11 (sometimes arrived earlier than the system would allow her to clock in).

[20] Page at 37:9-18; Bissell at 96:8-18; David at 21:12-22; Dolif at 30:10-31:3; Duval at 18:9-19:22, 58:6-18; Harris at 38:13-18; Martinez at 16:25-17:2, 38:10-12, 409:19-41:3; Reigenborn at 32:3-20, 60:6-9, 24:23-25:4; Stevens at 29:5-14, 40:1-12; Tafoya at 48:10-50:9, 54:16-25; Kerr at 125:15-127:12, 97:11-98:1, 77:16-78:5, 82:22-83:3; Mastroantonio at 67:17-68:18; Hamren. at 37:10:15; 40:20-41:2; Grays at

6) Some allege they clocked out before they stopped working or simply failed to input overtime to remain "on budget."[21]

7) Some allege they intended to clock in but were too busy to clock in when they arrived at work.  Andreen at 35:2-37:2.

8) Some allege that they came to work on their days off, but were not paid.  Duval at 45:19-46:1, 53:3-12, 79:14-17, 58:19-59:1; Martinez at 100:17-25.

9) Some allege DaVita did not pay for travel time between clinics or for running work-related errands.[22]

10) Some allege that when they worked double shifts, they were not paid for work performed between shifts.  Dolif at 31:4-15.

11) Some allege their supervisors shaved or voided their time.  Godinez at 25:21-25; Stant at 47:15-50:2.

12) Some allege they were not paid for occasional meetings.  Mastroantonio at 111:16-112:16; Selby at 32:4-21.

13) Some allege they were instructed not to record the overtime that they worked.  Landin at 34:2-35:16.

14) Some allege they sometimes came to work on the weekend to do prep work to teach training classes but were not paid.  Stant at 56:7-57:8, 104:11-105:21.

In addition to these fourteen different theories of liability, other opt-ins conceded that none

of these theories applied to them and admitted that they were paid for all compensable pre- and

post-shift activities.[23]  For instance, Opt-in Christina Voltolini admits that she never worked before

---

36:1, 37:6-11; 51:20-52:7, 55:17-22; Lucero 25 at 25:25-26:1, 26:17-21, 44:22; Stant at 66:6-67:8; Jackson at 53:23-54:1; Warren at 50:21-51:9, 86:20-87:5; Jones at 37:20-38:39:4.

[21] Page at 73:18-20; Hamren at 33:25-34:8. Mendiola.at 65:6, 71:12-20; Ratliff at 84:8-12, 62:8-12; Jackson at 46:10-47:7.

[22] Brakefield at 81:3-25, 63:15-64:15; Ratliff at 74:2-11; Kerr at 115:13-117:21, 118:23-119:24; Sembower at 59:1-23; Stant at 51:1-7; Garner at 86:12-87:6; Yang at 27:22-28:2; Massey at 58:5-15.

[23] Bush at 41:4; Everett-Earles at 34:11-24 (arrived before shift started but performed no work during this time); Godinez at 31:19-21 (would never arrive and perform work before clocking in); Horgan at 60:6-9

clocking in, that she was paid for all time worked for DaVita including time outside her scheduled shift, that her supervisors told her never to work off the clock, and that she could work whatever overtime was needed to get her job done. *See* Voltolini at 49:18-23, 48:9-49:1, 65:25-67:6, 56:21-57:3, 57:22-58:9, 60:7-12.

Even one of the Named Plaintiffs, Kelsey Oldershaw, admits that she was paid for her overtime hours worked almost every week. Oldershaw at 88:8-13. Similarly, others admit they were paid for their overtime hours and were never told they could not be clocked in for all of their hours worked even if they were over 40 per week. Bolan at 36:9-11, 58:21-23. Sabrina Thaboua likewise claims that she only worked off the clock on the night shift a handful of times, but never did so during the day shift. Thaboua at 48:21-49:8. Others, like Zinaida Kochkonyan, admit that they recorded and were paid for all hours worked. Kochkonyan at 38:19-24. Others candidly "don't know" whether they were properly compensated or paid for all overtime hours worked. *See e.g.*, Garner at 84:6-8, 84:20-85:19, 86:7-15.

