**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:  1:15-cv-01964-MSK-NYW

KELSEY OLDERSHAW,
ELINA NAVARRO,
JANE STANT, and
JAYMIE STEVENS
individually and on behalf of others
similarly situated,

      Plaintiffs,

v.

DAVITA HEALTHCARE PARTNERS, INC. and
TOTAL RENAL CARE INC.,

      Defendants.

---

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Defendants, DAVITA HEALTHCARE PARTNERS, INC. and TOTAL RENAL CARE INC. ("Defendants" or "DaVita"), by and through their undersigned counsel, pursuant to Federal Rule of Civil Procedure 56, move for partial summary judgment on claims brought by the named Plaintiffs, Kelsey Oldershaw, Elina Navarro, Jane Stant, and Jaymie Stevens and Opt-in Plaintiffs[1] (collectively "Opt-in Plaintiffs")(Named Plaintiffs and Opt-in Plaintiffs are collectively referred to as "Plaintiffs"), in their First Amended Complaint.  (Doc. 33).

---

[1] Defendants are moving as to the failure to maintain accurate records claims in Counts I and II on all Opt-in Plaintiffs, Kandace Anders, Alyssa Andreen, Deandra Baker, Kristina Baumer, Yvonne Bentley (f/k/a Lantz), Ernida Bissell, Heather Bolan, Katherine Brakefield, Debra Cowell, Sharon David, Anthony Dolif, Stacy Duval, Bobbi Everett-Earles, Diana Garner, Nancy Godinez, Collette Grays, Elizabeth Green, Georgia Hamren, Sandra Hannan, Roberta Harris, Matthew Horgan, David Jackson, Courtney Johnson, Angelina Jones, Catherine Kerr, Zinaida Kochkonyan, Denise Landin, Jamie Lubken, Michael Lucero, Joshua Martinez, Cynthia Massy, Stephanie Mastroantonio, Jaime Mautz, Nora Mendiola, Paula Murphy, Amber Petrelli, Arcandrice Ratliff, Sabrina Reigenborn, Denisa Rodriquez, Christina Voltolina (f/k/a Ross), Kirby Santos, Nancy Selby, James Sembower, Reinhilde Seutin,  Wendy Souza, Debora Stark,  Kimberly Tafoya, Sabrina Thaboua, and William Vue, and as to other claims for some of these Opt-in Plaintiffs as more fully described herein.

## PRELIMINARY STATEMENT

Four people, with nothing in common other than the same employer, brought differing wage-related claims against Defendants in this action. They sought to represent every single employee who worked for Defendants, regardless of the type of claim alleged, the employee's job title or the employee's job duties, by alleging collective and class action claims under the Fair Labor Standards Act ("FLSA") and Federal Rule of Civil Procedure 23 (Doc. 33).  On January 18, 2017, over Defendants' objection, the Court conditionally certified a much narrower FLSA collective action, which authorized notice to be sent to 601 putative class and collective members. (Doc. 138).  The Court *declined* to certify a Rule 23 class action and bifurcated those claims from the FLSA collective claims, which would be determined first.  (Doc. 138). 76 people, out of the 601 who received notices, filed Opt-in notices. (Docs. 56, 68, 134, 139, 140, 142, and 147).  Of those, 27 people never responded to their counsel and have been dismissed or their counsel has moved to withdraw.  (Docs. 187-191, 193).  The resulting outcome of the notice, opt-in process and laborious and expensive discovery confirms that the Named Plaintiffs and Opt-in Plaintiffs should not be litigating claims in the same action, and, more importantly, many should not be litigating at all.  Many of these Opt-in Plaintiffs were not able to establish a viable claim under the FLSA.  The Court is now left with the formidable yet critical task of reviewing what should be 53 individual lawsuits brought by the four Named Plaintiffs – Kelsey Oldershaw, Elina Navarro, Jane Stant, and Jaymie Stevens – and 49 Opt-in Plaintiffs.

Plaintiffs allege eight "claims of relief" under the FLSA and Colorado state law as follows: Claim 1- violation of the FLSA and failure to maintain records on behalf of all collective members; Claim 2- violation of the FLSA and failure to maintain records on behalf of Plaintiffs, individually; Claim 3- violation of the Colorado wage and hour laws and failure to maintain records on behalf

of all class members; Claim 4- violation of the Colorado wage and hour laws and failure to maintain records on behalf of Named Plaintiffs; Claim 5- retaliation for exercising rights pursuant to the FLSA on behalf of Named Plaintiff, Oldershaw; Claim 6- reprisal violation of the Colorado wage and hour laws on behalf of Named Plaintiff, Oldershaw; Claim 7- breach of contract on behalf of all class members; and Claim 8- breach of contract on behalf of Named Plaintiffs.[2] (Doc. 33).

Defendants seek summary judgment with respect to each Named Plaintiff and Opt-in Plaintiffs as more fully described below.

## CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT

### I.   Summary Judgment Standard.

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The burden is on the movant to show the absence of a genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323). When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the [C]ourt a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* at 671. If the movant carries the initial burden of making a prima facie showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of the claim such that a reasonable jury could find in nonmovant's favor. *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).

---

[2] Claims for relief three and seven relate to the uncertified Rule 23 class claims and are therefore not ripe for consideration.  (Doc. 138 p. 4: 9-13).

The nonmovant must go beyond the allegations and denials of the pleadings and provide admissible evidence, which the Court views in the light most favorable to nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of [the] case or a denial of an opponent's allegation" or it will be disregarded. *Bernard v. Group Publ'g, Inc.*, 970 F. Supp. 2d 1206, 1210 (D. Col. 2013) (citing 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738 at 356 (3d ed.1998)).

## II.   Defendants are Entitled to Summary Judgment Dismissing Plaintiffs' FLSA Claims (Claims 1 and 2).

### A.   The burden of proof and elements of an FLSA claim.

Defendants contend that Plaintiffs' FLSA claims should be dismissed because of one or more of the following reasons with respect to the claims upon which Defendants are moving: (1) Plaintiffs did not establish they worked over 40 hours in a week entitling them to unpaid overtime pay; (2) Plaintiffs failed to follow Defendants' proscribed timekeeping reporting system, and, as such, Defendants did not know nor should have known of the off-the-clock work; (3) Plaintiffs were properly classified as exempt and were not entitled to overtime compensation under the FLSA; (4) Plaintiffs' claims are barred by the statute of limitations; (5) Plaintiffs cannot prove willfulness, and, therefore, are limited to claims that arise within 2 years of the date of the Complaint or on which the Opt-in Plaintiffs filed consents to join this lawsuit; and (6) Plaintiffs are judicially estopped from bringing their claims. The burden of proof and elements for each of these arguments is addressed below.

1.  <u>Plaintiffs must produce evidence demonstrating they worked over 40 hours in a week in order to establish a claim for unpaid overtime.</u>

The FLSA requires an employer to pay an employee one and one-half times an employee's regular hourly rate for each hour the employee works in excess of forty hours per workweek. 29 U.S.C. § 207(a)(1). An employer, however, is not required to pay overtime to employees when they have worked fewer than forty hours in any given workweek. *Scott v. Raudin McCormick, Inc.*, 2010 WL 11565488, 2010 U.S. Dist. LEXIS 92902, at *9 (D. Kan. Sept. 7, 2010). There is no claim for unpaid compensation for hours worked under forty in a work week, also known as "gap time," under the FLSA assuming the employee is earning minimum wage, which is not at issue in this case. *Robertson v, Board of County Comm'rs*, 78 F. Supp. 1142 (D. Col. 1999); *see also Taylor v. McLane Foodservice*, No. 12-2697-JWL, 2013 WL 943531, 2013 U.S. Dist. LEXIS 32924 (D. Kan. March 11, 2013).

"An employee who brings suit under Section 16(b) of the FLSA for . . . unpaid overtime compensation, together with liquidated damages, has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1947); *see also Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1230 (10th Cir. 2012) ("To succeed on an FLSA claim for unpaid overtime, the plaintiff has the burden of proving that he performed work for which he was not properly compensated."). It is the employee's burden to "produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687.

General testimony that, for example, the plaintiff did not take a lunch is insufficient as a matter of law to create the necessary factual predicate to an FLSA claim. *Perez v. Pinon Mgmt.*, 2014 WL 5596261, 2014 U.S. Dist. LEXIS 156095 *20-21 (D. Colo. Nov. 4, 2014); *see also Martinez v. Xclusive Mgmt.*, *LLC*, 2015 WL 12734809, 2015 U.S. Dist. LEXIS 182161 *21-22 (D.

Colo. Aug. 12, 2015) (agreeing that the "clear weight of authority concludes that the FLSA does not provide recovery" for hours worked under 40 in a workweek); *Scott v. Raudin McCormick, Inc.*, 2010 WL 11565488, 2010 U.S. Dist. LEXIS 92902, at *9-10 (D. Kan. Sept. 7, 2010) (granting summary judgment in favor of employer because 138 opt-in plaintiffs did not work more than forty hours in any given workweek during their employment); *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 113-14 (2d Cir. 2013) (upholding dismissal of FLSA claim because the plaintiffs failed to allege that they worked compensable time in a workweek longer than 40 hours); *Kolesnikow v Hudson Valley Hosp. Ctr.*, 622 F.Supp.2d 98, 119 (S.D. N.Y. 2009) (granting summary judgment to the employer because she could not show that the extra hours she allegedly worked would have caused her to exceed 40 hours in a given week); and *Millington v. Morrow Cnty. Bd. of Comm'rs*, No. 06-347, 2007 U.S. Dist. LEXIS 74348, 2007 WL 2908817, at *7 (S.D. Ohio Oct. 4, 2007) ("Plaintiff's bare allegation that he worked an average of five hours every week at home is insufficient to meet his burden of proof . . . . Mere conclusory, factually unsupported allegations are insufficient to withstand a motion for summary judgment.").

> 2. <u>Defendants did not know and could not have known of Plaintiffs' alleged overtime, because Plaintiffs failed to notify Defendants through their timekeeping system.</u>

An employer may be held liable under the FLSA "[i]f the employer knows or has reason to believe that the [overtime] work is being performed." *See*, *e.g.*, 29 C.F.R. § 785.12.  However, "[i]f an employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of alleged overtime work, the employer's failure to credit that overtime is not a violation of the FLSA." *Robertson v. Board of County Comm'rs of County of Morgan*, 78 F. Supp. 2d 1142, 1158 (D. Colo. 1999) (citing *Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995) and *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981)).

In *Brown*, 700 F.3d at 1230-31 (10th Cir. 2012), the Tenth Circuit held that even though the plaintiff had presented uncontroverted evidence that he performed overtime work at home for which he was not compensated, he could not establish liability against the employer because he chose not to enter these hours into the employer's timekeeping system.  The Court found that the plaintiff could have easily reported his hours to the employer and was required to do so.  *Id.*  The Court held that "[u]nder these circumstances, where the employee fails to notify the employer through the established overtime record-keeping system, the failure to pay overtime is not a FLSA violation.  *Id.* (citing *Harvill v. Westward Communs., LLC,* 433 F.3d 428 (5th Cir. 2005)).

In *Harvill*, plaintiff argued that the district court erred in granting summary judgment in favor of the employer as to plaintiff's FLSA claim for unpaid overtime, because substantial evidence existed that she was required to keep false time sheets, which resulted in her not being paid for approximately 210 hours of overtime.  *Id.* at 440.  The plaintiff, however, offered no factual allegations to substantiate her conclusory claim.  *Id.* at 441.  Moreover, the Circuit Court found that she presented no evidence that her employer was aware that she worked overtime hours without compensation.  *Id.*  Thus, the court found that plaintiff failed to raise a genuine issue of material fact as to whether she went uncompensated for overtime work.  *Id.*

"Where an employer has no knowledge that its employees are working uncompensated overtime, courts may dismiss an FLSA claim on summary judgment."  *Bustillos v. Bd. Of Cnty. Comm'rs*, 2015 WL 8014565, 2015 U.S. Dist. LEXIS 162697, at *45 (D. N.M. Oct. 20, 2015) (citing *Brown*, 700 F.3d at 1230-31).  The question on summary judgment is not whether Plaintiffs will ultimately prevail on their claims.  *Id.*  Rather, Plaintiffs must present enough evidence to support an inference that Defendants "had actual or constructive knowledge that its employees

performed uncompensated overtime work." *Id.* at *46 (citing *Whitaker v. Pacific Enters. Oil Co.*, 956 F.2d 1170 (10th Cir. 1992)).

> 3. <u>Plaintiffs alleging misclassification were properly classified as exempt and were not entitled to overtime compensation.</u>

Generally, the FLSA requires that employers pay their employees overtime for all hours worked in excess of forty (40) hours per week. 29 U.S.C. § 207(a)(1). There is an exception to this general rule, however, for any person properly classified as an exempt executive employee.

