*Kelsey Oldershaw, et al. vs.*

*DaVita Healthcare Partners, Inc., et al.*

*Deposition of Paula Jean Murphy*

*December 18, 2017*



Stevens-Koenig Reporting

700 17th Street, Suite 1750
Denver, CO 80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Case 1:15-cv-01964-MSK-NYW   Document 199-3   Filed 04/30/18   USDC Colorado   Page 2 of 11

Kelsey Oldershaw, et al. vs.
DaVita Healthcare Partners, Inc., et al.

Deposition of Paula Jean Murphy
December 18, 2017

Page 17

1  convictions, have you been arrested for anything?
2       A.   (Deponent shook head side to side.)
3            MR. WILCOX: You need to answer audibly.
4       A.   Oh, I'm sorry. No.
5            THE DEPONENT: Thank you.
6       Q.   (By Mr. Smith) And then going back to
7  what I mentioned when we very first started, you
8  understand that you are a plaintiff in this lawsuit,
9  right?
10      A.   Correct.
11      Q.   And I understand that there was another
12 lawsuit in the 2008 time frame, if I'm going based on my
13 memory, that you were also a plaintiff, kind of like
14 this, against another employer; that's right?
15      A.   Class action.
16      Q.   Okay. Any other lawsuits that you've been
17 a part of?
18      A.   No.
19      Q.   In any way as a plaintiff or defendant?
20      A.   When was the -- the testimony I gave at
21 the murder?
22      Q.   Separate question. So --
23           MR. WILCOX: He's asking if you were a
24 party to any lawsuit.
25           MR. SMITH: Right.

Page 18

1       Q.   (By Mr. Smith) So did you sue or have
2  someone sue you?
3       A.   No, sir.
4       Q.   Separate question, which I'll go ahead and
5  ask now, but have you given any testimony under oath at
6  any other legal proceeding --
7       A.   Yes.
8       Q.   -- which it sounds like yes? Tell me
9  about that.
10      A.   It was a workplace violence. One employee
11 killed the other one.
12      Q.   Where was that?
13      A.   In Salinas, California. And he was the ER
14 nurse. So that's why I was called.
15      Q.   When?
16      A.   You mean --
17      Q.   When did it happen?
18      A.   Let's see. I was in Salinas.
19      Q.   '99 to 2001 time frame sound right?
20      A.   No. '91. Could have been '91. I was
21 living here, and I had to go back there to testify.
22      Q.   Oh, I see. All right. Some time ago
23 then?
24      A.   Yeah.
25      Q.   Any other testimony under oath?

Page 19

1       A.   No, sir.
2       Q.   Have you ever filed any charges or
3  complaints with government agencies about any employers?
4       A.   No.
5       Q.   Ever file for bankruptcy?
6       A.   Yes, sir.
7       Q.   When was that?
8       A.   I think in 2010.
9       Q.   Nothing more recent?
10      A.   No.
11      Q.   Are you currently contemplating filing
12 bankruptcy?
13      A.   No, sir.
14           THE DEPONENT: Am I saying it loud enough?
15           THE REPORTER: You're fine.
16      Q.   (By Mr. Smith) It's a quiet day.
17      A.   Yeah.
18      Q.   All right. Tell me, when did you first
19 start working for DaVita?
20      A.   '05.
21      Q.   Do you remember how you found out that
22 there was a job at DaVita?
23      A.   I was living in Alabama, and I was moving
24 back to Colorado, sort of tried to network with my
25 manager. I was working for Fresenius at that time, and

Page 20

1  they didn't have any positions here, so I applied for
2  DaVita.
3       Q.   So why -- let me back up.
4            Understanding you were at Fresenius, what
5  was your interest in working for DaVita at the time?
6       A.   Needed a job.
7       Q.   Fair to say that it was in roughly the
8  same field that you were doing before that?
9       A.   Absolutely. Yes, I was doing the same
10 job.
11      Q.   Do you remember the job that you applied
12 for?
13      A.   I was -- applied as a registered nurse, as
14 a float nurse.
15      Q.   Can you describe what a float nurse means?
16      A.   It means I go to any clinic they assign me
17 to to cover for another nurse that's on vacation or
18 absent.
19      Q.   Do you remember if that was a full-time or
20 part-time position?
21      A.   Oh, full time.
22      Q.   And were you assigned out of a specific
23 location?
24      A.   Yes.
25      Q.   Which one?

