**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

Civil Action No. 15-cv-01964-MSK-NYW

**KELSEY OLDERSHAW,
ELINA NAVARRO,
JANE STANT, and
JAYMIE STEVENS, individually and on behalf of others similarly situated,**

　　　**Plaintiff,**

**v.**

**DAVITA HEALTHCARE PARTNERS, INC.; and
TOTAL RENAL CARE INC.,**

　　　**Defendants.**

_____

**OPINION AND ORDER GRANTING MOTION TO DECERTIFY AND
GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY
JUDGMENT**
_____

**THIS MATTER** comes before the Court pursuant to the Defendants' (collectively,

"DaVita") Motion for Decertification (**# 198**), the Plaintiffs' response (**# 202**), and DaVita's

reply[1] (**# 210**); and DaVita's Motion for Summary Judgment (**# 199**), the Plaintiffs' response (**#

203**), and DaVita's reply (**# 208**).  Also pending is a motion by DaVita to strike (**# 209**) certain

exhibits tendered by the Plaintiffs in their summary judgment response, the Plaintiffs' response

(**# 212**), and DaVita's reply (**# 215**).

---

[1]　　　The Court extends its thanks to both parties for their efforts in affixing specific labels in the electronic filing system to their supporting exhibits – that is, listing, say, Exhibit 5 as "Smith Deposition," rather than simply providing an exhibit number.  That practice has significantly assisted the Court in grappling with a lengthy and complex record.

## **FACTS**

DaVita operates a business performing kidney dialysis and related services for patients in numerous facilities around the country. The named Plaintiffs are four DaVita employees. They brought this action alleging, among other things, that DaVita failed to pay them and other employees overtime pay for hours they worked over 40 in a week, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*

The named Plaintiffs sought to pursue this action as a collective action under 29 U.S.C. § 216(b), which allows similarly-situated employees the opportunity to affirmatively opt-in to the litigation to assert similar claims. In April 2017, the Court authorized (**# 119**) the Plaintiffs to send a *Hoffman-LaRoche* notice[2] to "all non-exempt employees who worked at" DaVita clinics in certain specified cities in Colorado, as well as "non-exempt employees who worked for DaVita out of state in Great Falls, Montana and under the supervision of Dan Viaches in clinics in Indiana, Illinois, Georgia, and Tennessee." At this point in time, the Court is advised that approximately 70 of the Plaintiffs' co-workers have filed opt-in notices.

DaVita now moves (**# 198**) to "decertify" the collective that the Court allegedly "certified." It contends that the various opt-in Plaintiffs were not subject to common employment policies or decisions, and that the causes of these employees' FLSA claims are so varied that a single trial of all opt-in Plaintiffs' claims is unwarranted. Separately, DaVita moves for summary judgment (**# 199**) on various aspects of the Plaintiffs' claims and DaVita's defenses, as explained in more detail below.

_____

[2]     *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).

# ANALYSIS

## A.  "Decertification"

### 1.  Legal standards

28 U.S.C. § 216(b) allows for an FLSA claim to be "maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated," but provides that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."

Courts have struggled with devising – and describing – the mechanisms to be used to implement the collective action process contemplated by Section 216(b).  The seminal 10th Circuit case addressing the topic is *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001).  In *Thiessen*, the 10th Circuit approved (among several options) of the use of a two-stage process.  First, the trial court makes a preliminary and substantially deferential "notice stage" assessment of similarity, binding together the collective for the limited purposes of giving affected co-workers notice of the suit and an opportunity to opt in.  Later, the trial court conducts a "stricter" analysis to decide whether the collective it initially approved is indeed composed of similarly-situated individuals.  This two-step process for defining the scope of the collective action has become a common, well-used mechanism in this circuit.  *See Deakin v. Magellan Health, Inc.*, 328 F.R.D. 427 (D.N.M. 2018) (collecting cases).

Here, the Court is at the second stage of that process, obligated to conduct a more searching inquiry as to whether the various opt-in Plaintiffs are sufficiently "similarly situated"

to the four named Plaintiffs herein.  *Thiessen* indicates that this second-stage analysis[3] should consider three major factors: (i) any disparate factual and employment settings among the individual plaintiffs; (ii) the various defenses available to the defendant that might be individual as to each plaintiff; and (iii) "fairness and procedural considerations."[4]  267 F.3d at 1103.

Various other cases inside and outside the 10th Circuit have articulated additional elements to consider or described the process in slightly different terms.  *See e.g. Turner v. Chipotle Mexican Grill*, 123 F.Supp.3d 1300 (D. Colo. 2015) (suggesting that courts view the first and second stage processes through the lens of the concept of joinder and that the similarity determination thus focus on whether the opt-in plaintiffs' claims "arise out of the same transaction, occurrence, or series of transactions and occurrences" as those of the named plaintiffs); *see also Hipp v. Liberaty Nat. Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001); *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 388 n. 17 (3d Cir. 2007) (suggesting that the "similarly situated" factors include whether the "plaintiffs are employed in the same corporate department, division and location; advanced similar claims [of FLSA violations]; sought substantially the same form of relief; and had similar salaries and circumstances of employment").  Ultimately, it appears to this Court that the

---

[3]     Courts often adopt the vernacular of Fed. R. Civ. P. 23 class actions, referring to the first stage determination as one "certifying" and the second stage inquiry as potentially "decertifying" a "class" of plaintiffs. *See e.g. Thiessen*, 267 F.3d at 1102 n. 3.  This Court is reluctant to do so, given the tendency for litigants and even courts to improperly conflate the conceptually-distinct collective action and class action mechanisms.  *See also Turner v. Chipotle Mexican Grill*, 123 F.Supp.3d 1300, 1306 (D. Colo. 2015).  Nevertheless, taking its cue from *Thiessen*, this Court may, for purposes of expediency, occasionally use the terms "certification" and "decertification" to describe the first and second stage processes here.