DaVita also has a policy and process for reporting any inaccuracies in time records (such as, for example, if a time record did not reflect all hours actually work). *See* Ex. 58 ("If you discover a mistake, report the error to your supervisor. Your supervisor will review, correct (if necessary) and approve your time records before it is processed by the Payroll Department.").

---

(has no claim for unpaid overtime); Mendiola at 104:20-11, 88:23 ("I'm not talking about paying us overtime here. They pay us overtime."); Miller at 40:18-23, 104:19-23 (never worked off the clock and paid for all hours worked), 77:6-8 (told by supervisor "you do what you need to do for the patients" without regard to whether in overtime); Johnson at 63:19-23, 64:20-24, 65:17-65:24 (did no work before clocking in or after clocking out); Sembower at 33:19-34:6 (always clocked in before started working), 25:18-20, 34:7-13, 35:6-11 (never clocked out until completed all work-related duties), 49:16-21 (always clocked in for and paid overtime); Hannan at 34:12-25, 35:17-24 (arrived to work early but sat in the break room until her scheduled start time); Garner at 34:16-35:5 (clocked in when she arrived at work and out right when she left); Seutin at 64:9-11, 75:11-76:15, 99:6-100:3 (always clocked in while working and when she took calls after punching out or worked from home, she reported to her supervisor); Petrelli at 32:15, 33:3 (punched in when arrived at the facility and did not perform work after punching out); Anders at 48:22-23.

Some opt-ins used this process to report any unreported hours and were paid.[24]  For those individuals who were aware of DaVita's mechanism to report and get paid for any off the clock time but failed to utilize it, DaVita will assert yet another individualized defense that such time is not compensable based on each employee's failure to notify DaVita of overtime worked.  *See Brown v. Scriptpro, LLC*, 700 F.3d 1222, 1230-31 (10th Cir. 2012) ("[W]here the employee fails to notify the employer through the established overtime record-keeping system, the failure to pay overtime is not a FLSA violation.").[25]

Even if the Court could determine liability for off-the-clock work on a collective-wide basis, the individualized inquiry does not end there.  The Court must then conduct an individualized analysis of each individual plaintiff's off-the-clock work to determine whether it occurred in weeks in which the plaintiff worked overtime or not.  If the employee did not work over 40 hours in the week, even with the added off-the-clock time, there is no liability under the FLSA.[26]  A good example of this is Stephanie Mastroantonio, who admits that the only position in which she performed off-the-clock work was a part-time position in which she did not work 40 hours.  *See* Mastroantonio at 104:18-105:10, 118:4-21, 49:13-16.  For Mastroantonio and others,

[24] *See e.g.* Seutin at 75:11-76:15, 99:6-100:3; Harris at 43:9-18, 51:25-52:10; Rodriquez at 67:7-25, 68:1-25; Souza at 76:18-20; Mastroantonio at 69:2-71:6.

[25] Other circuits are in accord that "work" that employees fail to make their employers aware of where there are means for reporting such time is not compensable under the FLSA. *See Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1314-15 (11th Cir. 2007); *White v. Baptist Mem. Health Care*, 699 F.3d 869, 876 (6th Cir. 2012) (citation omitted); *Kellar v. Summit Seating*, 664 F.3d 169, 177 (7th Cir. 2011); *Hertz v. Woodbury County*, 566 F.3d 775, 781 (8th Cir. 2009) (citations omitted); *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 415 (9th Cir. 1981).

[26] *See United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir. 1960); *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106 (2d Cir. 2013); *Monahan v. Cnty. of Chesterfield*, 95 F.3d 1263, 1270-72 (4th Cir. 1996); *Blankenship v. Thurston Motor Lines, Inc.*, 415 F.2d 1193, 1198 (4th Cir. 1969); *United States DOL v. Cole Enters.*, 62 F.3d 775, 780 (6th Cir. 1995); *Hensley v. MacMillan Bloedel Containers*, 786 F.2d 353, 357 (8th Cir. 1986); *Dove v. Coupe*, 759 F.2d 167, 172 (D.C. Cir. 1985).

even if the Court holds that off the clock work occurred, this finding alone does not result in liability on an unpaid overtime claim (because the factfinder would still need to determine the week(s) during which such work occurred, and whether it took her over 40 hours in those week(s)). The same is true for several additional plaintiffs who testified that they were scheduled to work three 12-hour shifts per week during some weeks or when they held certain positions. *See* Grays at 48:3-49:6; Thaboua, 62:12-16.