"While it is the employee's burden to prove that the employer is violating the FLSA, it is the defendant employer's burden to prove that an employee is exempt from FLSA coverage." *Archuleta v. Wal-Mart Stores, Inc.*, 543 F.3d 1226, 1233 (10th Cir. 2008). In *Encino Motorcars, LLC v. Navarro*, Case No. 16-1362, 2018 WL 1568025, 2018 U.S. LEXIS 2065, at *15 (U.S. Apr. 2, 2018), the U.S. Supreme Court stated that in determining whether a plaintiff's job duties satisfy an FLSA exemption, courts must give a *fair* reading to these exemptions rather than imposing a heightened burden on defendants to prove them:

> Because the FLSA gives no textual indication that its exemptions should be construed narrowly, there is no reason to give them anything other than a fair (rather than a "narrow") interpretation. The narrow-construction principle relies on the flawed premise that the FLSA "pursues" its remedial purpose "at all costs." But the FLSA has over two dozen exemptions in § 213(b) alone, including the one at issue here. Those exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement. We thus have no license to give the exemption anything but a fair reading.

*Id.* at *15 (internal citations and quotations omitted).

Under the FLSA, the executive exemption applies to any employee (a) compensated on a salary basis at a rate of not less than $455 per week; (b) whose "primary duty" is the management of the enterprise in which the employee is employed or of a customarily recognized department thereof; (c) who customarily and regularly directs the work of two or more other employees; and

8

(d) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given "particular weight." 29 C.F.R. § 541.100(a).

        4.   Plaintiffs' claims are barred under the statute of limitations.

Defendants bear the burden of establishing the statute of limitations affirmative defense. *See Robert L. Kroenlein Trust v. Kirchhefer*, 764 F.3d 1268, 1274 (10th Cir. 2014). In an FLSA collective action, the statute of limitations for an opt-in plaintiff is – at most – three years prior to the date he or she opts into the action. 29 U.S.C. § 256(b); *see also Avendano v. Averus, Inc.*, 2015 WL 1529354, 2015 U.S. Dist. LEXIS 42223 *27 (D. Colo. Mar. 31, 2015) ("The statute . . . contains a look-back provision which limits to three years from opt-in how far back a plaintiff can look to find violations by his or her employer.").

        5.   Plaintiffs cannot establish willfulness and, therefore, are limited to claims arising within the two year statute of limitations.

The FLSA generally imposes a two-year statute of limitations unless the defendant's violations are shown to be willful, in which case a three-year period applies." *Mumby v. Pure Energy Servs. (USA), Inc.*, 636 F.3d 1266, 170 (10th Cir. 2011) (citing 29 U.S.C. § 255(a)). The standard for willful violations is whether the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA." *Reich v. Monfort, Inc.*, 144 F.3d 1329, 1334 (10th Cir. 1998). The Supreme Court has endorsed a narrow definition of "willful" that is "synonymous with such words as 'voluntary,' 'deliberate,' and 'intentional.'" *Courtright v. Bd. Of County Comm'rs*, 2011 WL 2181954, 2011 U.S. LEXIS 60017, at *19 (W.D. Okl. June 3, 2011) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988)). "An employer's actions which are merely unreasonable, incorrect, or even negligent are

insufficient." *Smith v. Keypoint Gov't Solutions, Inc.*, 2016 WL 7324606, 2016 U.S. Dist. LEXIS 174332 (D. Co. Dec. 16, 2016).

The purported willful violation that gives rise to the cause of action must occur during the third year to invoke the three year statute of limitations period. *Solis v. La Familia Corp.*, 2013 WL 589613, 2013 U.S. Dist. LEXIS 19899, at *23 (D. Kan. Feb. 14, 2013). Plaintiffs have the burden of establishing willfulness. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *Bayles v. American Medical Response*, 937 F. Supp. 1477, 1489 (D. Co. 1996). The court is not to presume willfulness in the absence of evidence given that the burden rests with Plaintiffs to proffer such evidence. *Horrocks v. Daggett County*, 2006 WL 2598331, 2006 U.S. Dist. LEXIS 65236, at *11 (D. Utah Sept. 11, 2006).

### 6. One Opt-In Plaintiff is Judicially Estopped from Bringing her Claims.

A debtor moving for bankruptcy is required to disclose all assets, including pending or potential legal claims or causes of action. 11 U.S.C. § 521(a)(1); *Eastman v. Union Pacific R. Co.*, 493 F.3d 1151, 1159 (10th Cir. 2007); *Sender v. Simon*, 84 F.3d 1299, 1305 (10th Cir. 1996). The doctrine of judicial estoppel provides "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him. *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1069 (10th Cir. 2005). Courts apply judicial estoppel to preclude "improper use of judicial machinery" by barring "a party from adopting inconsistent positions in the same or related litigation." *Autos, Inc. v. Gowin*, 244 Fed. App'x 885, 890 (10th Cir. 2007) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)). Courts in the Tenth Circuit and others have routinely held that the doctrine of judicial estoppel bars a party from pursuing a cause of action

that was not disclosed in bankruptcy court. *Anderson v. Seven Falls Co.*, 696 F. App'x 341 (10th Cir. 2017) (failure to disclose suit in bankruptcy resulted in application of judicial estoppel); *Eastman*, 493 F.3d at 1159 (same); *Autos*, 244 Fed. App'x 890-91 (same).

Courts consider three non-exclusive factors in applying the doctrine of judicial estoppel: (1) a party's subsequent position is clearly inconsistent with its former position; (2) that the party succeeded in persuading a court to accept its earlier position; and, (3) that the party would derive an unfair advantage if not estopped. *Eastman*, 493 F.3d at 1156.

B. <u>Plaintiffs cannot meet all elements of an FLSA claim.</u>

1. <u>Matt Horgan- Elements that cannot be proven by Opt-in Plaintiff, Horgan.</u>

Matt Horgan alleges that Defendants failed to pay him all overtime owed under the FLSA by not paying him for time spent working outside of his scheduled shift hours. (Doc. 33, ¶¶ 68). Defendants are entitled to summary judgment on Horgan's FLSA overtime claim, because he cannot establish through his sworn deposition testimony, his burden to prove that he: (1) performed overtime work for which he was not properly paid; (2) that Defendants had actual or constructive knowledge of his alleged overtime; or (3) Defendants' conduct was willful.

*a. Horgan's Sworn Deposition Testimony.*

Horgan began working for Defendants in approximately late 2012. (*Horgan Deposition*, attached as **<u>Exhibit 1</u>**, p.17: 8-18). Horgan's first position was as a Registered Nurse. (*Horgan Depo.*, p. 19: 10-13; *Declaration of Sarah Creaghe,* attached as **<u>Exhibit 2,</u>** ¶ 5-6). Horgan was an hourly, nonexempt employee. (*Horgan Depo.*, p. 43:17-20). Horgan was later promoted to a manager. (*Horgan Depo.*, p. 20:18-21).

Horgan testified that there were times when he worked after he clocked out at the end of the day. (*Horgan Depo.*, pp. 62: 23-63:1). Horgan, however, could not estimate whether it was one to two hours per pay period or weekly:

> Q. How many occasions?
> A. I don't know.
> Q. Was it more than five?
> A. In my entire employment there?
> Q. Yeah.
> A. Maybe one to two hours per pay period or weekly.
> Q. Per pay period or weekly; which one?
> A. I am not sure. I mean, we can say weekly.

(*Horgan Depo.*, p. 63: 2-11). In fact, Horgan testified that he did not have an estimate of the amounts he alleges he is owed. (*Horgan Depo.*, p. 66: 3-13). Horgan has no evidence to support his allegation that he was not paid for all of the time he worked. (*Horgan Depo.*, p. 66: 3-13).

Horgan testified that the first thing he would do at the beginning of the day is punch in. (*Horgan Depo.*, p. 24: 21-23). Nevertheless, in the next breath, Horgan claims he would sometimes conduct pre-shift work off-the-clock. (*Horgan Depo.*, p. 64: 1-22).[3] Horgan explained that he felt "compelled to use that time" that he was on the premises prior to his shift. (*Horgan Depo.*, p. 74: 13-20). Horgan confirmed that no one told him he could not punch in for his pre-shift work. (*Horgan Depo.*, 91: 8-11).

Horgan claims he worked off the clock despite the fact that he recorded overtime hours some weeks and was indeed paid those overtime wages by Defendants. (*Horgan Depo.*, p. 63: 12-22). To Horgan's knowledge, he was paid time and a half for overtime and identified several specific examples during his deposition in which he was paid overtime wages. (*Horgan Depo.*,

---

[3] Horgan's claim is limited to pre- and post- shift work. Horgan testified that he stayed clocked in for lunch breaks. (*Horgan Depo.*, pp. 52: 21-53: 3). Horgan believes he was paid for any instance where he worked through lunch. (*Horgan Depo,*, p. 55: 1-6). Horgan does not have any evidence to support a claim that he was not paid for the time he worked through lunch. (*Horgan Depo.*, p. 65: 1-10).

pp. 51: 8-52:17, 55:20-60:5, *Horgan Depo.* Ex. 4, 5).  Horgan testified that he did not know of any

overtime work for which he was not paid.  (*Horgan Depo.*, p. 60: 6-9).

     Horgan understood that, as a non-exempt employee, he was required to clock in when he

started work and clock out at the end of his shift and for all other unpaid time, such as unpaid meal

breaks.  (*Horgan Depo.*, pp. 43:13-44:12, *Horgan Depo.* Ex. 2, 3).  Horgan understood that

Defendants' policy mandated that he be clocked in whenever he was performing work, even if it

was not during his scheduled shift.  (*Horgan Depo.*, pp. 44: 13-45:8, *Horgan Depo.* Ex. 2, 3).  In

fact, Horgan actually explained that this was the only way Defendants would know how many

hours Horgan worked.  (*Horgan Depo.*, p. 45: 6-8).  Horgan testified that no one at Defendants

ever told him to perform any work while he was not on the clock.  (*Horgan Depo.*, pp. 46: 24-

47:4).

     Horgan never complained to anyone that he thought he should have been compensated for

time for which he was not compensated.  (*Horgan Depo.*, p. 47: 5-8).  Horgan understood that he

was to notify his supervisor when he forgot to clock out and did so when appropriate. (*Horgan

Depo.*, p. 39: 20-25).  Horgan reported instances where he punched out before completing all of

his work.  (*Horgan Depo.*, 47: 9-48:10).  Horgan testified that when he reported times when he

worked off-the-clock, his supervisor never refused to make an adjustment to his time.  (*Horgan

Depo.*, 48: 11-24).

### b. *Horgan Testified He Did Not Perform Any Unpaid Overtime.*

     Horgan fails to satisfy his burden of proving that he performed overtime work for which

he was not properly compensated.  Horgan did not testify that he worked over forty hours without

being paid.  In fact, Horgan testified to the opposite- that he did not know of any overtime for

which he was not paid.  (*Horgan Depo.*, p. 60: 6-9).  Horgan failed to present any evidence that

his purported off-the-clock work resulted in any overtime as a matter of just and reasonable inference.   Horgan cannot meet his burden to show he has sustained any actual damages. Therefore, he cannot, as a matter of law, establish an FLSA violation for unpaid overtime pay.

        *c.  Horgan Cannot Establish An FLSA Violation Because He Failed To Follow Defendant's Timekeeping Policies To Record Time Such That Defendants Did Not Know And Could Not Have Known Of The Alleged Uncompensated Time.*

Just as in *Brown*, Horgan knew he was required to be clocked in to report his work hours to Defendants; in fact, he understood this was true even if he worked outside of his scheduled shift. Horgan testified that no one ever told him to perform pre- and post-shift work off-the-clock. Horgan was aware that he could report off-the-clock work and be paid for it as Horgan had done so and was never denied adjustments to his time. (*Horgan Depo.*, 48: 11-24).   Because Horgan failed to notify Defendants through their established overtime record-keeping system of his alleged off-the-clock work, the Court should grant Defendants' motion for summary judgment on Horgan's FLSA overtime claim.

        *d.  Horgan Cannot Establish Willfulness On The Part of Defendants.*

Horgan filed his consent to join the FLSA collective action on June 30, 2017.  (Doc. 134). Horgan's last day worked with Defendants was June 10, 2015.  (*Creaghe Dec.* ¶ 5).  Horgan does not have a claim during the two year statute of limitations.  As such, Horgan's claim only survives if he can demonstrate that Defendants' actions were willful.

Horgan testified numerous times that no one ever told him to perform work off-the-clock. (*Horgan Depo.*, pp. 46: 24-47:4, 91: 8-11).  Further, Horgan testified that the only way Defendants knew he was working was if he recorded his time in the timekeeping system.  (*Horgan Depo.*, p. 45: 6-8).  Horgan's testimony epitomizes a case in which there is zero evidence of willfulness by

Defendants. Accordingly, the Court should grant Defendants' motion for summary judgment on Horgan's FLSA claim.

2. <u>Paula Murphy- Elements that cannot be proven by Opt-in Plaintiff, Murphy.</u>

Paula Murphy alleges that Defendants failed to pay her all overtime owed under the FLSA by not paying her for time spent working outside of her scheduled shift hours. (Doc. 33, ¶ 68). Defendants are entitled to summary judgment on Murphy's FLSA overtime claim, because she cannot establish through her sworn deposition testimony, her burden to prove that she performed overtime work for which she was not properly paid within the applicable statute of limitations.