Kelsey Oldershaw, et al. vs.
DaVita Healthcare Partners, Inc., et al.

Deposition of Paula Jean Murphy
December 18, 2017

Page 21

1  A. My home unit was Englewood.
2  Q. All right. How long were you a float
3  nurse?
4  A. Seven years.
5  Q. So that takes us to about 2012. Does that
6  sound right?
7  A. Yes. And that's when I started
8  for -- with VillageHealth with DaVita.
9  Q. And what was your position then?
10 A. I was a case manager.
11 Q. Where did you work?
12 A. It was an office -- it's near the
13 Centennial Airport, and I think it's Havana.
14 Q. And then why did you go from being a float
15 nurse to a case manager?
16 A. Got sick.
17 Q. From what?
18 A. Bilateral breast cancer.
19 Q. And was that diagnosed around the same
20 time?
21 A. It was in 20 -- it was 2012.
22 Q. Between the float nurse position and case
23 manager position, did you miss time as a result of the
24 cancer?
25 A. Yes.

Page 22

1  Q. About how much time?
2  A. I was off a year.
3  Q. Sorry to hear that. And then -- and I
4  understand you said you got sick, but what about the case
5  manager position was a good fit for you as a result of
6  that?
7  A. Yes.
8  Q. What about it?
9  A. No -- the physical activity was much
10 reduced, walking, those sort of things.
11 Q. The case manager's more of a stationary
12 job, correct?
13 A. Telephonic, yes.
14 Q. And can you tell me, how long were you in
15 the case manager role?
16 A. Three years. Close to it.
17 Q. Okay. Then what did you do?
18 A. After case management, nothing. Went on
19 disability.
20 Q. Was that about 2000 -- well, let me back
21 up. Did that take you all the way to the end of your
22 employment?
23 A. Yes.
24 Q. Okay. So you're a case manager from
25 roughly 2012 all the way to 2016?

Page 23

1  A. '15. '16.
2  Q. I can pull them out, but I have in here
3  that your last date was in 2016.
4  A. There it is. There it is.
5  Q. If that sounds right?
6  A. Yes.
7  Q. Who was your supervisor as a case manager
8  in 2012?
9  A. Oh. That would have been Brenda -- I
10 can't remember her last name. She was only there a few
11 months.
12 Q. Do you remember who was after Brenda?
13 A. Lori Burk.
14 Q. Anyone after Lori?
15 A. We had one of the VPs cover us for a
16 little while, and then a lady named Olga.
17 Q. Anyone after her?
18 A. No.
19 Q. I'll show you a couple of offer letters
20 that I think may help us with some dates.
21    (Deposition Exhibit 2 was marked.)
22 Q. This document marked as Exhibit 2 is dated
23 October 7, 2005. Looks to me to be an offer letter for
24 your initial job with DaVita. Does that sound right?
25 A. Yes, sir.

Page 24

1  Q. Does this look like an accurate copy of an
2  offer letter you would have received back then?
3  A. Yes, sir.
4  Q. This says it was for SunDance as a float
5  RN and you would have been making $32 an hour?
6  A. Correct.
7  Q. Okay.
8     (Deposition Exhibit 3 was marked.)
9  Q. This is a letter dated March 7, 2012 --
10 A. Yes.
11 Q. -- to you, and it says here that you were
12 being offered a position at South Denver as a charge
13 nurse reporting to Shirley Kane. Do you see that?
14 A. Yes.
15 Q. Is this in between these other two jobs?
16 A. Well, I floated, and then I went to work
17 for -- just assigned to a facility as a regular employee.
18 That was March '12 up until August '12.
19 Q. Was this before you had to leave for the
20 cancer treatments?
21 A. That's when I was diagnosed, yes.
22 Q. Do you remember this position, this charge
23 nurse position, was this an hourly position or a salaried
24 position?
25 A. Anything floating was hourly.