[4]     *Thiessen* considered the collection action provisions in the context of an age discrimination action, as the Age Discrimination in Employment Act incorporates the FLSA's collective enforcement scheme.  Because age discrimination claims have exhaustion requirements that do not apply to FLSA claims, *Thiessen* also recommended that the second stage determination consider the extent to which the opt-in plaintiffs might have exhausted their claims.  This factor is not germane to FLSA claims, and this Court therefore ignores it.

differences among the various tests and analyses announced by these courts are largely semantic or abstract, and that the outcome of this matter is not dictated by whether the Court adopts one particular court's formulation of the analysis or another's. The fundamental question presented by the statute is whether the opt-in plaintiffs are "similarly situated" to the named plaintiffs, and it is with that central question in mind that this Court turns to the facts of this case.

2. <u>Factual background</u>

DaVita's operations consist primarily of numerous dialysis clinics located in various communities. Most employees have a "home" facility where they are typically assigned, but it is not uncommon for employees to perform work at several facilities in the same workweek. Each facility is staffed by employees who provide direct patient care (*e.g.* dialysis technicians and nurses), employees who provide indirect services (*e.g.* social workers, coordinators of various types), and administrative staff. Facility staff are given day-to-day direction and supervision by the facility administrator in each clinic. The upper half of DaVita's organizational chart – that is, the levels above facility administrator – is largely unclear from the record. The Plaintiffs have not meaningfully identified who supervises the various facility administrators, nor who in the corporate structure sets policies for the facilities or controls their operational budgets.

During the time period at issue, DaVita had an express policy that prohibited employees from working off the clock and there is some evidence in the record that at least employees were occasionally disciplined for doing so. DaVita also required employees to obtain their facility administrator's (or equivalent supervisor) approval for overtime work. The record reflects that these policies were communicated to all employees in an employee handbook and most Plaintiffs testified to having at least a general awareness of the policies. With the exception of situations in which supervisors made "adjustments" to employees' timesheets for lunch breaks (discussed

below), it appears to be undisputed that employees were typically paid overtime if their reported timecards or timesheets reflected more than 40 hours in a workweek.  During their depositions, many Plaintiffs acknowledged various pay records that showed them receiving certain amounts of overtime pay.  The issue here primarily concerns hours that employees worked but did not report on their timecards/timesheets – that is, "off-the-clock" work.[5]

Turning to the named Plaintiffs' roles in the organization and the nature of their complaints, the record reflects the following:

• **Ms. Oldershaw** worked as an executive assistant from approximately September 2014 until late 2015.  She did not work out of any clinic facility; rather, she worked out of DaVita's corporate headquarters in downtown Denver, supporting high-ranking DaVita officials.  Her duties included maintaining her boss' calendar, e-mail correspondence, travel and meeting planning, preparing expense reports, and other administrative tasks.  She recorded her own working time on an electronic timesheet.  Ms. Oldershaw frequently reported and was paid various amounts of overtime.  However, because her bosses would text or e-mail her at all hours of the day or night, there are additional hours that she worked, such as responding to those texts or e-mails, but did not report.  She did not report these additional hours because her then-supervisor, Maggie Anderson, "had a conversation" with her in 2014 in which Ms. Anderson mentioned that "you're working a lot of overtime."  Ms. Oldershaw testified that Ms. Anderson

---

[5]  For purposes of this action, the FLSA is concerned only with employees receiving premium overtime pay for hours worked over 40 in a week.  Except to the extent its minimum wage provisions are triggered, the statute is indifferent to how (or even if) an employer pays its employees for the first 40 hours of work they perform in a week.  Thus, employees who were scheduled for 35 hours per week at DaVita, but who regularly worked 4 additional hours off-the-clock per week for which they were paid nothing at all would have no FLSA claim whatsoever.  The FLSA is implicated only when those employees' weekly work time exceeds 40 hours.

The Court will assume, without finding, that every Plaintiff in this action purports to have worked more than 40 hours in at least one week without receiving overtime pay.

"never told me not to put it [overtime] in," but Ms. Oldershaw understood Ms. Anderson's comment to be a "kind of a pressure" to not report more overtime hours. Ms. Oldershaw felt that this was "contradictory because . . . she was texting me literally at all hours of the night and day and then she made a comment about how much overtime I had." She testified that the comment made her "nervous about [reporting] all the little bits and pieces type stuff for the rest of my job there." Shortly thereafter, Ms. Oldershaw began reporting to a different supervisor than Ms. Anderson, but continued to not report some of her work hours.

Ms. Oldershaw contends that her time records also have unexplained reductions in the number of hours she worked. The record is somewhat underdeveloped on this point. It is possible that this complaint correlates with a contention by Ms. Oldershaw that she routinely worked through her lunch break on most days. As the Court understands it, Ms. Oldershaw was expected to take an off-the-clock lunch break each day, and she believes that unspecified persons nevertheless adjusted her reported hours to deduct lunch breaks without her knowledge or approval.

• **Ms. Navarro** was employed by DaVita for 13 years. Near the end of that time period, she was employed in a management role, first as an assistant facility administrator and later as facility administrator at the Westminster facility. In these capacities, she had no on-site supervisor and was, effectively, in charge of directing the other employees at the Westminster clinic. As discussed in more detail below the parties agree that Ms. Navarro was exempt from the FLSA's requirements when performing work as a facility administrator, but Ms. Navarro contends that she had some non-managerial duties as well and that DaVita also classified Ms. Navarro as an administrative assistant for some of her weekly hours. Given her dual role as both manager and employee, the precise nature of Ms. Navarro's claims for unpaid overtime are

somewhat ill-defined.  Unsurprisingly, Ms. Navarro does not report that her supervisor – that is, herself – instructed or encouraged her to not report overtime hours, and the record is somewhat unclear as to what overtime hours Ms. Navarro worked and why she did not report them.   It is clear that Ms. Navarro knew that she should not be performing off-the-clock work.  Indeed, Ms. Navarro testified that she contacted DaVita's Human Resources office to ask what to do about some of her employees who were working off the clock and she was told that "it is your decision on what you want to do."  (Ms. Navarro instructed the employees not to work off-the-clock.)