More importantly, the Court could not possibly permit the testimony of those who claim to have worked off the clock to result in liability findings as to individuals who testified they were paid for all hours worked. When, as here, the evidence shows there is no liability for some class members (especially based on their own admission), the collective must be decertified.[27]

### 2. *The Meal Break Claims Are Individualized*

The testimony about whether each Plaintiff and Opt-in alleged unpaid overtime as a result of work during meal periods is equally fractured and individualized as Plaintiffs' pre- and post-shift claims. Once again, DaVita's common meal period policy is entirely lawful and is designed to ensure that non-exempt teammates either take a full 30-minute meal period or get compensated when they do not. *See* Ex. 58

---

[27] *See, e.g. Camesi,.* 2011 WL 6372873, *9-12 (decertifying collective action because of defendant's individualized defenses which included "whether individual plaintiffs actually worked overtime without compensation"); *Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, 2011 WL 6372852, *6-7 (W.D. Pa. Dec. 20, 2011) (noting that defendants had "significant individualized defenses" which precluded certification including that "some plaintiffs testified that they were paid for all time worked . . . while others testified that while they missed a break, they were permitted to leave work early . . . [and] still other plaintiffs testified that they did not know if they were not compensated because they could not understand their pay stubs"); *In re Zurn Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011) ("A district court may not certify a class . . . if it contains members who lack standing."); *Blades v. Monsanto Co.*, 400 F.3d 562, 571 (8th Cir. 2005) (when "not every member of the proposed classes can prove with common evidence that they suffered impact from the alleged conspiracy . . . damages as to all class members must be shown to justify the class action"); *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 774 (7th Cir. 2013) (finding certification improper when piece-rate system varied pay from worker to worker, use of an average conferred a "windfall" on some class members, and employees had incentive to under report time).

Again, several opt-ins testified they were always provided with a meal break and are not asserting a meal break claim.[28] But even among those that do assert a meal break claim, the claims vary. Some opt-ins claim that their pay was automatically deducted for some or all of their breaks, regardless of whether they were taken.[29] Others, however, concede that this practice only occurred at certain facilities. Massey at 59:1-61:3. Claims based on an automatic meal break deduction cannot be certified because the proof that any individual did not take an automatically-deducted meal period is entirely individualized based on each person's daily decisions and practices.[30] Thus,

---

[28] *See* Yang at 43:3-5 (compensated for meal breaks); Kochkonyan at 56:3-8; Brakefield at 73:21-75:21 (lunches she clocked out for were not interrupted); Everett-Earles at 38:8-24, 39:15-20 (admits took a meal break and when it got interrupted, she clocked back in); Horgan at 55:1-6 (admits did not always take lunch, but he was paid in such instances); Johnson at 39:8-19, 69:25-71:4, 72:9-13 (clocked in and out for breaks and always took full 30 minute lunch); Kerr at 83:9-17 (clocked out for lunch); Mastroantonio at 74:12-75:4 (worked through lunch and remained clocked in); Sembower at 26:16-25, 36:7-10 (always took lunch break and clocked out for it); Hannan at 54:22-55:13, 58:21-59:8 (usually received uninterrupted break; when interrupted, would inform supervisor who adjusted her time to make sure she was paid); Grays at 48-49 (only complaint about breaks is that she did not get a second break when working a 12-hour shift); Stant at 68:5-70:25 (regularly took meal breaks); Jackson at 59:1-13.

[29] Page at 106:9-12; David at 53:11-18; Duval at 68:3-14; Godinez at 62:24-63:1, 36:16-17; Harris at 42:1-4; Murphy at 78:16-19; Oldershaw at 48:1-6, 161:2-163:8; Ratliff 140:19-21; Stark at 7:3-13; 30:13-31:4, 38:15-40:6; Selby at 29:4-14; Seutin at 68:20-22, 161:14-22); Petrelli at 70:9-72:7; Massey at 59:1-61:3.