*a. Murphy's Sworn Deposition Testimony.*

Murphy began working for Defendants in approximately late 2005. (*Murphy Deposition*, attached as **<u>Exhibit 3</u>**, p.19: 18-20). Murphy's first position was a non-exempt Registered Nurse who was expected to "float" amongst different facilities in the geographic area for work. (*Murphy Depo.*, p. 20: 11-14, 24: 22-26: 4, *Murphy Depo*. Exs. 2-4). Murphy worked as a "float" nurse from 2005 to 2012. (*Murphy Depo.*, p. 21: 2-10). Murphy then worked in an exempt position from 2012 to 2016. (*Murphy Depo.*, pp. 22: 24-23:6, 24: 22-26: 4, *Murphy Depo*. Exs. 2-4). Murphy consented to join this lawsuit on June 30, 2017. (Doc. 134-2). In her deposition, Murphy testified that her claims in this lawsuit were limited to the time she worked as a non-exempt "float" nurse between 2005 and 2012. (*Murphy Depo.*, p. 79: 6-13).

*b. Murphy's Claims Are Outside The Applicable Statute Of Limitations.*

Murphy's claims are outside both the two-year and three-year statute of limitations. Based on the date Murphy signed her consent to join, June 30, 2017, any unlawful pay practices would have had to occur between June 30, 2017 and June 30, 2014 for her claim to be viable. Murphy's

claims are limited to the time she was a "float" nurse (2005-2012).  (*Murphy Depo.*, p. 79: 6-13).

Thus, Murphy's claims are outside the statute of limitations and should be dismissed.

      3.  <u>Stephanie Mastroantonio - Elements that cannot be proven by Opt-in Plaintiff, Mastroantonio.</u>

Stephanie Mastroantonio alleges that Defendants failed to pay her all overtime owed under the FLSA by not paying her for time spent working outside of her scheduled shift hours.  (Doc. 33, ¶¶ 68).  Defendants are entitled to summary judgment on Mastroantonio's FLSA overtime claim, because she cannot establish through her sworn deposition testimony, her burden to prove that she performed overtime work for which she was not properly paid.

*a.  Mastroantonio's Sworn Deposition Testimony.*

Mastroantonio began working for Defendants in December 2014.  (*Mastroantonio Deposition*, attached as **Exhibit 4**, p. 26: 11-13).  She began her employment as an as-needed Social Worker and worked approximately 16 hours per week.  (*Mastroantonio Depo.*, p. 78: 5-12).  In April 2015, she became a part-time Social Worker and was assigned to work no more than 10 hours per week.  (*Mastroantonio Depo.,* pp. 35: 10-16, 44: 15-21, 78: 22-25).  In December 2015, she became a full-time, exempt Social Worker.  (*Mastroantonio Depo.*, p. 79: 7-12).

Mastroantonio testified that when she worked as a part-time Social Worker, (between April, 2015 and December, 2015) at times, she performed work off-the-clock.  (*Mastroantonio Depo., pp.* 37: 23-39: 12).  Specifically, she testified she would take phone calls from doctors and attend telephonic meetings at home.  (*Mastroantonio Depo.*, pp. 38:12- 39:12).  She would also occasionally perform work prior to her shift before clocking in.  (*Mastroantonio Depo.*, pp. 67: 1-69:1).  Mastroantonio alleges that she was usually paid for about eight hours per week, but actually worked more like nine or ten hours per week.  (*Mastroantonio Depo.*, pp. 44: 24-45: 7).  Her claims

regarding unpaid work are limited to when she was a part-time Social Worker.  (*Mastroantonio Depo.*, p. 49: 13-17).

### b.  *Mastroantonio Testified She Was not Entitled to Unpaid Overtime.*

Mastroantonio admitted that her claim for unpaid time is limited to when she worked as a part-time Social Worker, averaging 10 hours of work per week.  Mastroantonio cannot establish that she performed more than forty hours of work in a given week for which she was not properly paid.  Mastroantonio does not allege an unpaid minimum wage claim.  As discussed above, gap time is not recoverable under the FLSA and accordingly, her FLSA claim fails as a matter of law.

### 4.   David Jackson - Elements that cannot be proven by Opt-in Plaintiff, Jackson.

David Jackson alleges that Defendants failed to pay him all overtime owed under the FLSA by not paying him for time spent working outside of his scheduled shift hours.  (Doc. 33, ¶ 68).  Defendants are entitled to summary judgment on Jackson's FLSA overtime claim, because he cannot establish through his sworn deposition testimony, his burden to prove that he performed overtime work for which he was not properly paid within the applicable statute of limitations.

### a.   *Jackson's Sworn Deposition Testimony.*

Jackson started his employment with Defendants in August 2012 as an hourly Patient Care Technician ("PCT").  (*Jackson Deposition*, attached as **Exhibit 5**, at pp. 26:10-13, 29:8-12, 30:1-2, 31:11-14).  In 2013, Jackson became a Patient Relations Liaison, a salaried, exempt position.  (*Jackson Depo.,* pp. 38:11-19, 71:11—72:4).  Jackson does not assert any claims regarding the manner in which he was paid in the Patient Relations Liaison position.  (*Jackson Depo.,* pp. 72:7-20, 73:7-9).  Jackson admitted that his FLSA overtime claims are limited to the time period between August 2012 and 2013 when he as a PCT.  (*Jackson Depo.,* pp. 71: 9-73: 9, 105:15-18).  Specifically, he alleges that, as a PCT, he believes he is entitled to pay for the 10-20

times he worked for 10-15 minutes before he clocked in for his shift. (*Jackson Depo.*, p. 98: 10:16). Jackson resigned his employment on November 14, 2014, while still a Patient Relations Liaison. (*Jackson Depo.,* pp. 131: 11-13; *Jackson Depo*. Ex. 14). Jackson filed his consent to join this lawsuit on July 21, 2017. (Doc. 139).

> b.   *Jackson's Claims Are Outside the Applicable Statute Of Limitations.*

Even using the three year statute of limitations, Jackson's claims would have had to been based on actions after July 21, 2014. Jackson, however, admitted that his claim for unpaid time is limited to when he worked as a PCT between August, 2012 to 2013. Jackson has not alleged any claims which occurred within the applicable statute of limitations and accordingly, judgment should be entered in favor of Defendants on his claims.

> 5.   <u>Collette Grays - Elements that cannot be proven by Opt-in Plaintiff, Grays.</u>

Collette Grays alleges that Defendants violated the FLSA by failing to pay her for time worked outside of her regularly scheduled shifts and for time worked during meal breaks that were either unavailable or interrupted. (Doc. 33, ¶¶ 67-68). Defendants are entitled to summary judgment on Grays' FLSA claims because she cannot establish that Defendants had actual or constructive knowledge of any unpaid overtime.

> a.   *Grays' Sworn Deposition Testimony.*

Grays started working for Defendants in February 2004 as a Charge Nurse. (*Grays Deposition*, attached as **Exhibit 6**, p. 19:2-9). She is still employed by Defendants. (*Grays* Depo., pp. 20:21-21:1). Currently, Grays is in an exempt position. (*Grays Depo.*, pp. 21:5-17, 57:19-20). She has held that position since at least August 2017. (*Grays Depo.*, pp. 21:5-17, 57:19-20). Thus, Grays' claims are limited to the time period that she was a Charge Nurse.

Grays admits that she usually clocked in before starting work, but states that she would sometimes forget.  (*Grays Depo.*, p. 38:4-15).   She also admits that she usually left work when she punched out, but claims that she would occasionally perform tasks like answering a phone call after punching out.  (*Grays Depo.*, pp. 51:20-52:13).  With respect to meal breaks, Grays alleges that Defendants "probably" made automatic deductions for breaks even when she did not take them (*Grays Depo.*, p. 103:3-5), and that her breaks were occasionally interrupted when she did take them.  (*Grays Depo.*, p. 47:3-19).

Grays admitted (twice) that she was paid for all overtime that she recorded. (*Grays Depo.*, pp. 30:24-31:1; 68:3-12).  The following exchange from her deposition is telling:

> Q: …I want to be perfectly clear for the record.  When you worked over 40 hours a week, you received time and a half for overtime pay for hours over 40, correct?
>
> A: Yes.  When it was documented on the clock, yes.

(*Grays Depo.*, p. 68:3-12).

With respect to her meal break claim, Grays admitted that she does not have any evidence that her time was automatically deducted.  (*Grays Depo.*, pp. 102:23-103:2).  To the contrary, she was confronted with her own time records during her deposition, and admitted that they did not show any automatic deductions.  (*Grays Depo.*, pp. 109:9-11, 110:6-8, 112:1-4, 106: 7-17, *Grays Depo*. Ex. 4).

Despite making a conclusory claim that she worked off-the-clock, Grays admits that she never complained to any of her Facilities Administrators ("FAs"), the highest level of management in a facility, about alleged unpaid time.  (*Grays Depo.*, p. 67:12-14).  Grays also admits that she does not know whether any of her FAs were aware that she worked overtime off-the-clock.  Specifically, she speculated that "[t]hey might have, in some instances" but added "honestly, I

don't know.  Because they're not paying attention to the clock.  They don't know if I punched in or punched out.  They don't know." (*Grays Depo.*, pp. 67:21-68:2).

Grays conceded that Defendants maintained a procedure to allow her to correct her time if she forgot to punch in or punch out, *and that she utilized that procedure multiple times*. (*Grays Depo.*, pp. 38:16-39:6, 56: 13-59:7, *Grays Depo*. Ex. 1).

> b.  *Grays Cannot Establish An FLSA Violation Because She Failed To Follow Defendant's Timekeeping Policies To Record Time Such That Defendants Did Not Know And Could Not Have Known Of The Alleged Uncompensated Time.*

Here, as in *Brown*, Grays understood and utilized Defendants' timekeeping system to keep track of the hours she worked.  Grays testified that she knew there was a procedure in place for correcting time if she worked off-the-clock and, in fact, utilized the process multiple times. (*Grays Depo.*, pp. 38:16-39:6).  Grays never complained to her supervisors about working off-the-clock and admits that "[t]hey didn't know" she worked off-the-clock. (*Grays Depo.*, pp. 67:21-68:2). Grays failed to notify Defendants through their established overtime record-keeping system of her alleged off-the-clock work.  Thus, the Court should grant Defendants' motion for summary judgment on Grays' FLSA overtime claim.

> c.  *Grays Cannot Demonstrate Willfulness on the Part of Defendants.*

Grays testified that her supervisors did not know about any alleged work off-the-clock. Thus, even if Grays can muster up a genuine issue of material fact that Defendants should have known about the off-the-clock work, any purported violation of the FLSA is necessarily not willful.  Grays filed her consent to join the FLSA collective action on July 27, 2017.  (Doc. 139). Thus, in the event her claims survive, they should be limited to two years from the date she filed her consent, July 27, 2017.

6.   <u>William Vue - Elements that cannot be proven by Opt-in Plaintiff, Vue.</u>

Vue alleges that Defendants failed to pay him all overtime owed under the FLSA by not paying him for time he spent working outside of his regular scheduled shift hours. (Doc. 33, ¶ 68). Defendants are entitled to summary judgment on Vue's FLSA overtime claim, because he cannot establish through his sworn deposition testimony, his burden to prove that: (1) Defendants had actual or constructive knowledge of his alleged overtime; and (2) Defendants' conduct was willful.

a.   *Vue's Sworn Deposition Testimony.*

Vue began working for Defendants in December 2012 as a Biomed Technician. (*Vue Deposition*, attached as **<u>Exhibit 7</u>**, pp. 23:1-3, 27:14-17, 29:7-10). Vue was an hourly, non-exempt employee. (*Vue Depo.,* pp. 26: 23-24, 66:17-22). Vue was responsible for recording his own time, which he maintained on a spreadsheet that he kept and sent to this supervisor on a daily basis. (*Vue Depo.,* pp. 44: 17-20, 53: 2-7). Vue testified that Defendants used the hours he represented as worked on his spreadsheets to calculate his pay. (*Vue Depo.,* pp. 58:17-59:11).

Vue was hired to perform 40 hours of work per week. (*Vue Depo.,* p. 28:7-14). He testified that he occasionally worked beyond his 40 hour per week schedule – he "guessed" that he worked an extra two or three hours per day approximately two to three times per week. (*Vue Depo.,* pp. 54:10-55:3). However, he acknowledged that he has no documentation to support his allegations, generally, or the specific amount of time he allegedly worked and was not paid for. (*Vue Depo.*, p. 55:7-15). Indeed, he testified that the time he claims he worked and was not paid for was "just a good guess … because I don't remember." (*Vue Depo.*, p. 91:8-14).

Vue understood that, as a non-exempt employee, it was ultimately his responsibility to advise his employer of the time he was working. (*Vue Depo.*, pp. 66:23-67:7). Vue testified that it was his responsibility to ensure the accuracy and completeness of the time records he submitted.

(*Vue Depo.*, p.67: 9-12). He further conceded that any error he perceived in his pay stub could be brought to Defendants' attention. (*Vue Depo.*, p. 67: 13-16). This is because, as he admitted, it was Defendants' policy to pay employees for all hours worked. (*Vue Depo.*, p. 67: 20-23). The only other evidence asserted by Vue to support is belief that he should not work overtime was him overhearing a conversation in which another Biomed Technician said they should not work overtime but Vue has no idea who said it. (*Vue Depo.*, p. 69:6-14).