Kelsey Oldershaw, et al. vs.
DaVita Healthcare Partners, Inc., et al.

Deposition of Paula Jean Murphy
December 18, 2017

Page 25

1  Q. And how about the charge nurse job at the
2  facility?
3  A. I would be charge nurse covering, so no.
4  Q. No, meaning you were paid a salary?
5  A. No. It was still hourly.
6  Q. Hourly. Okay.
7  A. Yes.
8     (Deposition Exhibit 4 was marked.)
9  Q. Then this document marked as Exhibit 4 is
10 dated July 12, 2013, and appears to be offering the
11 transfer to Centennial Guest Services Center and says you
12 will be working as a VillageHealth nurse reporting to
13 Becky Lee, and I'm assuming this is the case manager
14 position we discussed?
15 A. Yes, sir. And Becky Lee was the one who
16 hired me. I couldn't remember her last name.
17 Q. And so if we refer to either case manager,
18 or here it says VillageHealth nurse, same position?
19 A. Yes.
20 Q. This position, it says, has a base salary
21 of $70,000 per year. Do you see that?
22 A. Yes, sir.
23 Q. And then it says: "Your position is
24 exempt under the wage and hour laws." Do you see that?
25 A. Uh-huh.

Page 26

1  Q. So at this time, from July 12, 2013,
2  forward, you were paid based on a salary and not an
3  hourly basis, right?
4  A. Correct.
5  Q. All right. I wanted to get some of the
6  dates so we had our -- our dates correct. Let's focus
7  for now on this last position.
8  A. VillageHealth. Okay.
9  Q. The VillageHealth nurse position. Were
10 your duties basically the same the entire time you
11 performed that role, or did they change at any point?
12 A. There was a lot of change going on, but
13 basically my job responsibilities were the same.
14 Q. And can you walk through for us the kinds
15 of duties you would perform in a typical week as a
16 VillageHealth nurse?
17 A. I would get new patients enrolled in the
18 program, and the basic duty was education, so educating
19 the patients about their renal problems, how to prevent
20 it, how to be better.
21 Q. So you met directly with the patients,
22 right?
23 A. No, sir. It was telephonic.
24 Q. I should have clarified. But it was you
25 straight to the patient, right?

Page 27

1  A. Yes, sir.
2  Q. What brought the patients to you?
3  A. They were referred as a rule. And I
4  worked just with VA. So they were trying to get all the
5  VAs in for some good education.
6  Q. So I assume a patient is referred to you,
7  you contact the patient, correct?
8  A. Yes, sir.
9  Q. What do you tell them?
10 A. Oh, I ask them how they're doing. Ask
11 them, probably, about things we talked about last time
12 and to find out where they are in their education, who to
13 talk to about problems.
14 Q. And they're current patients at that
15 point?
16 A. Yes, sir.
17 Q. Undergoing dialysis?
18 A. Yes, sir.
19 Q. What kind of problems would they bring up
20 to you?
21 A. Oh, a lot of it wasn't even dialysis
22 related, but trying to stay on their diet, fluid
23 restrictions, getting to their treatments on time.
24 Q. Is staying on a diet difficult for
25 dialysis patients?

Page 28

1  A. Oh, gosh, yes.
2  Q. What impact can the diet have on them?
3  A. Their well-being. Just their well-being.
4  If they don't stay on the diet, they're -- they can
5  shorten their life, make it really hard.
6  Q. Were different patients on different
7  diets?
8  A. Well, there's the general diet for
9  dialysis patients, and then the patient, if they have
10 diabetes or liver problems, then they have to adjust
11 their diet. Potassium and fluid were the big ones.
12 Q. Say again?
13 A. Potassium and fluid were the big ones.
14 Q. So shortages of potassium and fluids?
15 A. Too much.
16 Q. And then did you know that somebody would
17 have either issues with potassium or fluids or something
18 else in their diet?
19 A. They come across -- well, they're
20 interlinked. So when they have labs, I'm able to see the
21 labs and their weight.
22 Q. So let's say I'm a patient, and you're
23 about to have a call with Austin about his dialysis
24 treatment. Is it fair to assume, then, that you would
25 review my file and my records before you would have the

Kelsey Oldershaw, et al. vs.
DaVita Healthcare Partners, Inc., et al.