• **Ms. Stant** worked as a clinical educator during the times pertinent to this case.[6] Her home clinic was in Aurora, but she traveled to many other facilities as part of her weekly duties.  Because of her itinerant duties, she did not clock in and out at a single clinic like normal employees would.  Instead, she maintained her own time records that she entered on DaVita's computer system and she billed portions of her weekly time to the budgets of each of the facilities she visited in the week.  Ms. Stant's FLSA claim seems to relate to time she spent setting up classrooms before her scheduled training programs; she did not report those hours to DaVita.[7]  (Ms. Stant may also have a claim not being paid correctly for travel time.)  Ms. Stant indicates that she "was only allowed to put in for 40 hours.  It was very specific.  There was to be no overtime for the clinical educator; 40 hours."  She states that that instruction came from Tamyara Warmack.  Ms. Warmack's title or role in DaVita is not specified, although she does not appear to be a facility administrator.

---

[6]  Ms. Stant may also have worked as a nurse at some points in time.  From the deposition excerpts provided, the Court is unable to discern whether her claims include unpaid overtime relating to that position as well.

[7]  Ms. Stant was well-aware of DaVita's policies prohibiting off-the-clock work, as she had previously worked as a facility administrator at two different clinics, and specifically advised employees not to engage in off-the-clock work.

• **Ms. Stevens** has had a long career with DaVita, working in "every DaVita location in Denver" at some point in time. During the pertinent time period, she worked as a clinical educator alongside Ms. Stant and also as a centralized trainer.[8] Ms. Stevens' testimony was similar to that of Ms. Stant's, although Ms. Stevens merely stated that 40 hours per week is "all I'm allotted." She did not testify that anyone told her not to report overtime hours; she merely stated that there is "an expectation [by] DaVita . . . when you are in a position and you are given tasks, you have to complete your tasks." She testified that an employee who reported working too many overtime hours might affect the bonuses that are paid to successful facilities.

Few of the opt-in Plaintiffs have the same job titles or responsibilities as Ms. Oldershaw, Ms. Navarro, Ms. Stant, and Ms. Stevens. Most of the opt-in Plaintiffs are perform work in clinic facilities; only two, opt-in Plaintiffs, Denise Landin and Georgia Harmen, are executive assistants like Ms. Oldershaw at DaVita's headquarters. None of the opt-in Plaintiffs are full- or part-time administrators like Ms. Navarro. A relatively small number of opt-in Plaintiffs have training duties like Ms. Stant and Ms. Stevens. Most of the opt-in Plaintiffs are involved directly or indirectly in patient care, as technicians or nurses, or work as administrative assistants in individual facilities. The opt-in Plaintiffs typically clock themselves in and out at the start and end of their shifts. Unlike any of the named Plaintiffs, these employees are subject to the direction of a particular facility administrator where they work.

The opt-in Plaintiffs describe several vectors for their lack of overtime pay: (i) being unexpectedly called upon to address an exigent circumstance or answer a co-worker question before clocking in for their shift or after clocking out, and forgetting (or choosing not) to

_____

[8]     Ms. Stevens also works occasionally as a fill-in patient care technician, although her deposition testimony seems to make clear that she does not contend that she did any off-the-clock work as a technician for which she claims to be entitled to overtime.

thereafter ask their supervisor to adjust their time records accordingly; (ii) clocking in and out as scheduled, but performing additional work from home after hours (such as making reminder calls to patients, responding to e-mails, or preparing work materials for the next day) and forgetting or choosing not to report that time; (iii) being unable to complete their assigned in-clinic tasks during their shift and choosing to complete those tasks off-the-clock, sometimes at the specific direction of their administrator and sometimes simply because the employee chose not to ask the administrator about obtaining approval for overtime; (iv) being summoned to address an exigent circumstance during an off-the-clock lunch break and forgetting to clock back in before addressing the situation; (v) being unable to take any lunch break due to workloads, yet having an administrator or other person manually manipulate time records to falsely reflect the employee taking their mandatory unpaid 30-minute lunch break each day; and (vi) a variety of idiosyncratic complaints about unpaid travel time or relocation expenses, unreported training time, and other work time that employees did not report for various reasons.

The Plaintiffs' briefing struggles somewhat to articulate the "single decision, policy, or plan" by DaVita that unifies all of their claims. *Thiessen*, 267 F.3d at 1103. At best, the Plaintiffs' theory is that DaVita's "practice of allocating a certain number of hours per employee shift during which each hourly employee was to complete their work" that was the common cause of each Plaintiff performing off-the-clock work. The Plaintiffs explain that "they cannot complete their work within the number of hours that [DaVita] allocated to their shift," and that they were "encouraged by their supervisors to perform these duties off-the-clock." The Court pauses here to note that this theory might describe the claims of Ms. Stant and Ms. Stevents, but does not explain the circumstances that result in Ms. Oldershaw or Ms. Navarro not reporting their overtime.