[30] *See, e.g. White v. Baptist Mem. Health Care*, 699 F.3d 869 (6th Cir. 2012) (affirming summary judgment in employer's favor on FLSA claim which challenged an automatic meal break deduction policy; and decertifying FLSA collective action because proof of any work performed during unpaid meal periods was individualized); *Hertz v. Woodbury County*, 566 F.3d 775 (8th Cir. 2009) (holding that employee has burden to prove performed compensable work during unpaid meal period); *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 2011 WL 6372873 (W.D. Pa. Dec. 20, 2011) (decertifying FLSA claims challenging automatic meal break deduction policy and noting that the *White* decision has "become the prevailing law in the country"); *Camilotes*, 286 FRD 339 (decertifying FLSA claims which included claims challenging automatic meal break deduction policy); *Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, 2011 WL 4351631 (W.DN.C. 2011) (denying conditional certification of automatic meal break deduction claims); *Zivali*, 784 F. Supp. 2d 456 (decertifying FLSA claims which included claims challenging automatic meal break deduction policy); *Cason v. Vibra Healthcare*, 2011 WL 1659381 (E.D. Mich. 2011) (denying conditional certification of automatic meal break deduction claims); *Saleen v. Waste Mgmt.*, 2009 WL 1664451 (D. Minn. 2009) (denying conditional certification of automatic meal break deduction claims).; *Creely v. HCR Manorcare, Inc.*, 920 F. Supp. 2d 846 (N.D. Ohio Jan. 31, 2013); *Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, 2011 BL 333319 (W.D. Pa. 2011).

if the collective advances a claim based on automatic meal break deductions, they cannot do so on a collective basis. *See id.*

Plaintiffs also advance several other meal break related claims, all of which are too individualized to be advanced on a collective basis. For example, some employees allege that they voluntarily clocked out for meal breaks, but worked through them. Page at 104:13-17; Landin at 44:3-11; Martinez at 65:17-19. Others allege they were told to clock out for lunch, but were not permitted to take a break. Andreen at 67:16-68:23. Others allege their breaks were interrupted by work demands with varying degrees of frequency, and that they sometimes forgot to clock back in before addressing those demands.[31] Others allege they simply forgot to clock out for their breaks on some days. Harris at 41:4-6. Still others allege that administrative assistants would sometimes clock them out for lunch without permission. Martinez at 102:13-25.

Like Plaintiffs' pre and post-shift claims, the meal break claims vary by supervisor. Amber Petrelli, for example, testified that one of her supervisors added punches for meal periods she did not take, but that her other supervisors did not engage in this practice. Petrelli at 45:11-23. Collette Grays testified that meal break practices varied from facility-to-facility. Ms. Grays was a nurse for DaVita, and worked at multiple different facilities. During her deposition, she candidly admitted that "[i]t depends on what clinic we're talking about as to whether I was able to take a break or not take a break." Grays at 63:19-64:8; *see also* Murphy at 88:15-25 (whether an automatic deduction was made for a break depended on what facility you were working at). She testified that when working at one facility, she typically got a meal break because there was sufficient coverage to allow her to do so without jeopardizing patient care. At a different facility,

---

[31] Bissell at 87:3-11; David at 51:12-19; Harris at 42:23-25; Martinez at 98:2-6; Reigenborn at 39:1-9; Selby at 35:16-18; Warren at 76:23-78:2; Thaboua at 42:17-43:10; Jones at 37:5-19, 43:23-44:5.

however, coverage was less readily available; so she typically would not be able to take a break, or was only able to take a short break.

Meal break practices also varied depending on what shift an individual was working. Several opt-ins acknowledged this fact during their depositions. *See e.g.,* Baumer at 24:21-25:9, 27:2-24, 29:4-15. For example, Kristina Baumer alleges that when she worked the day shift at one facility, she usually got a lunch break, but that the break was sometimes interrupted. *Id.* When Baumer worked nights at the same facility, she was always able to enjoy an uninterrupted 30-minute meal period. *Id.* When working a different facility, she was allegedly unable to take any break at all. *Id.* Amber Petrelli similarly testified that during day shifts, she punched out and took her breaks; but that during night shifts she did not take breaks because the coverage situation did not allow for them. Petrelli at 27:5-16, 73:6-17.