Vue never complained to anyone about his pay or questioned his wages or hours worked. (*Vue Depo.*, pp. 71:23-72:10). Vue did not call the Compliance Hotline that was established for employees to report perceived compliance violations. (*Vue Depo.*, pp. 63:23-64:6). While he claimed that his supervisor recommended that he "avoid" working overtime, Vue testified that he was not prohibited from working overtime. (*Vue Depo.*, pp. 69:15-70:14).

> b. *Vue cannot establish a FLSA violation because he Failed to Follow Defendants' Timekeeping Practices to Record Time such that Defendants did not know or could not have known of the uncompensated time.*

Vue is a unique Opt-in Plaintiff. Vue did not clock in or out, but rather, was responsible for keeping track of his own time and submitting time sheets to his supervisor. Vue knew it was his responsibility to accurately keep track of the time he worked and to turn that time into his supervisor. Vue testified that his supervisor recommended he "avoid" working overtime, but no one ever told Vue to work off-the-clock. In fact, Vue concedes that he was not prohibited from working overtime. Vue never questioned his hours worked or his pay stubs. There is simply no evidence that Defendants knew or should have known that Vue worked any alleged overtime. As such, the Court should grant Defendants' motion for summary judgment on Vue's FLSA overtime claim.

                *c.   Vue cannot prove Willfulness and, therefore, is limited to a two year Statute of Limitations.*

Vue filed his consent to join the FLSA collective action on June 30, 2017.  (Doc. 134). Vue's last day worked with Defendants was May 1, 2015, (*Vue Depo.*, p.15:8-14).  Therefore, Vue does not have a claim during the two year statute of limitations.  As such, assuming that the Court finds that Vue has met his burden of proof on his FLSA claims, Vue's claim only survives if he can demonstrate that Defendants' actions were willful.

Vue worked independently and differently than other opt-in Plaintiffs.  (*Vue Depo.*, pp. 33:18-20, 48:10-25).  No one directed his day-to-day activities. (*Vue Depo.*, p. 33:18-20).  Vue had no direct supervisor at any of the three locations to which he reported.  (*Vue Depo.*, pp. 46:19-47:6).  Vue believed that his supervisor, Dorman trusted him.  (*Vue Depo.*, p. 47:2-4).

Vue admitted he was expected to accurately record all of his time to ensure that he was paid for all hours worked.  (*Vue Depo.*, p.67: 9-12).  He simply chose not to because he assumed, incorrectly and despite acknowledged policies to the contrary, that he should not record all of his time.  Vue testified that he was not told to work off-the-clock or that he was prohibited from working overtime by his supervisor(s).  Accordingly, Vue has not and cannot demonstrate that the failure to pay any time he did not record (which Vue bases on mere "guesses") was willful.  The Court should therefore limit Vue's claims to two years from the date he filed his consent.

       7.   <u>Nancy Godinez, Elements That Cannot be Proven by Opt-In, Godinez</u>.

Nancy Godinez alleges that Defendants violated the FLSA by failing to pay her for time worked during meal breaks that were either unavailable or interrupted.   (Doc. 33, ¶ 67). Defendants are entitled to summary judgment on Godinez's FLSA claims because Godinez cannot establish that she performed overtime work for which she was not properly paid.

*a.   Godinez's Sworn Deposition Testimony.*

Godinez commenced employment with DaVita in November 2011, as a PCT.  (*Godinez Deposition*, attached as **Exhibit 8**, pp. 16:17-18, 19:10-12).  Godinez initially worked the day shift, but switched over to nights in August 2014.  (*Godinez Depo.,* p. 70:13-14).

Godinez is not making a claim for pre- or post-shift work that was allegedly performed off-the-clock, and admits that she never performed work before clocking in or after clocking out. (*Godinez Depo.,* p. 31:19-24).  Godinez alleges that her meals breaks were consistently interrupted (*Godinez Depo.,* p. 35:1-8), that her pay was automatically deducted for some, but not all meal breaks that she did not take (*Godinez Depo.,* p. 28:9-10), and that she did not receive "preceptor" pay for trainings that she performed in 2013 and 2014.  (*Godinez Depo.,* pp. 69:17-70:14).  When asked about the meal break deductions, the deductions were sporadic and not taken on every one of her shifts but more likely, approximately half of her shifts.  (*Godinez Depo.*, p. 64:5-9).

During her deposition, Godinez initially stated with conviction that she was automatically clocked out for a 30-minute break *every night* that she worked "up until recently."  (*Godinez Depo.,* p. 28:9-12).  When Godinez was confronted with her own time records, however, she was forced to change her testimony.  Indeed, Godinez acknowledged many different instances where she worked a night shift and there was no deduction for any break period in her payroll documents. (*Godinez Depo.,* pp. 41:1-57:13).  After being confronted with the records, Godinez conceded that "it was not an automated system," and did not affect many of her shifts.  (*Godinez Depo.,* p. 57:3-5).

*b.   Godinez Failed to Demonstrate That She Was Entitled to Unpaid Overtime.*

Godinez's FLSA claim is limited to her allegation that Defendants automatically deducted her pay for lunches/breaks that she did not receive.  This claim should be dismissed.  First, her

testimony about whether and when there were deductions for lunch breaks was inconsistent.  She initially alleged that Defendants automatically deducted a thirty minute lunch break during every shift.  When presented with substantial evidence to the contrary that she worked many shifts without any deduction for lunches, Godinez was forced to change her story and conclude it must not have been an automatic system.  Faced with that reality, Godinez speculates that Defendants must have deducted her time "when they remembered."  Godinez failed to provide any additional evidence beyond her own conclusory assumption regarding what lunches/breaks should not have been deducted, how long she worked during these times, and what she is allegedly owed.

More importantly, however, is the fact that Godinez's claims, even if true, would not have resulted in her working any unpaid *overtime*.  Godinez testified that she worked three, twelve (12) hour shifts a week.  Even if Defendants had deducted thirty minutes from each of Godinez three shifts a week, she would have at most worked up to 1.5 hours off-the-clock in a week.  Since Godinez only worked 36 hours per week (*Godinez Depo.*, pp. 30:6-31:2), an additional 1.5 hours of time would not have entitled her to overtime pay as she would not have worked more than forty hours in a given work week.  Given these undisputed facts, Godinez has failed to meet her burden of establishing that she performed overtime work for which she was not properly paid.

8.  Jamie Lubken - Elements that cannot be proven by Opt-in Plaintiff, Lubken.

Jamie Lubken alleges that Defendants violated the FLSA by failing to pay her for time spent working outside her scheduled shift hours.  (Doc. 33, ¶ 68).  Defendants are entitled to summary judgment on Godinez's FLSA claims because Lubken is judicially estopped from pursuing her claim against Defendants.

*a.   Lubken's Sworn Testimony.*

The First Amended Complaint in this action was filed on March 21, 2016. (Doc. 33).

Lubken signed her Consent to Join this matter on May 11, 2017, and her attorneys filed it with

this Court on June 30, 2017. (Doc. 134-2, p. 5).  Lubken filed her bankruptcy petition on August

30, 2017, in the United States Bankruptcy Court for the District of Arizona.  (*In re: Jamie Lynn

Lubken, Debtor*, United States Bankruptcy Court, District of Arizona, Case No. 17-10279-DPC

("Lubken Bankruptcy"), attached as **Exhibit 9**, at Doc. 1).[4]

*b.   Lubken is Judicially Estopped from Bringing her Claims.*

i.   Lubken adopted clearly inconsistent positions before this Court
     and the bankruptcy court.

The first factor—whether party's subsequent position is clearly inconsistent with its former

position—is demonstrated by Lubken's behavior.   While the present litigation case has been

proceeding, on August 30, 2017, Lubken filed for Chapter 7 bankruptcy.  (Lubken Bankruptcy at

Doc. 1, *Lubken Deposition*, attached as **Exhibit 10**, pp. 13:21-14:18).  Lubken's bankruptcy was

discharged on December 11, 2017, and the case was closed on December 19, 2017. (Lubken

Bankruptcy at Docs. 20, 22).

"A debtor who voluntarily submits him or herself to the jurisdiction of the bankruptcy court

to obtain the benefit of the discharge of debts, must fulfil certain duties to insure the estate assets

are administered in accordance with applicable law."  *Hermann v. Hartford Cas. Ins. Co.*, 675 F.

App'x 856, 860 (10th Cir. 2017).  Upon filing for bankruptcy, Lubken was required to list all assets

of her estate, including "all legal claims and causes of action, pending or potential, which a debtor

---

[4] Lubken also lacks standing to pursue her claim in this litigation because she is not the real party in interest to such
claims; rather, the bankruptcy estate was the real party in standing. *Brumfiel v. U.S. Bank*, 618 F. App'x 933, 936-37
(10th Cir. 2015) (finding plaintiff's failure to disclose claims in bankruptcy petition lacked prudential standing to
pursue claims that were the property of the bankruptcy estate).

might have." *Hermann*, 675 F. App'x at 860 (citing 11 U.S.C. § 521(a)(1)(B)(i); *Eastman*, 493

F.3d at 1159).  Lubken did not list the present litigation in her Schedule B – Personal Property,

even though numerous questions should have prompted Lubken to identify it, including:

> 30. Other amounts someone owes you
> Examples: Unpaid wages, disability insurance payments, disability benefits, sick
> pay, vacation pay, . . .
> . . .
> 33. Claims against third parties, whether or not you have filed a lawsuit or made a
> demand for payment.
> Examples: Accidents, employment disputes, insurance claims, or rights to sue.
>
> 34. Other contingent and unliquidated claims of every nature, including
> counterclaims of the debtor and rights to set off claims.
>
> 35. Any financial assets you did not already list.

(Lubken Bankruptcy at Doc. 1, Schedule B, at p. 15).  Instead of identifying the present litigation,

Lubken answered "NO" to each of these questions. (Lubken Bankruptcy at Doc. 1, Schedule B, at

p. 15; *Lubken Depo.*, p. 14:6-18).  Further, Lubken did not list the present litigation as an exempt

asset on Schedule C – Property Claimed as Exempt. (Lubken Bankruptcy at Doc. 1, Schedule C,

at p. 17-18).  In signing her bankruptcy filing, Lubken declared—under penalty of perjury—that

the information provided was "true and accurate." (Lubken Bankruptcy at Doc. 1, Petition, at p.

6).

Lubken's failure to identify this litigation in her Bankruptcy Petition and Schedule B

created a clearly inconsistent position in this Court and the bankruptcy court. Further, Lubken

never amended her petition at any point during the pendency of her bankruptcy. Thus, the first

factor is met, as Lubken took an inconsistent position in this Court and in the bankruptcy court.

ii.  <u>Lubken succeeded in persuading the bankruptcy court to adopt her clearly inconsistent position.</u>

The second factor—whether the party succeeded in persuading a court to accept its earlier position—is also demonstrated.  For this factor, the court considers the position that the movant took in their bankruptcy petition and that was accepted by the court.  *See e.g.*, *Queen*, 734 F.3d at 1091; *Anderson*, 696 F. App'x at 346.  Lubken clearly persuaded the bankruptcy court to accept her misrepresentation that she was not involved in any lawsuits because the court issued a discharge of her claims under 11 U.S.C. § 727. (Lubken Bankruptcy at Docs. 20, 22); *see Queen*, 734 F.3d at 1090.  Had Lubken properly disclosed the present litigation, thus making consistent representations, the bankruptcy court may have stayed the proceedings pending resolution of this matter. *Id.* at 1091 n. 4.  Lubken's failure to disclose the present action, however, creates "the perception" that the bankruptcy court was misled.  *Queen*, 734 F.3d at 1091 (citing *Eastman*, 493 F.3d at 1156).  Accordingly, this second factor is satisfied.

iii.  <u>Lubken would gain an unfair advantage if she is not estopped from pursuing the present action.</u>

Should Lubken proceed, she may obtain damages that would not have been exempt from their creditors had proper disclosures been made.  *See Queen*, 734 F.3d at 1093. Thus, the third factor is satisfied.  For all of the foregoing reasons, Lubken is judicially estopped from maintaining the present litigation against Defendants.

9.  <u>Christina Voltolini (Ross) – Elements that cannot be proven by Opt-in Plaintiff, Voltolini.</u>

Voltolini alleges in the Complaint that Defendants failed to pay her all overtime owed under the FLSA by not paying her for time spent working outside of her scheduled shift hours. (Doc. 33, ¶ 68).  Defendants are entitled to summary judgment on Voltolini's FLSA overtime claim because she cannot meet her evidentiary burden through her sworn deposition testimony to

prove that she ever worked off-the-clock outside of her scheduled shift hours, much less that she is entitled to unpaid overtime compensation.

a.   <em>Voltolini's Sworn Deposition Testimony</em>

Christina Voltolini is a current employee who was hired in or around June 2013 as a PCT. (*Voltolini Deposition*, attached as **Exhibit 11**, pp. 27: 22-24; 33:11).   Voltolini had previously worked as an Intern for DaVita, and was hired as full-time employee in Denver at the end of her internship.  (*Voltolini Depo.*, pp. 28: 7-16; 33: 6-11).   She worked in Denver until she transferred to the Black Rock facility in Connecticut in July 2014.  (*Voltolini Depo.*, p. 35:15-18).