Deposition of Paula Jean Murphy
December 18, 2017

Page 77

1   A.   This. I believe it was just one.
2   Q.   And you said that was because you had
3   questions about the documents that were sent to you?
4   A.   Uh-huh.
5   Q.   Is that a yes?
6   A.   Yes. On wording.
7   Q.   Do you remember what questions you had
8   about the wording?
9   A.   It had -- it was related to responsibility
10  of what the case would cost me, I think. I don't know.
11  Something like that.
12  Q.   Any questions about the actual substance
13  of the lawsuit, or were the questions more related to
14  whether it would cost you money if you joined it?
15  A.   Right.
16  Q.   More the latter?
17  A.   It was -- yeah.
18  Q.   Any questions about substance?
19  A.   No.
20  Q.   This other document, Exhibit 9, the
21  complaint here, have you read this document before?
22  A.   Gosh. It seems like I have. Yes, I have.
23  Yes, I have seen this and read it.
24  Q.   Okay. And like we said in the beginning
25  of this deposition, you understand you're a plaintiff in

Page 78

1   this case, right?
2   A.   Yes.
3   Q.   So can you tell me what this lawsuit is
4   about? To you.
5   A.   It's -- to me, it's DaVita didn't pay
6   hours that were worked.
7   Q.   All right. Tell me what you mean by that.
8   A.   What did I say?
9   Q.   You said the lawsuit is about DaVita not
10  paying hours that were worked.
11  A.   Correct.
12  Q.   Okay.
13  A.   And when I -- what I meant by that is the
14  question?
15  Q.   Yes.
16  A.   Well, I knew -- what I knew was that they
17  were taking a lunch out of the pay -- paycheck whether
18  you got a lunch or not and that they were -- by policy
19  were required to take that half hour out.
20  Q.   Okay. Did this happen to you?
21  A.   Oh, yes.
22  Q.   In which position?
23  A.   I was a float nurse.
24  Q.   So this is before the leave for cancer?
25  A.   Yes.

Page 79

1   Q.   Just from a timing standpoint?
2   A.   Yes.
3   Q.   I don't want to rehash all the dates
4   again.
5   A.   No. I'll probably mess it up.
6   Q.   So during the time you were a float nurse,
7   DaVita was taking out lunches from your paycheck whether
8   you received one or not, correct?
9   A.   Correct.
10  Q.   Before we talk about that, anything
11  else -- is there anything else that this lawsuit is about
12  with respect to your claims other than that aspect?
13  A.   No. I don't -- this is really the
14  only --
15  Q.   Okay.
16  A.   -- thing I got. I mean . . .
17  Q.   So let's go back, then, and talk about
18  that one. So with respect to the lunches, how long a
19  time period were lunches being taken out of your paycheck
20  whether you took them or not? I'm just looking for a
21  time period.
22  A.   Like when it started and ended, kind of?
23  Q.   Correct.
24  A.   Because I was a float nurse, I really
25  wasn't a part of a lot of gossip or, you know, things

Page 80

1   people were complaining about. I knew they were doing it
2   and complained.
3   Q.   But what about for you? So it ended for
4   you when you went on leave?
5   A.   Right.
6   Q.   When did it start before then?
7   A.   That I have been racking my brain about,
8   because -- I think I heard about it three years after I
9   started.
10  Q.   Did you ever review your own timecards to
11  see if it was being taken out of your time?
12  A.   It was, yes.
13  Q.   Did you -- well, did you complain to
14  anybody about it?
15  A.   Oh, yes.
16  Q.   To whom?
17  A.   Probably the manager, the AA who was doing
18  it, and where did that information come from? The
19  policy, that sort of thing. And there wasn't anything.
20  Q.   You said you probably complained to the
21  manager and the AA. Do you remember actually complaining
22  to them?
23  A.   This went on for so long, I don't.
24  Q.   Do you remember anyone specifically at
25  DaVita you talked to about the lunch periods being taken