Some components of the Plaintiffs' theory find support in the record. Several of the opt-in Plaintiffs testified that they were simply unable to perform all of their required job duties within their scheduled shift times. Fewer, however, testified that they were expressly instructed or encouraged by their supervisors to work off-the-clock to complete those tasks – only a few described situations in which a supervisor specifically instructed them to complete their work without being clocked in. Most of the Plaintiffs who testified, including Ms. Stant and Ms. Oldershaw, simply assumed or inferred that they should not report overtime hours, often relying on their own interpretation of ambiguous statements by a supervisor. Often, the statements the Plaintiffs relate simply direct the employees to get their work done within the time allotted, an instruction that could just as easily be understood as a directive to work harder, faster, or more efficiently during their scheduled shifts.[9]

Other components of the Plaintiffs' theory have little or no support in the record. The Plaintiffs argue that DaVita had a "practice of allocating a certain number of hours per employee shift during which each hourly employee was to complete their work," but offer only a skeletal description of this process. Joshua Martinez supplied an affidavit that described unspecified persons at DaVita setting a "Direct Patient Care budget" for each facility, setting a fixed number of labor hours based on the number of patients the clinic served. Mr. Martinez testified that these budget amounts were insufficient to complete all of a facility's required work. But the

---

[9]     See, for example, Stephanie Mastroantonio, whose administrator gave "this warning of: don't milk the clock. If you can do it in six hours, get it done in six hours and get out of here." Likewise, Denisa Rodriquez explained to her administrator that she had to clock in early if she was going to accomplish all of her assigned tasks. The administrator responded that "you need to learn how to do it in the time frame that I've given you."
        Other Plaintiffs, like Ms. Oldershaw or William Vue, construed seemingly-innocuous statements that merely reverenced overtime -- Ms. Anderson mentioning to Ms. Oldershaw that she was working a lot of overtime, or Mr. Vue's administrator telling him that employees should "avoid overtime if possible"  -- as a sort of directive to work off-the-clock.

record seems to suggest that the budget addressed a total number of hours allocated to the <u>entire</u> <u>facility</u> (or, at least, to the facility's entire scope of patient care services), and were thereafter subject to individual allocation decisions by each facility's administrator as they saw fit.  The fact that individual administrators made significant employment decisions might explain why Plaintiffs frequently reported that a particular administrator at a facility might instruct them to work off-the-clock or refuse to approve overtime, but acknowledged that other administrators at the same facility did not do so.  For example, employees testified that certain administrators, such as Michelle Pritzel at the Englewood facility and Kenneth French at the Sable facility, discouraged the reporting of overtime, but those same employees acknowledged that other administrators at those same facilities, such as Roger Bachelor or Joshua Kim at Englewood or Calum White and Erica Campos at Sable, did not.  It thus appears that some administrators managed their budget or their staff poorly and they chose to conceal that fact by encouraging employees to underreport their working time.  Other administrators appear to have either managed their staff more effectively (so that no overtime was needed) or disregarded DaVita's labor budget (by approving necessary overtime).  Thus, it appears to the Court that the locus of decisionmaking as to whether an employee would be instructed or encouraged to work off-the-clock was at the individual administrator level, not as a result of any particular directive from officials higher up within DaVita.

Finally, it is important to recognize that although the Plaintiffs' budget theory might explain some instances of off-the-clock work, it does not explain all of the different circumstances that caused the Plaintiffs to work off-the-clock.  Budget pressures would not explain why employees who chose to perform work from home rather than on-the-clock during their shifts would choose to not report it, nor would it account for employees who, while off-the-

clock, were called upon to immediately resume work to address an exigency and forgot to request an after-the-fact time adjustment.

3. Analysis

The question presented to the Court is whether, under these circumstances, the opt-in Plaintiffs are similarly situated to the named Plaintiffs. Consistent with the discussion above, this Court considers this question in light of the *Thiessen* factors.

(a) Factual and employment settings

This factor examines several aspects of the various Plaintiffs' claims for similarities. As noted above, courts examining this factor consider a wide range of facts, including employment locations, salaries, supervision, job titles, and many others aspects of employment for both the named and opt-in plaintiffs.

The Court begins with the observation that all four of the named Plaintiffs had employment settings that are substantially different than that of the typical opt-in Plaintiff (to the extent one can even describe a "typical opt-in Plaintiff" in the circumstances presented here). Ms. Oldershaw was not employed at a facility, but instead at DaVita's headquarters, a circumstance she shares only with two opt-in Plaintiffs. There is some question as to whether Ms. Navarro was an employee covered by the FLSA at all; to the extent that she is, unlike the opt-in Plaintiffs, she was her own supervisor and thus cannot blame DaVita for discouraging her from reporting of overtime. Ms. Stant and Ms. Stevens are not subject to the Plaintiffs' facility-level budgeting theory because they took their instructions from someone other than a facility administrator, they reported their working time across numerous facilities each week, and there is no evidence as to any DaVita facility budgeting policies applied to their work anyway. The disparity between the employment situations of the named Plaintiffs and those of the facility-

based opt-in Plaintiffs who reported to only one facility, performing direct patient care work under the direction of a single administrator, is so stark that this as to render them dissimilar under *Thiessen*.

This Court is further persuaded that the Plaintiffs' evidence, which focuses solely on the individual experiences of the Plaintiffs themselves, fails to illustrate any single, cohesive corporate policy that applied similarly to all of them. A recent decision by the Ninth Circuit affirmed a trial court's decertification of overtime claims by a group of some 2,500 Los Angeles Police Department officers is instructive. *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1120 (9th Cir. 2018). As the Circuit Court explained:

> The Officers' primary contention appears to be that there exists a kind of tacit policy that operates top-down, such that an inference may be drawn that the policy applies Department-wide. As the district court noted, however, the evidence the Officers have produced – a mass of individual declarations, mostly concerning rote recitations of hours worked and bare assertions of a certain Department "culture" – has a fundamentally different focus. The Officers' declarations speak of immediate supervisors at discrete worksites. And even then the evidence is not of a uniform practice from which one might infer direction from a higher level, but of variable practices variably applied. Critically, there is <u>no</u> evidence of any directives, incentives, conversations, emails, or actions (such as denials of promotions) by Department leadership that could have communicated to local supervisors, implicitly or otherwise, a uniform policy against reporting small amounts of overtime.