The variations among the claims advanced by the collective do not end there. Even those who base their meal break claim on the allegation that their break was interrupted offered dramatically different accounts of how often those interruptions occurred and why. *See* Brakefield at 38:1-40:4; Godinez at 45-47, 50:17-20 (two occasions per month when worked through automatically deducted meal periods); Bolan at 27:1-10 (meal break interruptions were occasional and frequency varied). Some employees claim they were sometimes required to work through breaks or their breaks were interrupted, but either did not clock out at all, or clocked back in or emailed their supervisors who assured they were paid.[32]

---

[32] Bergquist at 76:3-15, 77:18-78:3, 80:8-81:17; Mautz at 74:23-75:13; Miller at 93:11-15; Rodriquez at 67:7-25, 68:1-25; Souza at 73:19-2, 76:18-20; Tafoya at 67:24-68:1; Kerr at 48:19-49:7; Lucero at 36:24-37:1 (clocked back in when breaks got interrupted); Garner at 43:14-44:9 (often worked through lunch but did not clock out and got paid); Yang at 25:20-26:6 (did not clock out for breaks); Anders at 47:3-6 (when breaks got interrupted, clocked back in).

These differing accounts are more evidence that individualized inquiries into each claim are necessary to determine liability—and that the collective should therefore be decertified.

### 3. *Other Individualized Claims Asserted by Members of the Collective*

In addition to advancing a slew of pre- and post-shift and meal break off-the-clock claims, many of the opt-ins admitted in their depositions that they are participating to advance unique claims that are totally outside the scope of the claims pled in this case.  For example:

1) One opt-in alleges that her paid time off was unlawfully deducted.  Souza at 41:24-43.

2) Others allege that they were not reimbursed for mileage, or for their cell phones.[33]

3) Others advance breach of contract claims.[34]

4) Others allege they were denied "preceptor pay" while training others in a preceptor capacity.  Godinez at 70:6-11; Harris at 80:15-21.

5) Others allege they did not receive raises they were promised or to which they claim they were "entitled."  Kochkonyan at 42:23-49:4; Cowell at 135:5-136:23, 152:19-153:6.

6) Others allege DaVita failed to pay a shift differential.  Reigenborn at 57:14-17.

7) Others allege that when they received their checks, they did reflect all the hours they had worked.  Bird at 52:4-19; Anders at 41:1-4.

8) Some opt-ins claim they joined the lawsuit because they believe their hourly rate was too low or that they did not receive a promised raise.  Johnson at 101:3-16.

9) Others allege DaVita failed to reimburse them for relocation costs.  Garner at 55:19-56:20.

10) Even the Named Plaintiff advances a claim that her pay was simply deducted.  Oldershaw at 103:3-18.

---

[33] Kochkonyan at 38:25-40:8; Miller at 93:12-14 (not reimbursed for mileage); Souza at 82:1-84:14 (cell phone); Garner at 56:22-58:10 (mileage).

[34] *See* Duval at 102:19-104:21; Miller at 85:14-25; Navarro at 147:18; Oldershaw at 149:19-25, 151:7-8; Hannan at 78:17-21; Stant at 103:2-16; Bird at 79:4-6.

Like the off-the-clock and meal break claims, each of these claims would need to be addressed on an individual basis.  As such, they are not suitable to be tried collectively, and doing so would deprive DaVita of its right to assert all available defenses.  Accordingly, the collective should be decertified.

B.  *Discovery Revealed the Presence of Meritorious Individualized Defenses to the Claims of Several Plaintiffs*

The extreme nature of the individualized defenses applicable to some plaintiffs is crystallized by the situation of Ricky Bush.  Bush admits that she previously filed a claim for unpaid wages filed with the state labor board, and that she may have already been fully paid for the claims she is asserting here as a result of that earlier claim.  Bush at 45:21-24.  Similarly, Plaintiff Anthony Dolif admits that he recently declared bankruptcy, and that he failed to disclose his claims to the trustee.  He therefore lacks standing to proceed with his claim.  Dolif at 74:11-14.  Heathcliff Warren made similar bankruptcy-related concessions during his depositions, and his claims are therefore also subject to a unique defense.  *See* Warren at 14:20-15:3, 19:17-24.