Voltolini testified that she never performed any work prior to clocking in or after clocking out.  (*Voltolini Depo.*, pp. 49:18-20; 50:12-13; 50:17-51:1).   Voltolini confirmed that while she occasionally checked her work email at home for announcements or other notifications, she never performed any actual work at home.  (*Voltolini Depo.*, pp. 52:6-53:1; 133:24-25).   Further, Voltolini stated that neither of her supervisors ever instructed her to work off the clock or told her that she wasn't allowed to work overtime.  To the contrary, her supervisors told her that she should accurately and honestly record her time.  (*Voltolini Depo.*, pp. 40: 10-13; 57: 17-21; 59:19-60:12).

While Voltolini testified that she was required to attend "lunch and learn[s]" approximately 6 times per year, wherein the company would buy the employees lunch and they would listen to a demonstration during their lunch hour, she also confirmed that she was always on-the-clock and paid during those lunch and learns.  (*Voltolini Depo.*, pp. 53:12 – 54: 23).

Voltolini was well aware of Defendants policies regarding pay practices, accurately reporting her time, being clocked in when performing work, and correcting mistakes in her pay. (*Voltolini Depo.*, pp. 61:9-25; 65:19-67:12).  In fact, Voltolini contacted the company on a handful of occasions to correct her time when it was inaccurate or where she forgot to clock back in after

her lunch break.  (*Voltolini Depo.*, pp. 62:22-63:25; 67:14-68:2).  Voltolini was also aware of

Defendants' complaint hotline, but never used it.  (*Voltolini Depo.*, pp. 85:12-18; 127: 9-12).

Voltolini stated that there were occasions where her lunch would be interrupted due to a

patient emergency and she would miss some portion of her lunch break.  (*Voltolini Depo.*, p. 68:

10-13).  Voltolini testified that the facility's administrative assistant would contact her in these

instances and adjust her time to ensure she was paid.  (*Voltolini Depo.*, pp. 144:24-145:18).

Voltolini testified that she believed that her time was corrected every time she had to actually work

through her break.  (*Voltolini Depo.*, p. 147: 7-20).

Ultimately, Voltolini affirmatively testified that she did not perform any work for DaVita

for which she was not paid.  (*Voltolini Depo.*, pp. 56: 21-25; 147:21-23).

> b.  *Voltolini Cannot Establish a FLSA Violation Because She Failed to Produce Evidence Demonstrating That She Performed Any Off-The-Clock Work*

Voltolini's deposition testimony clearly establishes that she did not perform any off-the-

clock work for Defendants.  No one ever instructed her to work off-the-clock or told her that she

wasn't allowed to work overtime.  Voltolini was well aware of Defendants' policies requiring her

to be clocked in when performing work and the mechanisms available for correcting mistakes in

her paycheck or time records.  In fact, Voltolini had her time records corrected on several occasions

due to missed punch-ins or patient emergencies during her lunch break.  Voltolini's only dispute

with Defendants was that she felt that she did not receive a needed break when she was asked to

attend the company's "lunch and learns," all of which she was paid to attend.

Because Voltolini's testimony confirms that she was clocked in for all hours worked and

that she received all overtime compensation to which she was entitled, Voltolini cannot meet her

burden of proving that she performed work for which she was not properly compensated.  *See*

*Anderson*, 328 U.S. 680 at 686-87.   Accordingly, the Court should grant Defendants' summary judgment as to Voltolini's FLSA claim.

10.   <u>Heather Bolan - Elements that cannot be Proven by Opt-in Plaintiff, Bolan.</u>

Bolan alleges that Defendants failed to pay her all overtime owed under the FLSA by not paying her for time spent working outside of her scheduled shift hours.   (Doc. 33, ¶¶ 67, 68).   Defendants are entitled to summary judgment on Bolan's FLSA overtime claim her claims barred by the statute of limitations.

*a.   Bolan's Sworn Deposition Testimony.*

Bolan began working for Defendants in approximately 2001 as a PCT.   (*Bolan Deposition*, attached as **Exhibit 12**, pp. 14:2-3, 15:11-19).   Bolan was later promoted to a vascular access coordinator on July 21, 2013, working 30 hours per week.   (*Bolan Depo.*, pp. 15:20-25, 24:6-14, 56:25-57:11, 60:23-25; *Bolan Depo.* Ex. 3).   For the first six months after her promotion, Bolan continued to work one additional day per week as a PCT. (*Bolan Depo.*, pp. 23:12-24:2).   Bolan filed her consent to join this lawsuit on August 4, 2017.   (Doc. 140).

Bolan testified that her alleged unpaid overtime claims in this case are limited to her work as a PCT.   (*Bolan Depo.*, pp. 60:8-15, 73:4-11).   She is not claiming she was paid improperly in the vascular access coordinator position.   (*Bolan Depo.*, p. 60:8-15).   Her interrogatory response confirms that her allegations relate only to her work as a PCT.   (*Bolan Depo.* Ex. 3).

*b.   Bolan's Claims are Outside the Applicable Statute Of Limitations.*

Bolan filed her consent to join this lawsuit on August 4, 2017 and accordingly, her alleged FLSA claims must have arisen after August 4, 2014 (even applying a three-year statute of limitations).   Bolan does not have any claims within the applicable statute of limitations because her alleged unpaid overtime claims relate only to work she performed as a PCT through January

21, 2014 (six months after her promotion to vascular access coordinator on July 21, 2013). Accordingly judgment should be entered in favor of Defendants on Bolan's claims.

11. <u>Elizabeth Green - Elements that cannot be Proven by Opt-in Plaintiff, Green.</u>

Green's claim is limited to a purported breach of contract claim for Defendants failure to pay her a shift differential pay. (Doc. 33, Claim 7). Defendants are entitled to summary judgment as to Claims 1 and 2 with respect to Green, because Green has failed to establish that she performed any off-the-clock work.

*a.   Green's Sworn Deposition Testimony.*

Green worked for Defendants on two separate occasions, the second occurring between 2012 and 2016. (*Green Deposition*, attached as **Exhibit 13,** p. 26: 12-21). Green worked as a Registered Nurse in the Denver area until her employment was terminated in 2016. (*Green Depo.*, pp. 26: 20-24, 28: 23-24, 32: 13-15). During this time period, she "floated" to Defendants' facilities in Thorton, Longmont, Loveland, Brighton, East Aurora, South Denver, Denver, Littleton, East Englewood, Sterling, and Nebraska. (*Green Depo.*, p. 56: 4-12).

Green unequivocally stated that she never performed any work prior to clocking in, and never performed any work after clocking out for the day. (*Green Depo.*, pp. 49:22 – 50:2, 53: 18-20). Green testified that on the rare occasion that her lunch break was interrupted due to an emergency, she would clock back in before returning to work. (*Green Depo.*, pp. 47: 6-22, 53:21 – 54:6). Green was so definitive in her testimony that she explained that her unverified discovery responses, which she did not recall reviewing, were incorrect, because she is not alleging that she worked more than forty (40) hours a week without being paid and is not alleging that she was not properly paid for her lunch breaks. (*Green Depo.*, pp. 71:4-18, 72: 11-18, 75: 25-76: 5).

Green's claim is limited to a purported breach of contract claim for shift differential pay. (Green Depo., pp. 61: 7-17, 66: 1-4).  Green's float agreement states that all float RN and PCTs are evaluated on a compensation and performance basis to determine if they are eligible for float pay and, if deemed eligible, will receive $1.50 per hour for full time float RNs and PCTs. (*Green Depo.*, pp. 64:21-65:4, *Green Depo.* Ex. 1).[5]

> *b.  Green Cannot Establish an FLSA Violation Because She Failed to Produce Evidence Demonstrating That She Performed Any Off-The-Clock Work.*

Green definitively testified that she did not perform any off-the-clock work during her employment with Defendants.  Green stated that she clocked in when she was ready to begin working for the day, clocked out for lunch breaks, clocked back in when her lunch breaks were interrupted, and clocked out when she completed her tasks for the day.  Unverified discovery responses were submitted on behalf of Green alleging off-the-clock work, but during her deposition, Green explained that she was not asked to answer Defendants' interrogatories and they were incorrect.  (*Green Depo.,* pp. 71: 4-18, 72: 11-18, 75: 25-76: 5).  Green is a prime example of a claimant whose claim was not investigated prior to her consent to join this FLSA collective. Green, herself, admits there is zero evidence that she worked off-the-clock.  Accordingly, the Court should grant Defendants' summary judgment as to Green' FLSA claim.

12. Wendy Souza – Elements that cannot be proven by Opt-in Plaintiff, Souza.

Souza alleges that she was not paid for all hours worked remotely, but offers nothing more than speculation in support of her claim.  More fundamentally, she did not testify that any of these allegedly unpaid hours would have constituted overtime hours.  Defendants are entitled to

---

[5] Green's claim is limited to Claim 7, breach of contract, which is not currently at issue before this Court. (Doc. 138 p. 4: 9-13).

summary judgment on Souza's FLSA overtime claim because she cannot establish through her sworn deposition testimony her burden to prove that she worked any unpaid overtime.

### e.   *Souza's Sworn Deposition Testimony.*

Souza began working for Defendants in July of 2016 and resigned in November of 2017. (*Souza Deposition*, attached as **Exhibit 14,** pp. 24: 3-5, 32: 14-17). She worked as an IT support representative.   (*Souza Depo.*, p. 26: 13-18).   She was permitted to and frequently did work remotely. (*Souza Depo.*, p. 52: 16-18).

Souza testified that she regularly worked through her lunch breaks. (*Souza Depo.*, p. 73: 19-21).  However, she acknowledged that she would e-mail her supervisor to let her know that she worked through lunch to have her time adjusted. (*Souza Depo.*, p. 76: 18-20).

While working remotely, she did not clock in or out of a time system.  Instead, Souza would e-mail her time to human resources for HR to input into the timekeeping system. Souza conceded during her deposition that it was Defendants' policy that she would be paid for the time she submitted and that employees could report perceived inaccuracies in time to their supervisor(s). (*Souza Depo.*, pp. 57: 19-24, 60: 5-21).  She was never disciplined either for clocking in early or for clocking out late when she worked in the office. (*Souza Depo.*, p. 72: 17-22).  Souza was never instructed to perform any work either prior to clocking in or after clocking out. (*Souza Depo.*, pp. 72:23-73:3).  She presented no proof that her timecards were ever adjusted downward.  She presented no proof that time she submitted while working remotely was not added to her timecards. The time records reviewed with Souza in her deposition only reflected upward adjustments (meaning time being added) with notations that such additional time was added for off-site (or remote work).  (*Souza Depo.*, p. 48:1-9).  Souza did not testify that she was prevented from working and recording overtime.

a.  *Souza cannot establish a FLSA violation because she Provided no Evidence that she worked Unpaid Overtime.*

Souza did not testify either that she worked more than forty hours in a given week without being paid overtime or that any allegedly unpaid hours were overtime hours.  Therefore, she cannot, as a matter of law, establish an FLSA violation for unpaid overtime pay.

Even if Souza testified that she had worked overtime hours that were not paid, Souza did not list any date when she actually worked overtime and was not paid.  She, therefore, cannot meet her burden to show he has any actual damages.  Souza's conclusory testimony that she worked some amount of hours not shown on her time records is insufficient to demonstrate a FLSA violation.

For these reasons, this Court should grant Defendants' summary judgment as to Souza's FLSA claim.

## III.  Defendants are Entitled to Summary Judgment Dismissing Plaintiffs' Failure to Maintain Records Portion of their FLSA Claims (Claims 1, 2, and 4).

A.  The burden of proof and elements of an FLSA claim.

*See* the above burden of proof for FLSA claims.

B.  Plaintiffs cannot meet all elements of an FLSA claim

All Named and Opt-in Plaintiffs couch Claims 1, 2, and 4 as not only an alleged violation of the FLSA or Colorado wage and hour laws, but as claims for Defendants failing to maintain records.  (Doc. 33).  Defendants should likewise should be granted summary judgment as to the failure to maintain records allegations, because there is no private right of action for such claims.

Although the FLSA has a recordkeeping requirement, there is no private right of action for failure to maintain records.  *Schneider v. Landvest Corp.*, 03-02474, 2006 WL 322590, 2006 U.S. Dist. LEXIS 17230, at *62, n.5 (D. Colo. Feb. 9, 2006) ("To the extent that Plaintiffs'

complaint may be deemed to assert a claim for violation of the record keeping requirements of the FLSA, I find no evidence of Congressional intent to allow a private right of action." citing *East v. Bullock's Inc.*, 34 F. Supp. 2d 1176, 1182-83 (D. Ariz. 1998)); *see also Elwell v. Univ. Hosp. Home Care Servs.*, 276 F.3d 832, 843 (6th Cir. 2008); *Powell v. Florida*, 132 F.3d 677, 678 (11th Cir. 1998), *cert. denied*, 524 U.S. 916 (1998) (noting that Secretary has exclusive authority to bring suit under § 217); *Castillo v. Givens*, 704 F.2d 181, 198 n.41 (5th Cir. 1983).   Courts have consistently refused to find that there is a private right of action for an employer's alleged violations of the FLSA's recordkeeping requirement regardless of whether the suit seeks injunctive relief or damages.  *Bracamontes v. Bimbo Bakeries USA, Inc.*, No. 15-cv-02324-RBJ, 2016 WL 5791202, 2016 U.S. Dist. LEXIS 187936, at *7 (D. Col. Sept. 30, 2016).