SunDance Region 5
209 W. County Line Road
Littleton, CO 80126
Tel: (303) 730-6164  Fax: (303) 730-2065

October 7, 2005

Ms. Paula Murphy
6099 Millbridge Avenue
Castle Rock, CO 80104

Dear Paula:

On behalf of DaVita Inc, I am pleased to confirm your offer or employment in SunDance Region 5. We look forward to your first day of work on Wednesday, October 12th, 2005. You will be working as the Float RN reporting to the Englewood Dialysis unit as your Home Facility. The following represents the terms and conditions in this regard.

As we discussed, your base salary for this position has been set at $ 66,560.00 per annum or $32.00 per hour, less standard deductions and authorized withholdings. Your position is non-exempt under the wage and hour laws. You will be paid bi-weekly pursuant to our normal payroll practices. Should you accept a position with a chronic unit on a full time basis, you pay will be reduced to $31.00 per hour, but should you accept a permanent position in acutes, your pay will remain at $32.00 per hour. Your status will be that of a regular full-time benefit eligible teammate. Any further salary increases will be based upon DaVita's compensation program and your performance. Enclosed please find a Form W-4 for Income Tax Withholding, an Authorization for Direct Deposit, a DaVita Biographic Information Sheet and a DaVita Emergency Contact Sheet.

You will be eligible to receive health and disability insurance benefits, as well as other related benefits, under the same terms and conditions generally applicable to DaVita teammates at similar level of compensation and responsibility. You will be eligible to participate in DaVita's health and disability insurance plans on the first of the month after you have completed two (2) months of continuous employment. You will be receiving an enrollment kit outlining your choices. A summary of all of DaVita's benefits will be presented to you at the start of your employment.

It is understood and agreed that your employment will be at will and either your or DaVita may terminate the relationship at any time, for any or no reason, with or without notice. The terms of this letter, therefore, do not and are not intended to, create an express or implied contract of employment. Your at-will employment relationship may only be modified by a written agreement, signed by an officer or director of DaVita.

Please note that this offer is contingent upon successful completion and receipt of both your pre-employment drug test and background check and a pre-employment physical results before your first day of employment.

Exhibit #: 2
Name: Murphy
Rptr: CMB  Date: 12-18-17
*Stevens-Koenig Reporting*

Davita/Paula Murphy 000246

If you accept the terms of this offer, please sign the letter below and return it to me as soon as possible. We look forward to your first day of work, and being a part of DaVita's efforts and mission to be the Provider, Partner, and Employer of Choice. If you have any questions, or if I may provide further information, please do not hesitate to contact me directly.

Sincerely yours,

*Brenda K Shrader*

BRENDA K. SHRADER
Director

I accept the position of the Float RN under the terms and conditions outline above.

_____   Dated: 7 Oct 05
       signature

cc: HR File
    Facility Administrator, Littleton Dialysis

Davita/Paula Murphy 000247



March 7, 2012

Paula Murphy
55 Robin Lane
Bailey, CO. 80421

Dear Paula:

On behalf of DaVita Inc., I am pleased to confirm your offer of employment at South Denver. We look forward to your first day of work on March 8, 2012. You will be working as the Charge Nurse reporting to Shirley Kane, Facility Administrator. The following represents the terms and conditions in this regard:

As we discussed, your base salary for this position has been set at 33.80 per hour, less standard deductions and authorized withholdings. Your position is non-exempt under the wage and hour laws. You will be paid bi-weekly pursuant to our normal payroll practices. Your status will be that of a regular full-time benefit eligible teammate. Any further salary increases will be based upon DaVita's compensation program and your performance.