Although *Campbell* is not binding precedent, it is instructive because the same problems of proof identified in it are presented here. The record contains considerable anecdotal evidence that <u>some</u> facility administrators at <u>some</u> locations discouraged overtime and encouraged off-the-clock work. But there is no evidence that locates the origin of such policy outside individual facilities or shows that it was made by someone other than individual facility administrators. As in *Campbell*, the Plaintiffs here have identified no "directives, incentives, conversations, emails,

or actions (such as denials of promotions)" that corporate officials at DaVita used to pressure facility administrators to suppress overtime. [10]  Indeed, although the record on this motion alone runs to more than 2,000 pages, the Plaintiffs have produced no deposition testimony, interrogatory response, or affidavit from any corporate official of DaVita (or even any individual facility administrator, other than perhaps Ms. Navarro) attesting to any methods by which DaVita pressured administrators to avoid allowing employee overtime. *Compare Monroe v. FTS USA, LLC*, 860 F.3d 389, 402 (6th Cir. 2017) (finding this factor satisfied where "the record contains ample evidence of a company-wide policy of requiring technicians to underreport hours that originated with FTS executives" including "Managers testif[ying] that FTS executives directed them to order technicians to underreport time").

---

[10]     Mr. Martinez's affidavit discusses a semi-annual goal-setting scheme by which DaVita instructed each facility administrator to choose two goals from a list of options, then rewarded those facilities with variable monetary bonuses if they met their self-selected goals at the end of a given period.  The rewards were commensurate with the difficulty of the goal selected, and Mr. Martinez states that goals relating to meeting the labor budget earned the highest level of bonuses.

DaVita has moved **(# 209)** to strike Mr. Martinez's affidavit in part, arguing, among other things, that Mr. Martinez lacks personal knowledge of the matters he attests to, including the goal-setting scheme.  The Plaintiffs' response argues that the Court can and should infer Mr. Martinez's knowledge of the matters he discusses due to his position – that is, as a patient care technician whose job duties included "scheduling employees' shifts."  (The Plaintiffs also attached the entirety of Mr. Martinez's deposition but, the Court notes, Mr. Martinez never testified at all about the DaVita goal-setting scheme or his knowledge of it.)

The Court agrees with the Plaintiffs that Mr. Martinez's activities in scheduling might give him sufficient personal knowledge to discuss the operation and effect of the labor budget process, but it also agrees with DaVita that nothing in Mr. Martinez's position or job duties would suggest that he would have personal knowledge about DaVita's goal structure for facility administrators.  Thus, the Court grants DaVita's motion to strike paragraphs 18-27 of Mr. Martinez's affidavit, which encompasses all discussion of the goal-setting scheme.

Admittedly, both Ms. Navarro and Ms. Stevens testified vaguely about how minimizing overtime had an effect on the bonuses DaVita gave to facilities.  But neither testified about the situation in sufficient detail for the Court to assume that any bonus structure was particularly coercive.

Giving due deference to the Plaintiffs' unifying theory, this Court is reluctant to treat all the named Plaintiffs and the opt-in Plaintiffs as similarly situated simply because DaVita budgets for its labor hours.  Certainly, there may be circumstances where an employer's budgeting is so aggressive and unrealistic, and the punishments for failing to meet those budgets so punitive, that a court might find that the employer effectively forces its employees to work off-the-clock.  But, at least in the abstract, the notion of an employer budgeting for labor costs and encouraging, even perhaps strongly, its managers to attempt to keep overtime expenses to a minimum is hardly unusual in the American workplace.  If employees need only show that their employer imposes budgets for labor costs in order to obtain certification of a single, broadly-disparate collective FLSA action, the purpose of a certification requirement at all would be rendered effectively meaningless; nearly every collective would be certified.  As in *Campbell*, the larger and more diffuse the collective, the more important it is for the plaintiffs to demonstrate the existence of a uniform, corporately-imposed policy that clearly encourages off-the-clock work, not to merely point to a vague "culture" of suppressing overtime.  As noted above, the DaVita's budgeting practices appears to give each facility administrators some degree of discretion in deciding how to allocate that available hours among the facility's employees and moves the locus of decisionmaking with regard to overtime from DaVita's corporate headquarters down to each individual facility and individual administrator.  This, in turn, demonstrates the absence of a single, overarching policy that binds a collective of employees from numerous facilities with numerous different administrators into a cohesive whole.

Accordingly, the Court finds that the Plaintiffs have not come forward with significant evidence that suggests that each Plaintiffs shares similar employment situations to support treating all Plaintiffs as sharing a collective claim.

(b)  Individualized defenses

In addition, the Court finds that, because the proposed collective is so broad and diffuse, there is great risk that the breadth of potential individualized defenses would overwhelm the efficiencies of proceeding in a collective action.

FLSA overtime claims offer an employer two primary defenses.  First, the burden is on the employee to show that the employer had actual or constructive knowledge that the employee was working overtime hours without compensation.  *McGrath v. Central Masonry Corp.*, 276 Fed.Appx. 797, 799 (10th Cir. 2008).  Here, questions about DaVita's knowledge of many of the Plaintiffs' overtime work would be highly individualized.  Many of the Plaintiffs never bothered to ask their administrator to approve overtime work because the employees simply assumed – through "understandings" or "atmospheres" or inferences or other forms of unspecific *gestalts* – that they should not be reporting their overtime work to their supervisors.  This raises the possibility that DaVita might not have even been aware of such work, particularly work performed off-the-clock in exigent circumstances (where the administrator might not be aware that the work was being performed off-the-clock) and unreported work performed from home (where the administrator might not be aware that work was being performed at all).  This presents the risk that extensive inquiry into the circumstances under which each opt-in Plaintiff's administrator was aware of each instance of that opt-in Plaintiff working off-the-clock will be necessary, overwhelming any efficiencies of trying this matter collectively.