Discovery also revealed that the claims of several opt-ins are barred by the applicable statute of limitations.  For example, Jamie Mautz makes off the clock claims relating to positions she held before 2013.  *See* Mautz at 30:1-3.  Those claims are thus not timely.   Likewise, David Jackson testified that the last position in which he worked off the clock was the PCT position, which he has not held since April 2013.  Jackson at 30:1-19.  Others testified that the last time they worked for Defendants was beyond the limitations period.  *See, e.g.,* Yang at 17:1-12 (last worked for DaVita in July 2013); *see also* Warren at 17:24-18:1 (has not worked for DaVita since January 2014); Bird at 28:3 (only worked for DaVita from June-December 2013).  Similarly, William Vue can only recover if Plaintiffs prove that DaVita willfully violated the FLSA.  *See* Vue at 75:13-

76:13 (Vue signed consent on May 26, 2017, but stopped working for DaVita in May 2015); Doc. 134.

Defendants are entitled to advance these individualized defenses to liability and would be severely prejudiced if they are precluded from doing so if this case is allowed to proceed as a collective action.

## POINT III

## FAIRNESS AND PROCEDURAL CONSIDERATIONS MANDATE DECERTIFICAITON

The third and final factor the Court should consider is the fairness and procedural considerations associated with allowing the case to go to trial as a collective action.  The principal applicable consideration for this factor when considering a motion for decertification is "coherently managing a trial . . . and presenting evidence in a manner that will not confuse the jury or unduly prejudice any party."[35]   Here, fairness and procedural considerations mandate decertification.  The differences between Plaintiffs' claims are so fundamental that they cannot possibly be defended (or, for that matter, proven) using common evidence and representative testimony.  There is no possibility that some Plaintiffs could provide "representative" testimony that would apply across legal theories, regions, facilities or supervisors.  The use of such "representative" testimony at trial to prove the claims of non-testifying class members is the principal benefit of keeping a case certified at trial.[36]   Without the ability to offer such

---

[35] *Gatewood*, 2009 WL 8642001, *16; *Carlson v. C.H. Robinson Worldwide, Inc.*, 2006 WL 2830015, *11 (D. Minn. Sept. 26, 2006) (where the dominant liability issues at trial cannot be adjudicated collectively, fairness and procedural considerations favor decertification because the Court cannot fairly and efficiently administer collective actions that require individualized inquiry); *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 574 (E.D. La. 2008) ("[T]he more dissimilar plaintiffs are and the more individualized [the employer's] defenses are, the greater doubts there are about the fairness of a ruling on the merits – for either side – that is reached on the basis of purportedly representative evidence.")

[36] *See, e.g. Am. Waste Removal Co. v. Donovan*, 74 F.2d 1406, 1410 (10th Cir. 1984); *Reich v. Petroleum Sales*, 30 F.3d 654, 657 (6th Cir. 1994); *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 87-89 (2d Cir. 2003);

"representative" testimony, each opt-in must either present his or her own case which negates any benefit of the collective model.  Otherwise, permitting the factfinder to make collective-wide determinations based on the testimony of some would be incredibly prejudicial to DaVita because it would: (1) allow the factfinder to determine classwide liability when the Plaintiffs do not even allege the same types of harm; and (2) allow liability determinations that are not based on the applicable facts to each Plaintiff.

Here, the practices applicable to particular Plaintiffs and Opt-ins, and even their claims, do not affect one another, making the liability determination individualized.  To avoid the inequities attendant with subjecting an employer to "all-or-nothing" liability, despite differences in employees' working conditions,

> the Court would be forced to utilize numerous subclasses, individualized evidence, individualized liability determinations, and individualized damage determinations.  Under those circumstances, a collective action no longer poses benefits in terms of manageability or fairness and is not preferable to individual actions.

*Mathis*, 2014 WL 4428171 at *5; *see also Zivali*, 784 F. Supp. 2d 456 (finding in FLSA case involving claims of off-the-clock work that "considerations of procedure and fairness weigh heavily in favor of granting decertification, as the Court harbors considerable doubt that any fair determination could be achieved on the basis of representative evidence.")