For these reasons, Defendants should be granted summary judgment with respect to Plaintiffs' alleged claim of failure to maintain records as part of Claims 1, 2, and 4 of the Amended Complaint.  (Doc. 33).

**IV.     Defendants are Entitled to Summary Judgment Dismissing Navarro's Claim as to Violation of the Colorado Wage and Hour Laws (Claims 2 and 4) on Defendants' Fourteenth Defense that Navarro was an Exempt Employee.**

A.  Burden of Proof and Elements

*See* above. As demonstrated below, the undisputed facts in this case demonstrate that Navarro satisfied the requirements of the executive exemption because she was the highest management employee in the facility and was responsible for managing the facility.

B.  The undisputed facts show Navarro was an exempt employee under the executive exemption

Defendants employed Navarro as an Assistant Facility Administrator ("AFA") from May 26, 2013 to March 14, 2015 and a FA from March 15, 2015 until her employment ended on November 24, 2015. (*Navarro Deposition*, attached as **Exhibit 15**, pp. 10:15-25, 94:14-24;

*Declaration of James Hein* attached as **Exhibit 16,** ¶ 5. Navarro generally had the same job duties in both positions. (*Navarro Depo*, pp. 102:21-103:18).

<ol>
<li>Defendants compensated Navarro on a salary basis at a rate of not less than $455 per week</li>
</ol>

Defendants compensated Navarro on a salary basis at the following pay rates: $53,000 or $57,000 annually (approximately $1019 or $1096 per week) as an AFA; and $65,000 annually ($1,250 per week) as an FA. (*Navarro Depo*, pp. 111:12-112:5). These amounts are well in excess of the $455 per week required for the executive exemption under the FLSA.

<ol start="2">
<li>Navarro's "primary duty" was the management of the clinic in which she was employed</li>
</ol>

The FLSA defines a "primary duty" as "the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). Under the Department of Labor ("DOL") regulations, "management" duties include activities such as:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. Additionally, the FLSA sets out four factors to utilize in determining the employee's primary duty: (1) the relative importance of the exempt duties as compared with other types of duties, (2) the amount of time spent performing exempt work, (3) the employee's relative

freedom from direct supervision, and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of non-exempt work performed by the employee.  29 C.F. R. § 541.700(a) (post-2004).

While the amount of time an employee spends performing exempt work can be a useful guide in determining whether exempt work is the primary duty, an employee does not necessarily need to spend more than half their time performing exempt duties to satisfy this part of the test. *Bernard v. Grp. Publ'g, Inc.,* 970 F. Supp. 2d 1206, 1223 (D. Colo. 2013) (granting summary judgment in favor of the defendant-employer on the plaintiffs' overtime claim where the plaintiffs argued that more than half of their time was spent performing non-exempt duties); *see also* 29 C.F.R. § 541.700(b) (noting that "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement" and that "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other facts support such a conclusion"); *Harris v. Liberty Oilfield Servs., LLC,* 2018 WL 447355, 2018 U.S. Dist. LEXIS 7426, *9-10 (D. Colo. 2018) (granting summary judgment in favor of the defendant-employer and finding that while employee performed some clerical duties, his primary duties fell within the professional exemption); *Meyer v. Bd. Of Cty. Comm'rs,* 5 F. Supp. 2d 914, 918 (D. Kan. 1998) (granting summary judgment in favor of the employer, finding the plaintiffs primary duties fell within the administration exemption and that the amount of time spent performing managerial versus non-managerial work was immaterial).

Moreover, the fact that an employee concurrently performs exempt and non-exempt work does not disqualify the employee from the executive exemption.  The DOL regulations specifically provide that concurrent performance of exempt and non-exempt duties does not disqualify an

employee from the executive exemption as long as the employee's primary duty is still management. *See* 29 C.F.R. 541.106(a). "Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work." *Id.*

Applying the above factors to the facts of this case, it is undisputed that Navarro's primary duty was management. Navarro testified she was responsible for significant managerial duties, including all of the "Essential Duties & Responsibilities" listed in the FA job description (except certain "Acute" and "HHD/PD" duties that did not apply). (*Navarro Related Litigation Deposition[6], attached as **Exhibit 17,** pp. 56:24-60:13; Navarro Depo*. Ex. 1). Her duties and responsibilities included:

- <u>Financial management of the clinic</u>, including monitoring of financial results, variance reporting and action plans to meet established budget objectives; reviewing and managing income statements; supervising inventory management including purchasing, product selection, and supply usage; ensuring patient and treatment charge information and other related data are accurate and submitted in a timely manner;

- <u>Risk management/quality assurance compliance</u>, including ensuring compliance with DaVita policies and procedures in accordance with State and Federal Regulations for patient care and services; ensuring compliance with state or federal regulations of the Injury Prevention and Safety Training Program; maintaining quality assurance programs; constantly looking at current processes and procedures and identifying and implementing areas of improvement while adhering to legal as well as hospital and DCS requirements; participating in and leading quality assurance meetings and all applicable in-services;

- <u>Facility/equipment management</u>, including ensuring equipment and supplies are maintained to provide quality care and to ensure the safety of patients and teammates; identifying and planning prompt corrective action for any issues with safety or equipment and systems; participating in the development and

---

[6] The depositions of Elina Navarro taken on July 11, 2017, Kelsey Oldershaw taken on August 31, 2017, Ben Stapleton taken on October 24, 2017, and Shannon Gibbons taken on September 27, 2017 were in *Oldershaw, et. al. v. DaVita Healthcare Partners Inc. and Total Renal Care Inc.,*Case No. 17-cv-00131-MSK-MJW, pending in the United States District Court for the District of Colorado and are referred to herein as the deposition taken in the Related Litigation, i.e. Navarro Related Litigation Depo.

periodic revision of policies and procedures with the Regional Operations
Director ("ROD")/Medical Director to assure consistent, efficient and safe
operation of the facility/program;

- <u>Patient care management</u>, including participating in development and revision
of policies and procedures with ROD and Medical Director to ensure consistent,
efficient and safe treatment delivery; fostering a sense of urgency in teammates
that promotes commitment to optimal clinical outcomes, regulatory compliance
for the facility; and

- <u>Teammate/employee management</u>, including providing leadership to direct
reports; creating, maintaining, employee schedules according to the needs of
the facility; helping direct reports overcome any organizational obstacles
encountered during projects; implementing, following, and communicating to
teammates all DaVita employment policies and procedures, awards, and other
opportunities; ensuring DaVita employment processes are completed timely
and in compliance with DaVita policy and any applicable laws including
Performance Development Reviews, teammate personnel file maintained, etc.;
planning, organizing and supervising the nursing, technical and biomedical
staff to ensure high quality patient care; facilitating teammate development
(Performance Development Reviews, coaching, mentoring, DaVita training,
outside training); collaborating with direct reports to create professional
development goals; addressing teammate relations issues appropriately and
escalate as necessary; providing work direction for department teammates;
determining staffing plans that promote the most effective use of all teammates;
ensuring coverage during teammate absences; reporting and documents all
teammate injuries; reviews and tracks time cards, overtime, paid time off,
attendance; developing and conducting educational programs for teammates.

(*Id.*; *see also Navarro Depo.*, pp. 94:25-95:20; 96:1-12, 22-25).

Navarro contends that in addition to her AFA/FA duties, she also spent time performing

non-exempt duties of a PCT and Administrative Assistant ("AA"), such as patient care, answering

phones, searching for and keeping medical records and maintaining employee files. (*Navarro*

*Depo*, pp. 104:14-105:12)   However, Navarro's concurrent performance of exempt and non-

exempt duties did not disqualify her from satisfying the executive exemption.  Rather, Navarro's

managerial duties were indispensable for the day-to-day operations of the clinic.  *See Hindsdale v.*

*Liberal Hous. Auth.,* 1997 U.S. Dist. LEXIS 18802, *47-52 (D. Kans. 1997) (finding plaintiff was

exempt under the executive exemption where, although she performed both managerial and non-

managerial tasks, because she was ultimately responsible for the day-to-day operation of the office and was not supervised on a daily basis, her management duties were significantly more important to the operation of the business than her non-managerial tasks), a copy of the *Hindsdale* case is attached as **Exhibit 18**; *Slusser v. Vantage Builders, Inc.,* 576 F. Supp. 2d 1207, 1217-1221 (D.N.M. 2008) (granting summary judgment as to Plaintiff's overtime compensation claim and finding her exempt from the FLSA because while she performed clerical work, she was still responsible for managerial duties); *see also Diaz v. Team Oney, Inc.*, 291 F. App'x 947, 949 (11th Cir. 2008) (affirming summary judgment on behalf of the defendant-employer and holding that the plaintiff, a restaurant manager, was exempt under the executive exemption where he was responsible for supervising drivers, counterpersons, and cooks, apportioned work, made deposits, filled out required forms, interviewed prospective employees, and engaged in local restaurant marketing, which duties were all significantly more important to the operation of the restaurant than his non-managerial tasks); *Jackson v. Jean Coutu Grp. (PJC) USA, Inc.*, 2007 WL 1850710 (S.D. Ga. June 26, 2007) (granting summary judgment as to Plaintiff's overtime compensation claim for the period of time she was employed as store manager where the plaintiff's managerial duties as store manager were indispensable and outweighed her non-managerial duties and she was properly classified as an exempt employee).

Navarro also exercised her duties free from direct supervision.  Indeed, Navarro's admits that, except for the rare occasion when her managers visited the clinic, she was the highest level of management at the clinic.  (*Navarro Depo*, pp. 16:17-25, 36:6-37:22, 109:9-111:3)  Therefore, the undisputed facts compel a finding that Navarro's primary duty was the management of the clinic.

3.  <u>Navarro customarily and regularly directed the work of two or more other employees</u>

To qualify for the FLSA's executive exemption, Navarro must customarily and regularly direct the work of two or more other employees.  29 C.F.R. § 541.100(a)(1).  The regulations define "customarily and regularly" as "a frequency that must be greater than occasional but which, of course, may be less than constant."  29 C.F.R. § 541.701.  Plaintiff satisfies the second component, "two or more employees," if she supervises "two full-time employees or their equivalent."  29 C.F.R. § 541.104(a).

Here, Navarro directly supervised approximately five to ten full-time employees. (*Navarro Related Litigation Depo.* pp. 59:3-9).  Accordingly, she satisfies this prong of the executive exemption analysis.

4. <u>Navarro had the authority to hire or fire other employees and her suggestions and recommendations were given particular weight</u>

Finally, to qualify for the executive exemption, Navarro must have had "the authority to hire or fire other employees or [her] suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees [were] given particular weight."  29 C.F.R. § 541.100.

To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. . . . An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.  29 C.F.R. § 541.105.

Here, Navarro had the authority to hire and fire employees or her suggestions and recommendations were given particular weight. (*Hein Dec.* ¶ 6). Navarro participated in hiring of PCTs, nurses and other teammates in her facility, during which she provided suggestions and recommendations that her managers relied upon.  (*Navarro Depo*, pp. 50:11-54:15; *Hein Dec.* ¶ 7). Navarro had authority to promote employees, though she did not have occasion to do so. (*Navarro Depo*, p. 58:1-4; *Hein Dec.* ¶ 8).

Navarro also had the authority to discipline and fire teammates, if necessary. (*Hein Dec.* ¶ 9).  Navarro testified that she needed to consult People Services (human resources) with respect to disciplining employees, but admitted that People Services would only take notes and told her "it was up to [her]" and "[y]ou can do any discipline that you would like." (*Navarro Depo*, pp. 29:13-30:5, 81:11-85:22).  At times, People Services would make recommendations, but Navarro made the ultimate decision as to whether and how to discipline employees.  (*Navarro Depo*, pp. 29:13-30:5, 81:11-85:22, 86: 3-17).  Navarro was also responsible for terminating employees.  (*Navarro Depo.*, pp. 87:18-88:6).  There was only one occasion that People Services discussed with Navarro coaching an employee versus terminating an employee.  (*Navarro Depo.*, p. 88:7-89:1).  This, however, was a unique situation because the employee cursed specifically at Navarro.  (*Navarro Depo.*, p. 88:7-89:1).  Thus, People Services acted as an objective third party in discussing how to handle the employee.  Therefore, Navarro also satisfies the last prong of the executive exemption analysis.

As demonstrated herein, Navarro satisfied the salary basis test, her primary duty was the management of the clinic, she customarily and regularly directed the work of at least two full-time employees or their equivalent per week, and she had the authority to hire and fire employees or

her suggestions and recommendations were given particular weight. Therefore, Navarro was properly classified as an exempt employee under the executive exemption of the FLSA.

    C. <u>Navarro Cannot Demonstrate Willfulness on the Part of Defendants.</u>

Navarro has no evidence that Defendants either knew or showed reckless disregard for whether it violated the FLSA when it classified her as exempt from overtime. Accordingly, to the extent Navarro's FLSA claim survives summary judgment, she is only entitled to a two-year statute of limitations.