**[For benefit-eligible teammates only]** You will be eligible to receive health and disability insurance benefits, as well as other related benefits, under the same terms and conditions generally applicable to DaVita teammates at the similar level of compensation and responsibility. You will be eligible to participate in DaVita's health and disability insurance plans on the first of the month after you have completed two (2) months of continuous employment. You will be receiving an enrollment kit outlining your choices. A summary of all of DaVita's benefits will be presented to you at the start of your employment.

It is understood and agreed that your employment will be at-will, and either you or DaVita may terminate the relationship at any time, for any or no reason, with or without notice. The terms of this letter, therefore, do not, and are not intended to, create an express or implied contract of employment. Your at-will employment relationship may only be modified by a written agreement, signed by an officer or director of DaVita.

You will be required to enter into a Confidentiality and Non-solicitation Agreement.

Please note that this offer is contingent upon successful completion and receipt of pre-employment drug screen and background check results before your first day of employment.

**The Welcome Wagon will contact you to arrange your pre-employment drug screen. You will be sent a link to your email address to print your drug screen form to take with you to the collection site. Additionally, you will receive a link to enter your background check information.**

Distribution:
☐ Original – Send to The Welcome Wagon People Services, 1627 Cole Blvd., Lakewood, CO 80401
☐ Facility File
☐ Teammate



PS-106
Davita/Paula Murphy 000232
REV: 3/7/2012

If you accept the terms of this offer, please sign the letter below and return it to me as soon as possible. We look forward to your first day of work, and being a part of DaVita's efforts and mission to be the Provider, Partner and Employer of Choice. If you have any questions, or if I may provide further information, please do not hesitate to contact me directly.

Sincerely,

**DAVITA INC.**

*[signature]*

Shirley Kane
Facility Administrator

I accept the position of __RN__ under the terms and conditions outlined above.

*[signature]* Paula Murphy RN      3/7/12
Signature Accepting Offer           Date

cc:   People Services Teammate File – The Lodge, Lakewood CO
      Hiring Manager File

Distribution:
☐ Original – Send to The Welcome Wagon People Services, 1627 Cole Blvd., Lakewood, CO 80401
☐ Facility File
☐ Teammate

PS-106
Rev. 3/2012

Davita/Paula Murphy 000233



July 12, 2013

Paula Murphy
55 Robin Lane
Bailey, CO 80421

Dear Paula:

On behalf of DaVita Inc., I am pleased to confirm your transfer to the Centennial, CO Guest Services Center. We look forward to your first day of work on September 2, 2013. You will be working as a VillageHealth Nurse reporting to Becky Lee. The following represents the terms and conditions in this regard:

As we discussed, your base salary for this position has been set at $70,000 per annum, less standard deductions and authorized withholdings. Your position is exempt under the wage and hour laws. You will be paid bi-weekly pursuant to our normal payroll practices. Your status will be that of a regular full-time benefit eligible teammate. Any further salary increases will be based upon DaVita's compensation program and your performance.

It is understood and agreed that your employment will be at-will, and either you or DaVita may terminate the relationship at any time, for any or no reason, with or without notice. The terms of this letter, therefore, do not, and are not intended to, create an express or implied contract of employment. Your at-will employment relationship may only be modified by a written agreement, signed by an officer or director of DaVita.

If you accept the terms of this offer, please sign the letter below and return it to me as soon as possible. We look forward to your first day of work, and being a part of DaVita's efforts and mission to be the Provider, Partner and Employer of Choice.

Distribution:

☐ Original - Fax to The Welcome Wagon: 1-888-225-2987.
☐ Facility File
☐ Teammate



PS-106
Rev. 04/29/13

Davita/Paula Murphy 000273

Sincerely,

Becky Lee
Director, VillageHealth Clinical Operations

I accept the position of <u>VillageHealth Nurse</u> under the terms and conditions outlined above.

_____          16 July 2013
Signature Accepting Offer                 Date

cc:  People Services Teammate File
     Hiring Manager File

Distribution:

☐ Original - Fax to The Welcome Wagon: 1-888-225-2987.
☐ Facility File
☐ Teammate

PS-106
Rev. 04/29/13

Davita/Paula Murphy 000274