Second, although the FLSA calls for automatic liquidated damages, employers may attempt to avoid such damages by showing that they acted in "good faith" in attempting to comply with the FLSA.  *Mumby v. Pure Energy Services (USA), Inc.*, 636 F.3d 1266, 1272 (10th Cir. 2011), *citing* 29 U.S.C. § 260.  It is undisputed that DaVita maintains an express policy

prohibiting off-the-clock work, and there is some evidence that administrators, including Ms. Navarro and Ms. Stant, attempted to enforce that policy. It is also apparently undisputed that DaVita paid all overtime that employees actually reported. Although the Court need not resolve the issue at this time, it is arguable that these policies, if sufficiently communicated and applied, could suffice to show DaVita's "good faith." Many of the Plaintiffs testified to varying levels of knowledge of DaVita's off-the-clock policy, raising the possibility that a considerable portion of trial of a collective action would devolve into extended inquiry from each Plaintiff about their own individual familiarity with those policies and their particularized reasons for choosing not to follow them.

Moreover, as noted above, there are additional, highly-individualized questions about whether a given Plaintiff was instructed or encouraged to work off-the-clock or not that will turn on which facility administrator was in charge of them. In a suitably-narrow collective action – *e.g.* one that encompassed only those Plaintiffs who worked during Mr. French's tenure running the Sable facility, or Ms. Pritzel's time as Administrator of the Englewood facility – there might be no need to differentiate among time spent working under "bad" administrators who suppressed overtime work and "good" administrators who didn't. But given the breadth of the collective sought by the Plaintiffs, it will likely be necessary for DaVita to tease out the supervisory history of each Plaintiff in detail. There is also a wide array of the type of work that allegedly occurred off-the-clock that will require individualized examination.

For these and other reasons, this Court is persuaded that there are significant individualized defenses that DaVita can reasonably be expected to develop given the broad composition of the current collective.

(c). Fairness and procedural considerations

The Court freely acknowledges that there is expediency in trying as many as 70 Plaintiffs' claims in a single proceeding, rather than inividually or on a series of smaller trials. And there is much to recommend allowing Plaintiffs to band together to vindicate mostly low-value claims that might otherwise not be pursued if individualized proceedings were required. *See generally Monroe*, 860 F.3d at 405.

At the same time, much of the preceding discussion highlights the considerable obstacles that may prevent a full and fair single trial of all Plaintiffs' claims as currently certified. Were the Plaintiffs prepared to propose a group of smaller, more similarly-situated collectives – *e.g.* those limited to a specific administrator known to have commanded or encouraged off-the-clock work – the Court might weigh this factor differently. But the Plaintiffs have neither suggested the option of breaking the case into smaller, more discrete collectives, nor provided the Court with sufficiently granular facts to allow the Court to do so on its own. Rather, the Plaintiffs have presented the question of decertification as an all-or-nothing proposition. Faced with that scenario, the Court concludes that concerns of fairness and procedural complications tip against continued certification of the current collective as a whole.

Accordingly, the Court finds that the *Thiessen* factors all favor "decertification" at this second stage. [11] Although the Court may decertify a collective in a number of ways, the most

---

[11] The Plaintiffs argue that this Court should instead apply *Turner*'s joinder-based analysis. The 10th Circuit has not endorsed that approach for resolving second-stage "decertification" questions. Nevertheless, even were this Court to attempt to apply it here, the result would still be the same. The question presented there is whether all of the Plaintiffs' claims arise out of the same set of operative facts and circumstances. For many of the same reasons stated herein, the Court would find that they do not.

Indeed, the Court has considerable doubt that even the four named Plaintiffs themselves have claims that are properly joined to one another. Ms. Oldershaw's employment situation (as an executive assistant who, because of a single, ambiguous statement from her boss, chose not to report intermittent bursts of work involving late-night texts or e-mails) is so different from Ms. Stant's and Ms. Stevens' (as trainers whose primary complaint involves not being paid

common remedy is the dismissal without prejudice of the FLSA claims of the opt-in Plaintiffs, leaving only the original named plaintiffs to proceed on their individual claims. *See Mooney v. Aramco Servs Co.,* 54 F.3d 1207, 1213 (5th Cir. 1995), *cited with approval in Thiessen*, 267 F.3d at 1102. Subject to the concerns stated above that the named Plaintiffs themselves are improperly joined to one another, the Court finds such an approach appropriate here. Each of the opt-in Plaintiffs are free to bring their own individual claims in separate suits, or to seek to band together in more precisely-focused collectives Accordingly, the Court will dismiss without prejudice the claims of each of the opt-in Plaintiffs, leaving only Ms. Oldershaw, Ms. Navarro, Ms. Stant, and Ms. Stevens' FLSA claims to proceed to trial.

### B. Motion for Summary Judgment

Simultaneously with the decertification motion, DaVita filed a lengthy Motion for Summary Judgment (**# 199**). Most of the arguments contained within that motion are directed at claims of various opt-in Plaintiffs who, due to the discussion above, are no longer parties or are directed at claims that the named Plaintiffs have subsequently chosen to withdraw. The remaining arguments requiring resolution are that: (i) DaVita is entitled to summary judgment on Ms. Navarro's FLSA claim and its own affirmative defense relating to that claim because Ms. Navarro, as a facility administrator, was an FLSA-exempt executive employee; and (ii) DaVita is

---

discernable amounts of time setting up classrooms because of a specific directive from a specific supervisor) that the Court sees little justification to trying their claims jointly. Ms. Navarro's situation (as, at best, a hybrid manager/employee who somehow suppressed her own ability to claim overtime) is even more unclear and untethered to that of Ms. Oldershaw, Ms. Stant, or Ms. Stevens. Where there is so little cohesion among the <u>named</u> Plaintiffs themselves, it is effectively impossible to then effectively join some 70 other persons with even more varying employment situations. Thus, even under a joinder analysis like that proposed in *Turner*, the Court would still "decertify" the collective.

entitled to summary judgment on the named Plaintiffs' breach of contract claims because they cannot show that DaVita's employee handbook constitutes a contract.