Thus, allowing the case to proceed as a collective would allow the case "to devolve into numerous mini-trials, causing the jury to evaluate testimony from countless witnesses and other evidence that is unique to particular Plaintiffs." *Green*, 888 F. Supp. 2d at 1104.  This process "would be anything but efficient," and would therefore defeat the entire purpose of allowing a case to proceed as a collective action.  *Scott*, 2010 WL 5093650, at *4.

---

*Murray v. Stuckey's, Inc.*, 939 F.2d 614, 621 (8th Cir. 1991); *Secretary of Labor v. DeSisto*, 929 F.2d 789, 793 (1st Cir. 1991).

Given the different claims and applicable facts to each opt-in, "[i]t is unclear how proceeding collectively and using representative testimony would be fair or useful." *Creely*, 920 F. Supp. 2d at 857.   Collectives have been decertified, under highly analogous circumstances, where the "Court d[id] not find that representative testimony from licensed practical nurses in one location would necessarily be representative of individuals who held even the same position in another location." *Id.*   Under those circumstances, which mirror those presented by this case, the court held that "[t]hese individuals had different experiences and worked under different managers who may have implemented Defendants' policy in different ways."   This fact led the Court to conclude that "[c]ertification here would hinder, not promote, judicial economy." *Id.*

## <u>CONCLUSION</u>

For all these reasons, Defendants request that this Court grant Defendants' Motion to Decertify the Collective Action.   The individuals' claims within the conditionally-certified collective cannot be tried together to determine liability.   These opt-ins held different jobs that created admittedly variant circumstances that could lead to off the clock work.   They advance totally different substantive claims, some of which are not even claims that are part of this lawsuit. If each of these opt-ins wish to have liability determined on their own merits, they are entitled to do so individually.   But permitting this case to proceed to trial as a collective action prejudices DaVita's right to have each individual's claims determined on their merits and even prejudices the opt-ins by having their claims determined based on facts that may be wholly irrelevant to their own claims.

Respectfully submitted this 30th day of April, 2018.

JACKSON LEWIS P.C.

*s/ Veronica von Grabow*
Veronica von Grabow
Melisa H. Panagakos

950 17th Street, Suite 2600
Denver, Colorado 80202
Telephone: (303) 892-0404
Facsimile: (303) 892-5575
Veronica.vonGrabow@jacksonlewis.com
Melisa.Panagakos@jacksonlewis.com

Dorothy D. McDermott
10 West Market Street, Suite 2400
Indianapolis, IN 46204
Telephone: (317) 489-6930
Facsimile: (317) 489-6931
Dorothy.McDermott@jacksonlewis.com

Stephanie Adler-Paindiris
390 N. Orange Avenue, Suite 1285
Orlando, FL 32801
Telephone: (407) 246-8440
Facsimile: (407) 246-8441
Stephanie.Adler-Paindiris@jacksonlewis.com

Amanda A. Simpson
390 N. Orange Avenue, Suite 1285
Orlando, FL 32801
Telephone: (407) 246-8440
Facsimile: (407) 246-8441
Amanda.simpson@jacksonlewis.com

Eric R. Magnus
1155 Peachtree Street N.E.
Suite 1000
Atlanta, GA 30309
Telephone:  (404) 525-8200
Facsimile:   (404) 525-1173
MagnusE@jacksonlewis.com

*ATTORNEYS FOR DEFENDANTS*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 30th day of April 2018, a true and correct copy of the foregoing **DEFENDANTS' MOTION FOR DECERTIFICATION** was served via CM/ECF on the following:

RAMOS LAW

Colleen T. Calandra
Madison Fiedler Carlson
3000 Youngfield Street
Wheat Ridge, CO 80215
colleen@ramoslaw.com
madison@ramoslaw.com

WILCOX LAW FIRM, LLC

Ronald L. Wilcox
383 Corona Street, #401
Denver, CO 80218
ron@wilcox.legal

*ATTORNEYS FOR PLAINTIFF*

*s/ Valerie A. Martinez*
for Jackson Lewis P.C.