    **V.   Defendants are Entitled to Summary Judgment Dismissing Oldershaw's Retaliation and Reprisal Claims (Claims 5 and 6).**

    A. <u>Burden of Proof and Elements</u>

Retaliation claims are evaluated "under the analytical framework set forth in *McDonnell Douglas Corp. v. Green*." *Richmond v. ONEOK, Inc.*, 120 F. 3d 205, 208 (10th Cir. 1997) *citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under that standard, "the plaintiff initially must establish a *prima facie* case. The burden then shifts to the employer to offer a legitimate non-retaliatory reason for the plaintiff's termination. If the employer offers such a reason, the burden then shifts back to the plaintiff to show that 'there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual.'" *Id. quoting Randle v. City of Aurora*, 69 F. 3d 441, 451 (10th Cir. 1995).

In order to establish a *prima facie* case, "a plaintiff must show that: (1) she engaged in activity protected under…;(2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Id.* at 209-10 *citing Archuleta v. Colorado Dep't of Institutions*, 936 F.2d 483, 486 (10th Cir. 1991).

    B. <u>Elements That Cannot be Proven by Oldershaw</u>

Assuming without conceding that Oldershaw can establish the first two elements of a *prima facie* retaliation claim[7], that claim still fails because she cannot establish a causal connection between the protected activity and her termination.  Indeed, Oldershaw testified that she did not even notice, much less complain about, any issue relating to her wages until after becoming aware of her forthcoming termination.

> a. *Oldershaw Cannot Establish a Causal Connection Between DaVita's Decision to Terminate Her Employment and Any Protected Activity*

It is undisputed that Oldershaw's supervisor, Ben Stapleton, informed Oldershaw that she should start looking for a new job before she reported (or even noticed) any issue with her wages.  Indeed, although Oldershaw could not recall the exact date, she testified that Mr. Stapleton made that call on July 21st of 22nd.  (*Oldershaw Depo.*, p. 118: 17-24).  Mr. Stapleton did recall the exact date of the call, and testified that he made it on July 22nd.  (*Stapleton Related Litigation Deposition*, attached as **Exhibit 20**, pp. 215:23-216:16).

By her own admission, Oldershaw did not even notice—much less report—any issue with her wages until *after* this phone call had occurred.  (*Oldershaw Depo.*, pp. 74:4-12; 142:3-7).  Oldershaw also could not recall the exact date that she noticed the alleged issue with her wages, but testified that "[i]t was in August," (*Oldershaw Depo.*, p. 106:23) and that she noticed it "after [Mr. Stapleton] told me" to start looking for a new job.  *(Oldershaw Depo.*, p. 142:6).  Oldershaw admitted that she knew she was going to be terminated and was looking through her records and

---

[7] Oldershaw made several complaints that do *not* constitute protected activity.  Oldershaw testified, for example, that she allegedly complained about "the Concur, the reporting…how [Mr. Stapleton (her supervisor)] was putting his apartment through, the surgery, [and] his reaction to my surgery…" (*Oldershaw Deposition,* attached as **Exhibit 19**, pp. 73:22-74:3).  Even if such complaints were made, they do not constitute protected activity under the FLSA or state law.  *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1335 (2011) (to qualify as protected activity, a complaint must constitute an "assertion of rights protected by the statute and a call for their protection"); *Valerio v. Putnam Associates*, 173 F. 3d 35, 44 (1st Cir. 1999) ("[N]ot all abstract grumblings will suffice to constitute the filing of a compliant with one's employer.").  The first, and only, complaint that even arguably constitutes protected activity related to the alleged deductions from Oldershaw's pay—and was not made until August, after Oldershaw knew she was going to be terminated.  (*Oldershaw Depo.*, pp, 74:4-12; 106:7-11; 106:23).

noticed the issue to try to "protect [herself] because [she] saw it coming." *(Oldershaw Depo.*, p.

107:9-11). The following exchange from Oldershaw's deposition is reflective of this fact:

> Q:    …Before your termination and the 6.87 hours that you discovered after that,
>       did you complain to anybody ay DaVita about your pay?
> A:    No, I hadn't discovered it yet…

*(Oldershaw Depo.*, p. 106:4-7).

In light of these undisputed facts, it is clear that there was no causal connection between

the alleged protected activity and Defendants' decision to terminate Oldershaw's employment.

Accordingly, Oldershaw cannot establish a *prima facie* case of retaliation and DaVita's motion for

summary judgment should be granted.

> a. *Even if Oldershaw Could Establish a Prima Facie Case, Her Retaliation
>    Claims Still Fail Because Defendants Have Established a Legitimate Non-
>    Retaliatory Reason for Her Termination*

Even if Oldershaw had established a *prima facie* case (which she has not), the retaliation

claim still fails because Defendants have established a legitimate non-retaliatory reason for her

termination. It is beyond dispute that poor job performance is a legitimate non-retaliatory reason

for a termination. *See Richmond*, 120 F. 3d at 209-10.

The facts reveal, unequivocally, that Defendants terminated Oldershaw because of her poor

job performance. Oldershaw's performance issues started even before she was assigned to

Stapleton. Indeed, Oldershaw's prior supervisor, Margaret Anderson, gave her constructive

criticism and verbal warnings on several occasions. (*Oldershaw Related Litigation Deposition*,

attached as **Exhibit 21**, pp. 69:21-70:17; *Gibbons Related Litigation Deposition*, attached as

**Exhibit 22**, 103:12-104:14). After Oldershaw failed to improve, she was demoted and assigned

to Stapleton. (*Gibbons Related Litigation Depo.*, p. 107:5-15).

Even after the demotion, Oldershaw's performance problems persisted. Stapleton

frequently had to counsel Oldershaw about performance deficiencies, including repeated syntax

and grammatical errors.  (*Stapleton Related Litigation Depo.*, pp. 155:18-156:3).  Oldershaw's

2015 performance review reflects these deficiencies (and others), stating that Oldershaw's "[e]mail

communication is definitely an area that needs focus.  She needs to be more succinct and

professional when sending or replying to email…"  (*Oldershaw Related Litigation Depo.*, pp.

133:18-134:19, *Oldershaw Depo.* Ex. 3, p. 2).

Oldershaw was placed on a performance improvement plan ("PIP") on July 6, 2015 after

months of less formal feedback failed to prompt the necessary improvements.  (*Stapleton Related

Depo.*, p. 157:17-24, Ex. O).  The PIP made it clear that failure to make the requisite improvements

within 30 days would result in termination.  (*Stapleton Related Litigation Depo.,* p. 157:17-24,

*Oldershaw Related Litigation Depo Ex.* 8).  Oldershaw signed and acknowledged the PIP on July

6, 2015.  (*Stapleton Related Litigation Depo.*, p. 157:17-24, *Oldershaw Related Litigation Depo*

*Ex.* 8).  Unfortunately, however, Oldershaw failed to demonstrate any tangible improvement

despite continued counseling.  (*Stapleton Related Litigation Depo.*, pp. 8:1-14; 211:22-212:11).

Accordingly, Defendants terminated Oldershaw effective August 3, 2015.

Where, as here, the decision to take adverse action was made *before* the protected activity

occurred, no causal connection exists.  *See Martinez v. City & County of Denver,* 2012 WL

3842616, 2012 U.S. Dist. LEXIS 125700, at *30 (D. Colo. Sept. 5, 2012) (holding that no causal

connection existed between protected activity and an adverse action where the protected activity

occurred after the adverse action); *Luster v. Vilsack*, 2010 WL 3842616, 2010 U.S. Dist. LEXIS

129390, at *20 (D. Colo. Dec. 6, 2010) (same).

*Luster v. Vilsack* is particularly instructive.  In that case, plaintiff claimed that her

supervisor informed her that she would be assigned different job duties in retaliation for an internal

complaint.  2010 WL 3842616, 2010 U.S. Dist. LEXIS 129390 at *20.  Discovery revealed,

however, that the supervisor had made the relevant decision before plaintiff made the internal complaint, and before her supervisor had ever become aware of it.  *Id.*  Notably, the plaintiff in that case admitted during her deposition that her supervisor had informed her of her new duties before she made her internal complaint.  *Id.*  Accordingly, the court held that there was no causal connection between the protected activity and the assignment of new duties—and granted summary judgment to the employer on plaintiff's retaliation claim.  *Id.*

Given the undisputed facts, Defendants has established a legitimate, non-retaliatory reason for Oldershaw's termination.  Accordingly, the burden shifts back to Oldershaw to establish that this reason is actually just pretext for retaliation.

b. *The Legitimate Reason for Oldershaw's Termination is Not Pretext for Retaliation*

"[O]nce the 'defendant carries its burden of producing legitimate, nondiscriminatory reasons for its decision, the presumption of [retaliation] created by the *McDonnell Douglas* framework drops from the case, and the factual inquiry proceeds to a new level of specificity." *Conner v. Schnuck Mkts.*, 121 F.3d 1390, 1396 *quoting Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).  It is well-established in this circuit that "[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City and County of Denver,* 365 F.3d 912, 924-25 (10th Cir. 2004).  Plaintiff may still prevail, but only if she can establish pretext by showing that the reason offered for her termination is unworthy of credence by producing specific, direct evidence—"[m]ere conjecture that the employer's reason is pretext…will not defeat a motion for summary judgment." *Richmond*, 120 F. 3d at 209; *see also Mitchell v. Qwest Communs. Int'l, Inc.*, 2007 WL 4287499 (D. Colo. Dec. 4, 2007) ("Plaintiff's difference of opinion about responsibilities or her performance are insufficient to create issues of

fact as to whether [her supervisors] honestly believed in good faith that termination was justified for legitimate reasons.").

Oldershaw has not, and cannot, establish pretext. There is ample documentation supporting the reason for Oldershaw's termination (poor job performance), all of which predates any alleged protected activity and therefore cannot defeat the instant motion for summary judgment. *See e.g., Betts v. Work Zone Traffic Control, Inc.*, 2017 WL 6033690 2017 U.S. Dist. LEXIS 208716, at *8-*9 (D. Colo. Oct. 31, 2017) ("Plaintiff has failed to provide sufficient evidence from which a rational juror could conclude that Defendant's legitimate, non-retaliatory reason is pretextual. Defendant is therefore entitled to summary judgment on Plaintiff's FLSA retaliation claim.").

c. *Oldershaw's State Law Retaliation Claim Fails for The Same Reasons as the FLSA Retaliation Claim*

The Colorado Wage Claim Act ("CWCA") contains an anti-retaliation provision similar to the one contained in the FLSA. *See* Colo. Rev. Stat. 8-4-120. Oldershaw has also asserted a retaliation claim under that statute, but this claim fails for the same reasons as the FLSA retaliation claim discussed *supra*. Indeed, courts in this Circuit have observed that the two provisions are similar and have analyzed such claims on parallel tracks. *See e.g., Solis v. Circle Grp., LLC,* 2017 WL 1246487, 2017 U.S. Dist. LEXIS 51936, at *13-*14 (D. Colo. Apr. 5, 2017) (noting the similarities between the FLSA and the CWCA and noting that there "are good reasons to interpret the CWCA similarly" to the FLSA); *Boeser v. Sharp*, 2006 WL 898126, 2006 U.S. Dist. LEXIS 19374, at *14 (D. Colo. Mar. 31, 2006) (noting the "virtually identical language in the Fair Labor Standards Act").

In light of the foregoing, Defendants respectfully submits that they are entitled to summary judgment on Oldershaw's retaliation claims under the FLSA and CWCA. Oldershaw cannot establish a *prima facie* case because there is no causal connection between her complaint about

wages and her termination.  Even if she could, however, these claims still fail because Defendants

have articulated a legitimate non-retaliatory reason for her termination that is not pretextual.

VI.   **Defendants are Entitled to Summary Judgment Dismissing Named Plaintiffs' Claims for Breach of Contract (Claim 8).**

    A.   The Burden of Proof and Elements of a Breach of Contract Claim.

Under Colorado law, a breach of contract claim has four elements: (1) the existence of a

contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to

perform the contract by the defendant; and (4) resulting damages to the plaintiff.  *Romstad v. City*

*of Colo. Springs*, 650 Fed. Appx. 576, 580 (10th Cir. 2016).

Summary judgment is proper if Plaintiffs failed to prove the existence of a contract.  *See,*

*e.g., Farmers Alliance Mut. Ins. Co. v. Cutrone*, 448 F. Supp. 2d 1226, 1234 (D. Col. 2006).  Even

if Plaintiffs were able to muster up some alleged damages, their failure to demonstrate the

existence of a contract that covers the alleged damages is fatal to their claim.  *Id.*

To establish the existence of a contract based on an employment manual or written

employment policies, "the employee must establish that the employer's actions manifested to a

reasonable person the intent to be bound by the provisions of the manual or handbook."  *Evenson*

*v. Colo. Farm Bureau Mut. Ins. Co.*, 879 P.2d 402, 408-09 (Colo. App. 1993).  If the manual "is

merely a description of the employer's present policies, it is neither a promise nor a statement that

can reasonably be relied upon."  *Hoyt v. Target Stores*, 981 P.2d 188, 194 (Colo. App. 1998).