       1.  <u>Ms. Navarro's exemption</u>

The FLSA excludes from its coverage "any employee employed in a bona fide executive. . . capacity." 29 U.S.C. § 213(1). As pertinent here, an "executive" employee's "primary duty" must involve "management" of a department or subdivision of the business. 29 C.F.R. § 541.100(a)(2). "Management" includes tasks such as interviewing, selecting, and training employees; setting and adjusting rates of pay and hours of work; directing the work of employees; appraising employee performance; imposing discipline; and firing employees (or at least making recommendations for firing that are "given particular weight"). 29 C.F.R. § 541.100(a)(4), 541.102. In determining an employee's "primary duty," the focus is on the "principal, main, major, or most important duty that the employee performs," examined in light of the job as a whole. 29 C.F.R. § 541.700(a). The inquiry is fact-intensive, examining not only the relative amount of time the employee spends performing each duty, but also the employee's freedom from direct supervision, the employee's pay relative to others performing similar non-exempt work, the extent to which the employee herself chooses when to perform the non-exempt work, and the extent to which the employee is held responsible for the success or failure of the operation. 29 C.F.R. § 541.700(a), (b); 29 C.F.R. § 541.106(a). The employer bears the burden of proving that an employee is exempt from the FLSA's coverage. *Lederman v. Frontier Fire Protection, Inc.*, 685 F.3d 1151, 1157-58 (10th Cir. 2012).

Ms. Navarro worked at the Westminster facility as an assistant facility administrator in the Westminster clinic from 2013 until 2015, and as the facility administrator from March 2015 until November of that year. She testified that throughout that time, no one of higher rank was

ever physically present at the Westminster clinic. There appears to be no dispute that, in her role as facility administrator, Ms. Navarro was exempt from coverage under the FLSA because she was responsible for scheduling and supervising employees, keeping the clinic on budget and otherwise managing the clinic's finances, participating in hiring and disciplinary decisions, and so on. But Ms. Navarro testified that, although she was the nominally the facility administrator, due to understaffing she was also required to regularly perform the duties of administrative assistant during normal clinic operating hours, including "answering the phones, searching for medical records, making sure that the medical records and the documentation is complete on the floor, [and] making sure that the teammate records are kept up to date." Ms. Navarro testified that these administrative duties occupied most of the normal work day – from roughly 7:00 a.m. until the early afternoon hours – and that she completed her facility administrator duties at home, before and after the regular work day. Ms. Navarro testified, repeatedly, that she understood that DaVita coded her as being both an administrative assistant and a facility administrator in its personnel records.[12]

Because DaVita bears the burden of proving that Ms. Navarro was FLSA-exempt, Ms. Navarro need only adduce sufficient evidence to raise a genuine dispute of fact as to whether her "primary duty" was managerial in order to avoid summary judgment. The Court finds that she

---

[12]     DaVita moves to strike Ms. Navarro's affidavit that attests to this fact, arguing that Ms. Navarro lacks personal knowledge about how she was logged in DaVita's payroll systems. But Ms. Navarro has submitted pay stubs from 2015 that, curiously, break her weekly hours into to separate categories: 29 hours per week in "pay category 20," and 11 hours per week in "pay category 21." Ms. Navarro testified that pay category 20 reflects "an[ ] hourly position, administrative assistant." Even if the Court were to strike those portions of Ms. Navarro's affidavit that might be hearsay, her explanation of her pay stub is arguably within the scope of her personal knowledge. Thus, the Court is satisfied that Ms. Navarro has adduced seemingly-admissible evidence supporting her contention that she was classified in two different positions in DaVita's pay system.

has done so.  Although there is no dispute that Ms. Navarro had managerial duties at the

Westminster clinic, there is also significant evidence that the bulk of Ms. Navarro's working

time was spent performing routine, non-exempt work typical of an administrative assistant, and

that managerial duties occupied only a few hours of her day before and after a normal shift.

There is evidence that Ms. Navarro performed the administrative assistant duties involuntarily, as

she testified that she asked her superiors "if I could . . . give the [administrative assistant] work

to someone who was better equipped to do [it]," but was apparently told that she could not.  And

there is significant evidence that DaVita itself classified Ms. Navarro as both a facility

administrator _and_ an administrative assistant, logging her time separately in each job title.  Thus,

the Court finds that there is at least a genuine dispute as to whether Ms. Navarro's "primary

duty" was managerial, requiring denial of DaVita's summary judgment motion on this point.[13]

     2.  Breach of contract

---

[13]    The Court need not reach the question of whether DaVita is entitled to summary judgment on Ms. Navarro's individual claim under state law.  There is some dispute between the parties as to whether the Court's prior oral ruling bifurcating the state and federal claims **(# 92)** affects the individual Plaintiffs' state law claims.  The Court's bifurcation severed "the FLSA claims from the Rule 23 claims" – that is, the state law claims that the Plaintiffs intended to pursue _via a class action_.  It was not necessarily the Court's intention to forestall consideration of the named Plaintiffs' _individual_ state law claims, as the rationale for bifurcation focused solely on the difficulties of harmonizing the notice provisions of simultaneous FLSA collective actions and Rule 23 class actions, not on the difficulty of trying individual federal and state law claims together. Admittedly, the Court's supplemental Order **(# 130)** on this point was less precise, arguably staying _all_ state law claims, class-based _and_ individual, until the conclusion of the FLSA proceedings.

    In the interests of efficiency, it would seem to be appropriate to resolve _all_ of the named Plaintiffs' individual claims, state and federal, in one trial (or as few trials as possible, if joinder of the four named Plaintiffs is inappropriate).  But the Court need not resolve that question at this time.  Because there are genuine disputes of fact requiring trial on the question of whether Ms. Navarro is FLSA-exempt, the same rationale requires trial on the question of whether Ms. Navarro is exempt under the Colorado Wage Claim Act as well.  DaVita acknowledges that the analysis under both statutes is substantially similar, if not identical.