Further, an employee manual or written employment policies does not create a contract

"where a clear disclaimer of any contractual rights appears."  *Jaynes v. Centura Health Corp.*,

148 P.3d 241, 248 (Colo. App. 2006).  Whether a contract disclaimer is clear and conspicuous is

a question of law for the court.  *Id.*; *see e.g., Romstad*, 650 Fed. Appx. at 581 (holding that an

employer handbook included a clear and conspicuous contract disclaimer because the employer reserved the right to modify, revoke, suspend, or terminate the policies and the handbook stated it was not intended to create a contract); *Hull v. Beverage Distribs. Co.*, 2013 WL 878768, 2013 U.S. Dist. LEXIS 32300 *19-21 (D. Colo. Feb. 14, 2013) (holding that an employer handbook that stated in bold typeface, "this handbook is not a contract, express or implied, . . ." clearly advised that the employer did not intend the handbook to operate as a contractual offer to the plaintiff); *Stephan v. Brookdale Senior Living Cmtys., Inc.*, 2012 WL 4097717, 2012 U.S. Dist. LEXIS 132906 *13-14 (Sept. 17, 2012) (holding that the arbitration policy in the employer's handbook did not act as a contract because the handbook contained a statement that the policies were merely "guides" and "general statements" of policies and procedures that could be modified at any time).

B. Named Plaintiffs Cannot Prove all of the Elements of a Breach of Contract Claim.

Despite deposing all named Plaintiffs, Defendants are left guessing as to what they contend is the alleged contract at issue in Claim 8 which they believe was breached.  In their First Amended Complaint, Named Plaintiffs allege vaguely that Defendants distributed "policies and procedures" that constituted "contractual commitments." (Doc. 33 ¶¶123-127).  The only specific purported "contract" Named Plaintiffs identify is the Corporate Integrity Agreement.  (Doc. 33 ¶123).  The Corporate Integrity Agreement is an agreement between the Office of the Inspector General of the Department of Health and Human Services and DaVita Healthcare Partners, Inc. – not with Named Plaintiffs or Defendants' employees.  **(Exhibit 24**).[8]  In addition, contrary to

---

[8] The Corporate Integrity Agreement is a publically available document maintained on the United States Office of Inspector General of the United States Department of Health and Human Services, Inc., website, at https://oig.hhs.gov/fraud/cia/agreements/Davita_Healthcare_Partners_Inc_10222014.pdf (last visited April 30, 2018).  Therefore, the district court has authority to take judicial notice of public records under Federal Rule of Evidence 201 as it is generally known, and may be accurately and readily determined from sources that cannot reasonably be questioned. *Garling v. United States EPA*, 849 F.3d 1289, 1298 n. 4 (10th Cir. 2017) (citing *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 & n.22 (10th Cir. 2009) (taking judicial

Named Plaintiffs' allegations in the First Amended Complaint, the Corporate Integrity Agreement does not contain provisions regarding Defendants' employees' pay.  (Doc. 33 ¶127).

Oldershaw and Stant allege that Defendants' Teammate Policies form the basis for their breach of contract claims.  (*Oldershaw Depo.*, pp. 148: 16-149: 25; *Stant Deposition,* attached as **Exhibit 23**, pp. 102: 19-103:16).   Defendants distribute "Teammate Policies" to all their employees, which are periodically updated. (Creaghe *Dec.* ¶ 7-8.) Named Plaintiffs testified that they were aware of the Teammate Policies and had access to them.  (*Oldershaw Depo.*, pp. 42:23-45:11 and *Oldershaw Depo*. Ex. 2; *Stant Deposition,* p. 73:1-16 and Ex. 2; *Stevens Deposition*, attached as **Exhibit 25**, pp. 49:25-50:20 and Ex. 2; and *Creaghe Dec.* ¶ 8). Page six of the Teammate Policies – which is labeled IMPORTANT and is written in all caps – states in part:

> THE TEAMMATE POLICIES ARE DESIGNED TO ACQUAINT TEAMMATES WITH DAVITA HEALTHCARE PARTNERS AND PROVIDE SOME INFORMATION ABOUT WORKING AT DAVITA.  THESE POLICIES ARE NOT ALL-INCLUSIVE, BUT ARE INTENDED TO PROVIDE A SUMMARY OF SOME OF DAVITA'S POLICIES.  THIS EDITION REPLACES THE TEAMMATE GUIDELINES AND ALL PREVIOUSLY ISSUED EDITIONS.
>
> EMPLOYMENT WITH DAVITA IS AT-WILL.  JUST AS ALL TEAMMATES HAVE THE RIGHT TO END THEIR WORK RELATIONSHIP WITH DAVITA, WITH OR WITHOUT NOTICE, AND WITH OR WITHOUT CAUSE, SO TOO DOES DAVITA HAVE THE SAME RIGHT.   THE LANGUAGE USED IN THESE POLICIES AND ANY VERBAL STATEMENTS MADE BY MANAGEMENT ARE NOT INTENDED TO CONSTITUTE A CONTRACT OF EMPLOYMENT, EITHER EXPRESS OR IMPLIED, AND THEY ARE NOT A GUARANTEE OF EMPLOYMENT FOR A SPECIFIC DURATION OR ANY CHANGE TO DAVITA'S POLICY OF AT-WILL EMPLOYMENT.   THE POLICY OF AT-WILL EMPLOYMENT CAN ONLY BE MODIFIED IN WRITING, SIGNED BY A SENIOR EXECUTIVE OF THE COMPANY.

---

notice of facts on government websites and observing, "It is not uncommon for courts to take judicial notice of factual information found on the world wide web" (quotations omitted)); *United States v. Windsor*, 133 S. Ct. 2675, 2690, 186 L. Ed. 2d 808 (2013) (citing state government website for results of citizens' initiatives concerning same-sex marriage); *Denius v. Dunlap*, 330 F.3d 919, 926-27 (7th Cir. 2003) (taking judicial notice of information from government website)).

> THE TEAMMATE POLICIES HAVE BEEN PROVIDED TO OFFER GUIDANCE IN HANDLING MANY ISSUES, BUT THE POLICIES ALSO ALLOW FOR LATITUDE IN THEIR APPLICATION TO INDIVIDUAL CIRCUMSTANCES OR AS THE NEEDS OF OUR BUSINESS MAY WARRANT.  EXCEPT FOR THE POLICY OF AT-WILL EMPLOYMENT, ANY POLICY MAY BE CANCELLED OR MODIFIED AT ANY TIME, AT DAVITA'S SOLE DISCRETION, WITH OR WITHOUT PRIOR NOTICE . . . .

(*Creaghe Dec.* ¶ 9-10, Ex. A).

Defendants' Teammate Policies manual contains a clear and conspicuous contract disclaimer.  Employees were specifically informed that "THE LANGUAGE USED IN THESE POLICIES AND ANY VERBAL STATEMENTS MADE BY MANAGEMENT ARE NOT INTENDED TO CONSTITUTE A CONTRACT OF EMPLOYMENT."  The disclaimer also states that "THE TEAMMATE POLICIES HAVE BEEN PROVIDED TO OFFER *GUIDANCE* IN HANDLING MANY ISSUES, BUT THE POLICIES ALSO ALLOW FOR LATITUDE IN THEIR APPLICATION" and that "EXCEPT FOR THE POLICY OF AT-WILL EMPLOYMENT, ANY POLICY *MAY BE CANCELLED OR MODIFIED AT ANY TIME*, AT DAVITA'S SOLE DISCRETION, WITH OR WITHOUT PRIOR NOTICE."  *Id.* (emphasis added).  These statements are sufficient to show that DaVita did not manifest any intent to be bound by the manual and that the policies set forth in the manual were just that: current policies, not a promise that can reasonably be relied upon as a contract.  Accordingly, Defendants' Teammate Policies manual does not constitute a contract between the Named Plaintiffs and Defendants.

Stevens' breach of contract claim is based on "our eight core value of getting stuff done." (*Stevens Depo.*, p. 63:19-24).  She goes on to say:

> And with the schedule that I have with my centralized training and then the expectations of making sure that I get these reports done and completed and sent out in a timely manner, how they have the centralized training programs kind of rotating out left me with very little time to prep for the classes.  And so I'm – My

feeling is that they're not allowing me to – enough time to complete what they're asking me to complete.

(*Stevens Depo.*, pp. 63:24-64:8).   When asked if there are any other contractual commitments she believed DaVita breached, she responded "Not – Nothing really comes to mind right at the moment." (*Stevens Depo.,* p. 64:11-12).   Because no contractual obligation exists as asserted, there can be no claim for breach of contract based on Stevens' factual contentions.

Similarly, Navarro testified that her breach of contract claim is based on "the DaVita culture." (*Navarro Depo.*, p. 145:3-25).   She continued, "[P]art of DaVita's contract culturally is making sure that patient care is number one.   And the budget being cut so tight and not allowing people to safely do patient care would be where I would think that it would be the breach of contract." (*Navarro Depo.*, p. 146:3-10).   She could not think of any other contracts she entered into with DaVita.   Because no contractual obligation exists as asserted, there can be no claim for breach of contract based on Navarro's factual contentions.

Defendants are not aware of any other "policies and procedures" that could possibly constitute a valid contract between it and its employees, nor have Plaintiffs satisfied their burden of producing any such policies in support of their claim.   The Named Plaintiffs' breach of contract claims are therefore subject to summary judgment.

## CONCLUSION

Opt-in Plaintiffs, Matt Horgan, Paula Murphy, Stephanie Mastroantonio, David Jackson, Collette Grays, William Vue, Nancy Godinez, Jamie Lubken, Christina Voltolini (Ross), Heather Bolan, Elizabeth Green, and Wendy Souza fail to state a claim under Claims 1 and 2 of the First Amended Complaint for one or more of the following reasons, as more fully described above: (1) Plaintiffs did not work any unpaid overtime; (2) Plaintiffs failed to follow Defendants' proscribed timekeeping reporting system and as such, Defendants did not know nor should have

known of the off-the-clock work; (3) Plaintiffs were properly classified as exempt and were not entitled to overtime compensation under the FLSA; (4) Plaintiffs' claims are barred by the statute of limitations; (5) Plaintiffs cannot prove willfulness and, therefore, are limited to claims that arise within 2 years of the date of the Complaint or on which the Opt-in Plaintiffs filed consents to join this lawsuit; and (6) judicial estoppel.

All Named and Opt-in Plaintiffs fail to state a claim for failure to maintain adequate records under Claims 1, 2 and 4 of the First Amended Complaint, because there is no private cause of action for such a claim.

Defendants are entitled to summary judgment as to Claims 2 and 4 with respect to Named Plaintiff, Elina Navarro, on Defendants' fourteenth defense, because Navarro was properly classified as an exempt employee.

Defendants are entitled to summary judgment as to Named Plaintiff, Kelsey Oldershaw's Claims 5 and 6, because Oldershaw has failed to establish a *prima facie* case of retaliation or reprisal.  Even if this Court finds that Oldershaw stated a *prima facie* case, Defendants have proven they had a legitimate, non-retaliatory reason for her termination.

Named Plaintiffs fail to state a claim for breach of contract under Claim 8, because they have failed to prove the existence of a contract, let alone satisfied the other elements of this claim.

WHEREFORE, Defendants respectfully request that this Court enter final judgment in its favor and against Plaintiffs as more fully described above and grant such further relief as the Court deems just and proper.

Respectfully submitted this 30th day of April, 2018.

JACKSON LEWIS P.C.


*s/Veronica von Grabow*
Veronica von Grabow
Melisa H. Panagakos
950 17th Street, Suite 2600
Denver, Colorado 80202
Telephone: (303) 892-0404
Facsimile: (303) 892-5575
Veronica.vonGrabow@jacksonlewis.com
Melisa.Panagakos@jacksonlewis.com

Dorothy D. McDermott
10 West Market Street, Suite 2400
Indianapolis, IN 46204
Telephone: (317) 489-6930
Facsimile: (317) 489-6931
Dorothy.McDermott@jacksonlewis.com

Stephanie Adler-Paindiris
390 N. Orange Avenue, Suite 1285
Orlando, FL 32801
Telephone: (407) 246-8440
Facsimile: (407) 246-8441
Stephanie.Adler-Paindiris@jacksonlewis.com

Amanda A. Simpson
390 N. Orange Avenue, Suite 1285
Orlando, FL 32801
Telephone: (407) 246-8440
Facsimile: (407) 246-8441
Amanda.simpson@jacksonlewis.com

Eric R. Magnus
1155 Peachtree Street N.E.
Suite 1000
Atlanta, GA 30309
Telephone:  (404) 525-8200
Facsimile:   (404) 525-1173
MagnusE@jacksonlewis.com

*ATTORNEYS FOR DEFENDANTS*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 30th day of April, 2018, a true and correct copy of the foregoing **Defendants' Motion for Partial Summary Judgment** was served via CM/ECF on the following:

RAMOS LAW

Colleen T. Calandra
Madison Fiedler Carlson
Gretchen Lipman
3000 Youngfield Street
Wheat Ridge, CO 80215
colleen@ramoslaw.com
madison@ramoslaw.com
gretchen@ramoslaw.com

WILCOX LAW FIRM, LLC

Ronald L. Wilcox
383 Corona Street, #401
Denver, CO 80218
ron@wilcox.legal

*ATTORNEYS FOR PLAINTIFF*

*s/ Valerie A. Martinez*
for Jackson Lewis P.C.