Finally, DaVita seeks summary judgment on the claim of each named Plaintiff for breach of contract. The named Plaintiffs's response brief indicates that the breach of contract claims arise from provisions in the DaVita employee handbook that require DaVita to pay employees for "any time worked." This quoted phrase, however, does not appear in the handbook excerpts relied upon by the named Plaintiffs in Docket # 203-50. Instead, it appears that the named Plaintiffs are relying on DaVita's statement of its policy of paying employees for "overtime at one-and one-half times their regular rate of pay for hours worked in excess of 40 for any workweek" (section 4.3 and 4.5) or its policy that "if it is necessary for non-exempt teammates to work during a meal period . . . then the meal period is considered time worked, and they will be compensated accordingly" (section 4.6). DaVita argues that the policies stated in the handbook do not constitute a contract because the handbook contains conspicuous and express disclaimer language stating that "the language used in these policies . . . are not intended to constitute a contract of employment" and that they "may be cancelled or modified at any time, at DaVita's sole discretion, without or without prior notice."

Under Colorado law, an employee asserting a contract claim based on an employee handbook is required to show that the employer's words or actions "manifested to a reasonable person an intent to be bound by the provisions" of the handbook. *Romstad v. City of Colo. Springs*, 650 Fed.Appx. 576, 580 (10th Cir. 2016), *citing Evenson v. Colo. Farm Bureau Mut. Ins. Co.*, 879 P.2d 402, 408-09 (Colo.App. 1993). However, a handbook will not create a contract "where a clear disclaimer of any contractual rights appears." *Id., citing Jaynes v. Centura Health Corp.*, 148 P.3d 241, 248 (Colo.App. 2006). Even if the Court were to assume that the DaVita handbook could be construed by a reasonable person to manifest contractual promises – notably, the cited language is phrased in mandatory, rather than suggestive or

aspirational, terms – it is undisputed that DaVita also has conspicuous language disclaiming any contractual intent.  As the 10th Circuit has explained, "it is settled law in Colorado that where, as here, the handbook contains such clear and conspicuous disclaimers, the handbook will not be construed as a contract. . . ."  *DeFazio v. Starwood Hotels & Resorts Worldwide, Inc.*, 554 F.ed.Appx. 692, 693 (10th Cir. 2014), *citing George v. Ute Water Conservancy Dist.*, 950 P.2d 1195, 1198 (Colo.App. 1997).

The named Plaintiffs' arguments to the contrary are unavailing.  They cite to two cases, *Baker v. Echostar Communications Corp.*, 2007 WL 428794 (D.Colo. Dec. 4, 2007), and *Duran v. Flagstar Corp.*, 17 F.Supp.2d 1195 (D.Colo. 1998), for the proposition that disclaimer language only operates to preserve an employee's <u>at-will status</u> over contractual claims to the contrary, not to negate all promises in the handbook.  Besides being non-binding on this Court, both of those cases were based on findings that the disclaimer language in question was contained in a provision that specifically addressed at-will employment, and thus concluded that the disclaimer should be limited to that issue.  Here, DaVita's disclaimer language is far broader than those in *Duran* and *Baker*.  It consists of three paragraphs.  The first is not particularly relevant.  The second, like the disclaimers in *Duran* and *Baker*, focus on disclaiming anything other than an at-will relationship.  But the third paragraph explains that the policies therein "have been provided to offer guidance in handling many issues, but the policies also allow for latitude in their application to individual circumstances or as the needs of our business may warrant. . . . Any policy may be cancelled or modified at any time, at DaVita's sole discretion, with or without prior notice."  The indication that the policies merely provide "guidance" and may be applied differently than stated in "individual circumstances or as the needs of our business may warrant" is much broader and more inclusive than the limited disclaimers regarding at-will status

in *Baker* and *Duran*.  Accordingly, the Court finds that DaVita is entitled to summary judgment on the named Plaintiffs' breach of contract claims.[14]

## <u>CONCLUSION</u>

For the foregoing reasons, DaVita's Motion to Decertify (**# 198**) is **GRANTED**.  The claims by the opt-in Plaintiffs are dismissed without prejudice, and only the claims by Plaintiffs Oldershaw, Navarro, Stant, and Stevens shall proceed to trial.[15]

DaVita's Motion for Summary Judgment (**# 199**) is **GRANTED IN PART AND DENIED IN PART**, insofar as DaVita is entitled to summary judgment on the Plaintiffs' breach of contract claims (and that the Plaintiffs' FLSA claims for failure to maintain records and Ms. Oldershaw's retaliation claims are deemed withdrawn and dismissed), and denied in all other respects.  DaVita's Motion to Strike (**# 209**) is **GRANTED IN PART AND DENIED IN PART** as set forth herein.  The parties shall begin preparation of a Proposed Pretrial Order consistent

---

[14]     Even if the contract claims were otherwise cognizable, the Court would be inclined to dismiss them as entirely duplicative of the Plaintiffs' statutory claims.  The contractual promise by DaVita to pay overtime for hours over 40 in a workweek is identical to DaVita's statutory obligations under the FLSA; the promise to pay employees for time spent working if called back to work during an otherwise off-the-clock break is identical to DaVita's obligations to pay employees for all time spent working under the Colorado Wage Claim Act.  C.R.S. § 8-4-101(14)(a)(I) (defining "wages" as "all amounts for labor performed by employees" and providing that, once determinable, "such amount shall be payable to the employee").  Thus, because an identical, cognizable statutory remedy exists for both of the Plaintiffs' ostensible contract claims, there is no reason to simultaneously entertain an entirely redundant contract claim.

[15]     For purposes of the Proposed Pretrial Order, the parties shall assume that the trial will encompass <u>all</u> individual claims by the named Plaintiffs, whether sounding in state or federal law.

with the directives in the to-be-issued Trial Preparation Order and shall jointly contact chambers to schedule a Pretrial Conference.

Dated this 4th day of February, 2019.

BY THE COURT:

_____
Marcia S. Krieger
Chief United States District Judge